ORIGINAL

"FILED"

1   MARC J. WINTHROP - State Bar No. 63218
    SEAN A. O'KEEFE - State Bar No. 122417
2   CHARLES LIU - State Bar No. 190513
    **WINTHROP COUCHOT**
3   **PROFESSIONAL CORPORATION**
    660 Newport Center Drive, 4th Floor
4   Newport Beach, CA 92660
    Telephone: (949) 720-4100
5   Facsimile:  (949) 720-4111

6   Proposed General Insolvency Counsel for
    Debtor And Debtor-in-Possession

7

03 MAY 20  PM 12: 06

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

BY:_____C4:_____DEPUTY

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                    **LOS ANGELES DIVISION**

11

12   In re:                           Case No. LA 03- 23620 -ER

13                                    Chapter 11 Proceeding

14   STROUDS ACQUISITION
     CORPORATION, a Delaware corporation,   **DEBTOR'S EMERGENCY MOTION FOR:**
15                                    **AN ORDER (i) APPROVING AND**
                                      **AUTHORIZING THE ASSUMPTION OF THE**
16            Debtor and             **AGENCY AGREEMENT, (ii) AUTHORIZING**
              Debtor-in-Possession.  **DEBTOR AND LIQUIDATING AGENT TO**
17                                    **CONDUCT GOING-OUT-OF-BUSINESS**
                                      **SALES, (iii) AUTHORIZING THE SALE OF**
18                                    **ASSETS FREE AND CLEAR OF LIENS,**
                                      **CLAIMS, AND OTHER INTERESTS, AND**
19                                    **(iv) GRANTING SECURITY INTEREST TO**
                                      **LIQUIDATING AGENT IN ACCORDANCE**
20                                    **WITH AGENCY AGREEMENT;**
                                      **MEMORANDUM OF POINTS AND**
21                                    **AUTHORITIES; DECLARATION OF SUSAN**
                                      **STOREY AND ALAN MAZURSKY IN**
22                                    **SUPPORT THEREOF**

23

24

25

26

27

28

19wae

#86486 v3 - Strouds Revised Mtn re GOB Sale
5/20/03 8:06 AM

# TABLE OF CONTENTS

**PAGE**

I.    SUMMARY OF MOTION ................................................................ 4

II.   BACKGROUND OF THE DEBTOR ................................................. 5
      A.    The Debtor ........................................................................ 5
      B.    The Debtor's Primary Secured Obligations ....................... 6
            1.    Fleet Facility ........................................................... 6
            2.    Equipment Loan ...................................................... 6
            3.    Mezzanine Loan Agreement ..................................... 6
                  a.    Preferred Stock Agreement ............................ 7
                  b.    Intercreditor Agreement ................................ 7
                  c.    Pledge Agreement .......................................... 7
            4.    The Subordinated Notes ........................................... 8
      C.    Debtor's Equity Holders .................................................... 8
      D.    Assets and Liabilities ........................................................ 9
      E.    Debtor's Financial Difficulties .......................................... 9

III.  THE DEBTOR'S CHAPTER 11 STRATEGY AND THE
      AGENCY AGREEMENT ............................................................. 10
      A.    Debtor's Chapter 11 Strategy ........................................... 10
      B.    The Agency Agreement .................................................... 11
      C.    The Impact upon Creditors ............................................... 12
      D.    The Debtor Believes this Is the Only Viable Alternative ..... 12

IV.   ASSUMPTION OF AGENCY AGREEMENT IS IN THE DEBTOR'S
      BEST INTERESTS ..................................................................... 13

V.    THE RELIEF SOUGHT IS WARRANTED UNDER SECTIONS 105(a) AND
      363(b) OF THE BANKRUPTCY CODE ......................................... 14

VI.   THE COURT SHOULD WAIVE COMPLIANCE WITH STATE AND
      LOCAL LAWS, RULES, AND ORDINANCES RESTRICTING GOB SALES .... 17

VII.  LEASE RESTRICTIONS REGARDING THE GOB SALES ARE
      UNENFORCEABLE ..................................................................... 21

VIII. THE COURT SHOULD AUTHORIZE THE SALE OF MERCHANDISE
      FREE AND CLEAR OF LIENS BASED ON THE SENIOR SECURED
      LENDERS' CONSENT ................................................................. 22

IX.   THE DEBTOR SHOULD BE AUTHORIZED TO GRANT SECURITY
      INTERESTS TO THE AGENT PURSUANT TO SECTION 364 OF THE
      BANKRUPTCY CODE BASED ON THE SECURED LENDERS' CONSENT .... 23

-i-

|  |  | **PAGE** |
|---|---|---|
| X. | THE DEBTOR SHOULD BE AUTHORIZED TO ABANDON OF CERTAIN PROPERTY IN CONNECTION WITH THE GOB SALES | 24 |
| XI. | THE TRANSFER OF MERCHANDISE UNDER THE AGENCY AGREEMENT SHOULD BE EXEMPT FROM ANY APPLICABLE STAMP OR SIMILAR TAX PURSUANT TO SECTION 1146(c) OF THE BANKRUPTCY CODE | 25 |
| XII. | WAIVER OF STAY ORDER | 26 |
| XIII. | REQUEST FOR SHORTENED TIME HEARING REGARDING FINAL APPROVAL OF THE AGENCY AGREEMENT AND RELATED RELIEF | 26 |
|  | A.   Request for Shortened Time Hearing on the Approval Order | 26 |
|  | B.   Proposed Notice Regarding Shortened Time Hearing | 27 |
| XIV. | CONCLUSION | 27 |

**EXHIBITS**

EXHIBIT "1"   Agency Agreement dated May 19, 2003, between the Agent and the Debtor
EXHIBIT "2"   Debtor's March 31, 2003 Balance Sheet
EXHIBIT "3"   Debtor's March 31, 2003 Income Statement
EXHIBIT "4"   Liquidation Analysis
EXHIBIT "5"   Cash Budget
EXHIBIT "6"   List of Stores

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

Alabama Surface Mining Comm'n v. N.P. Mining Co., Inc. (In re N.P. Mining Co., Inc.),
    963 F.2d 1449 (11th Cir. 1992) ................................................................................ 17

Baker & Drake, Inc. v. Public Service Commission of Nevada (In re Baker & Drake, Inc.),
    35 F.3d 1348 (9th Cir. 1994) .................................................................................... 18

Belculfine v. Aloa (In re Shenango Group, Inc.),
    186 B.R. 623 (Bankr. W.D. Pa. 1995) ...................................................................... 18

Borman's Inc. v. Allied Supermarkets Inc.,
    706 F.2d 187 (6th Cir. 1983),
    Cert. Denied 464 U.S.. 908 (1983)
    aff'd, 112 F.3d 633 (3d Cir. 1997) ...................................................................... 13, 14

Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),
    60 B.R. 612 (Bankr. S.D.N.Y. 1986) ........................................................................ 15

Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
    722 F.2d 1063 (2d Cir. 1983) ................................................................................... 15

Group of Institutional Investors v. Chicago, M. St. P., & P.R.R. Co.,
    318 U.S. 523 (1943) ............................................................................................ 13, 14

In re Ames Dep't Stores, Inc.,
    136 B.R. 357 (Bankr. S.D.N.Y. 1992) ................................................................. 15, 21

In re Amsterdam Ave. Development Associates,
    103 B.R. 454 (Bankr. S.D.N.Y. 1989) ...................................................................... 25

In re Boume Chem. Co.,
    54 B.R. 126 (Bankr. D.N.J. 1984) ............................................................................ 18

In re Corona Plastics, Inc.,
    99 B.R. 231 (Bankr. D.N.J. 1989) ............................................................................ 18

In re Fashion Two Twenty, Inc.,
    16 B.R.784 (Bankr. N.D. Ohio 1982) ................................................................. 13, 14

In re Federal Employees' Distributing Co. d/b/a FEDCO, Inc.,
    Case No. LA 99-35700 AA .................................................................................. 16

In re Hechinger Inv. Co. of Delaware, Inc.,
    254 B.R. 306 (Bankr. Dude. 2000) ........................................................................... 25

-iii-

1

**PAGE**

2

In re Jacoby- Bender, Inc.,

3
   758 F.2d 840 (2d Cir.1985) ................................................................. 25

4

In re Libson Shops, Inc.,
   24 B.R. 693 (Bankr. E.D. Mo. 1982) .......................................... 21, 22

5

In re Lopez Dev., Inc.,

6
   154 B.R. 607 n. 3 (Bankr.S.D.Fla.1993) ............................................ 25

7

In Re Minges,

8
   602 F.2d 38 (2d Cir. 1979) ....................................................... 13, 14

9

In re Permar Provisions, Inc.,
   79 B.R. 530 (Bankr.E.D.N.Y.1987) ................................................... 25

10

In re R. H. Macy & Co.,

11
   170 B.R. 69 (Bankr. S.D.N.Y. 1994) ................................................ 21

12

In re RLR Celestial Homes Inc.,

13
   108 B.R. 36 (Bankr. S.D.N.Y. 1989) ......................................... 13, 14

14

In re Smoss Enter. Corp.,
   54 B.R. 950 (E.D.N.Y.1985) .............................................................. 25

15

In re Tobago Bay Trading Co.,

16
   112 B.R. 463 (Bankr. N.D. Ga. 1990) ........................................ 21, 22

17

In re Walter,

18
   83 B.R. 14 (B.A.P. 9th Cir. 1988)............................................ 8, 15, 36

19

In re Wild Horse Enters., Inc.,
   136 B.R. 830 (Bankr. C.D. Cal. 1991) ............................................. 15

20

Krause's Custom Crafted Furniture Corp.,

21
   Case No. SA 01-16360 JB ................................................................. 16

22

Missouri Dep't of Natural Res. v. Valley Steel Prods. Co. (In re Valley Steel Prods. Co.),

23
   157 B.R. 442 (Bankr. E.D. Mo. 1993) .............................................. 18

24

Missouri v. United States Bankruptcy Court,
   647 F.2d 768 n.18 (8th Cir. 1981),

25
   vacated on other grounds, Lindsay v. Ipock,

26
   732 F.2d 619 (8th Cir. 1984) .................................................... 18, 20

27

Myers v. Martin (In re Martin),
   91 F.3d 389 (3d Cir. 1996) ............................................................... 15

28

**PAGE**

NLRB v. Bildisco and Bildisco,
  465 U.S. 513 (1984) ............................................................................................. 13, 14

Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),
  147 B.R. 650 (S.D.N.Y. 1992)
  (quoting Smith v. Van Gorkom, 488 A.2d 858 (Del. 1985)) ........................................ 15

Sharon Steel Corp. v. National Fuel Gas Distribution,
  872 F.2d 36 (3d Cir. 1989) ................................................................................... 13, 14

**Statutes**

11 U.S.C. § 105(a) ................................................................................................ 2, 14, 15
11 U.S.C. § 363 ................................................................................................................ 21
11 U.S.C. § 363(b) ................................................................................... 2, 14, 15, 20, 22
11 U.S.C. § 363(b)(l) ....................................................................................................... 15
11 U.S.C. § 363(e) ........................................................................................................... 21
11 U.S.C. § 363(f) ..................................................................................................... 22, 23
11 U.S.C. § 363(m) ............................................................................................................ 2
11 U.S.C. § 364 ............................................................................................................... 23
11 U.S.C. § 364(c)(3) ...................................................................................................... 23
11 U.S.C. § 364(d) ........................................................................................................... 24
11 U.S.C. § 365 ................................................................................................................. 2
11 U.S.C. § 365(a) ..................................................................................................... 13, 14
11 U.S.C. § 554(a) ........................................................................................................... 25
11 U.S.C. § 1129 ............................................................................................................. 25
11 U.S.C. § 1146(c) ........................................................................................................ 25
11 U.S.C. § 1146(c) ........................................................................................................ 25
28 U.S.C. § 959(b) .................................................................................................... 17, 18
Cal. Comm. Code § 6103 ................................................................................................ 19
Cal. Comm. Code § 6103(c)(7) ....................................................................................... 19
California Business & Professions Code § 17500 ........................................................... 19

**Other Authorities**

Ariz. Rev. Stat. Ann. § 47-6103 ..................................................................................... 19
Ariz. Rev. Stat. Ann. § 47-6103(c)(7) ............................................................................ 19
City of Las Vegas Municipal Code §§ 6.14.030
  (Ord. 3563 §§ 2, 5, (1991)), 6.14.160 (Ord. 3563 §§ 2, 18, (1991)) ........................ 19
City of Los Angeles Municipal Code §§ 7.40.030
  (Ord. 6472 § 3, 1954), 7.40.020 (Ord. 6472 § 3, 1954) ............................................ 19
City of San Bernardino Municipal Code § 5.16.030
  (Ord. MC-460, part 1861 (5-13-85)) ......................................................................... 19

**PAGE**

**Rules**

Federal Rule of Bankruptcy Procedure 2002 ................................................................................. 27
Federal Rule of Bankruptcy Procedure 6004(g) ............................................................................. 26
Federal Rule of Bankruptcy Procedure 9014 ................................................................................... 2

**Regulations**

California Code of Regulations § 1312 ............................................................................................ 19

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:06 AM

1    **TO THE HONORABLE _____, UNITED STATES**

2    **BANKRUPTCY JUDGE, THE TWENTY LARGEST UNSECURED CREDITORS AND**

3    **THE OFFICE OF THE U.S. TRUSTEE:**

4        Pursuant to Bankruptcy Code Sections 363(b) and 105(a) and Federal Rule of Bankruptcy

5    Procedure 9014, Strouds Acquisition Corporation, a Delaware corporation, the debtor and debtor-

6    in-possession herein (the "Debtor") hereby moves this Court for an order granting the following

7    relief:

8        The entry of an order granting the following relief:

9          1.    Authorizing the Debtor to Assume the Agency Agreement pursuant to

10   Section 365 of the Bankruptcy Code.

11         2.    Approving the Agency Agreement;

12         3.    Authorizing the Debtor and the Agent to conduct going-out-of-business

13   sales (the "GOB Sales") at each of the Debtor's retail stores pursuant to the terms of the Agency

14   Agreement;

15         4.    Authorizing the sale of substantially all assets of the estate free and clear

16   of liens, claims, and other interests;

17         5.    Finding that the sale of assets proposed herein is a good faith sale and

18   consequently the Agent is entitled to all of the protections set forth in 11 U.S.C. § 363(m);

19         6.    Granting a security interest to the Agent in accordance with the Agency

20   Agreement; and

21         7.    Authorizing the Debtor to abandon FF&E (the "Approval Order").

22        This Motion is based on the attached Memorandum of Points and Authorities, the

23   Declarations of Alan Mazursky (the "Mazursky Declaration") and Susan L. Storey (the "Storey

24   Declaration"), all papers and records in the Debtor's Chapter 11 case, all matters of which this

25

26

27

28

1    Court may take judicial notice and such further evidence and argument that may be presented to

2    the Court at or before any hearing on this matter.

3    DATED: May 20, 2003                    **WINTHROP COUCHOT**

4                                           **PROFESSIONAL CORPORATION**

5                                           By: _____

6                                                Marc J. Winthrop
                                                 Sean A. O'Keefe
7                                                Robert W. Pitts
                                                 Charles Liu
8                                           [Proposed] General Insolvency Counsel for
                                            Debtor and Debtor-in-Possession
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

## MEMORANDUM OF POINTS AND AUTHORITIES

### I

### SUMMARY OF MOTION

The Debtor is a specialty retailer of bed, bath, tabletop and other home textile products. It operates a chain of forty-seven retail stores. Like many other participants in the retail homeware sector, the Debtor business has been severely impacted by the national recessionary trend that developed during the first quarter of 2001, and which continued throughout the year. Although the Debtor's has endeavored to address its business problems, these efforts were impaired by a lack of working capital, the decline in store inventories caused by this lack of buying power, and poor external economic conditions. During the ten month period ending March 31, 2003, the Debtor suffered a net loss of approximately ($8,800,000).

The Debtor filed the instant Chapter 11 proceeding on May 20, 2003 (the "Petition Date") to effectuate a controlled but expedited liquidation of the Debtor's assets. This controlled liquidation will be implemented through a template that has been successfully employed by a number of other prominent retailers in Chapter 11 proceedings throughout the country (most recently House2Home, but also HomePlace, Inc., Montgomery Wards, Three D Bed & Bath). In summary, the agency arrangement proposed herein allows a liquidating agent to sell substantially all of the Debtor's inventory through its existing chain of stores, with the agent paying the associated sales costs. Under the proposed contractual arrangement the liquidating agent will guarantee the payment of fixed percentage for the Debtor's inventory, with the Debtor having additional participatory rights if certain sales levels are achieved.

At the conclusion of the sale process proposed herein, the Debtor will then liquidate the remainder of its assets to the extent they have value. The Debtor believes that the proceeds from this liquidation effort will be sufficient to retire all valid secured claims, and that there is reasonable possibility that sufficient funds will be available to pay a small dividend to unsecured creditors through a liquidating plan. *However, there is no assurance that such a dividend will be possible.* Any future dividend to unsecured creditors will depend upon the amount of the secured,

-4-

1  priority and administrative claims, the amount payable under the Agency Agreement, and the

2  funds generated from the sale of the Debtor's remaining assets.

3  　　　The Debtor is seeking the relief sought herein on an emergency basis because it has no

4  other option. The Debtor is all but completely out of the cash. It lacks the funds to pay anything

5  but a skeleton crew of employees, and it cannot pay the expenses associated with ongoing

6  operations. But for the limited financial support being made available by the Debtor's secured

7  creditors it would have to cease operations immediately. Emergency relief is also appropriate

8  because the Debtor's potential yield under the Agency Agreement improves if the sale is initiated

9  sooner, and with the fast approaching Memorial Day sale window, the Debtor has a unique

10  opportunity to jump start its sale effort. In summary, the Debtor believes that prompt judicial

11  relief will avoid a costly closure and enable the Debtor to obtain the highest yield for creditors.

12  **II**

13  **BACKGROUND OF THE DEBTOR**

14  　　　A.　　**The Debtor.** The Debtor is a specialty retailer of bed, bath, tabletop and other

15  home textile products in the United States. It stores offer an extensive selection of high quality,

16  brand name as well as private-label merchandise for the home environment. The breadth and

17  depth of linen category merchandise in the Debtor's stores exceeds what is generally available in

18  department stores, and is more comprehensive than what is available in most other specialty

19  stores.

20  　　　The Debtor markets it wares through a chain of 47 full-line stores and outlets that are

21  located primarily in California. However, it also has stores in Nevada, Minnesota and Arizona.

22  The Debtor's stores sell primarily brand name and private-label merchandise, while its outlet

23  stores carry discounted overruns, closeouts, and specialty products. The Debtor also sells it wares

24  through catalogs and its website. The Debtor's corporate office is located in the City of Industry,

25  California. Prior to the Petition Date, the Debtor employed approximately 870 persons.

26  　　　The Debtor was formed in March 2001 to acquire substantially all the assets of Strouds,

27  Inc., from a bankruptcy proceeding that Strouds filed in the District of Delaware in September of

28  2001. Strouds, Inc., was a major regional player in the house wares industry at the time of its

-5-

1  Chapter 11 filing. The Debtor made this acquisition believing that it could improve upon

2  Stroud's business model, and exploit what management perceived to be a viable niche in the

3  homeware market.

4        **B.**    **The Debtor's Primary Secured Obligations**. The Debtor is a party to four

5  primary secured loan arrangements. Each of these arrangements is discussed below.

6              1.    <u>Fleet Facility</u>. The Debtor and Fleet Retail, Inc., a Delaware corporation

7  ("Fleet") are parties to that certain *Loan And Security Agreement* dated April 26, 2001 (the "Fleet

8  Facility"). The Fleet Facility is a revolving credit agreement that was structured to provide the

9  Debtor working capital for operations. As of the Petition Date the outstanding balance on the

10  Fleet Facility was approximately $17,000,000. Pursuant to the terms of the Fleet Facility, and the

11  UCC-1 forms filed in support thereof, all funds advanced under the Fleet Facility are secured by a

12  first priority lien on all property of the Debtor. FCCG holds a $2 million junior participation in

13  the Fleet Facility.

14              2.    <u>Equipment Loan</u>. On July 30, 2002, the Debtor and the Bank of Hemet

15  entered into that certain *Business Loan Agreement* (the "Hemet Loan Agreement") and related

16  *Commercial Security Agreement*. Pursuant to the Hemet Loan Agreement, Hemet loaned the

17  Debtor the sum of $1,600,000 to acquire certain furniture, fixtures and equipment utilized in the

18  Debtor's operations (the "Hemet FF&E"). All proceeds advanced under the Hemet Loan

19  Agreement are secured by a first priority lien against the Hemet FF&E. As of the Petition Date

20  the approximate sum of $1,400,000 was owed under the terms of the Hemet Loan Agreement.

21              3.    <u>Mezzanine Loan Agreement</u>. On March 5, 2003, the Debtor as borrower,

22  and FCCG, Cruttenden and The Yogananda Foundation ("TYF") as lenders (collectively the

23  "Mezzanine Lenders"), entered into that certain *Loan Agreement* (the "Mezzanine Loan

24  Agreement") and related *Security Agreement*. Pursuant to the terms of this agreement, each of the

25  Mezzanine Lenders agreed to loan the Debtor certain fixed amounts in two "stages". The "Stage

26  1" loan amounts were the following: FCCG loaned the Debtor $900,000 (the "FCCG Senior

27  Mezzanine Note"); Cruttendon loaned the Debtor $1.9 million and TYF agreed to Loan the Debtor

28

-6-

1    $1,000,000 (the "Junior Mezzanine Notes"). The Junior Mezzanine Notes (and the liens securing

2    them) are expressly subordinated to the FCCG Senior Mezzanine Note.

3        All of the Stage 1 loan amounts have been advanced by the Mezzanine Lenders,

4    resulting in a principal indebtedness of $3,800,000, of which $900,000 in principal amount is

5    senior and the remainder subordinated. The Stage 2 loan amounts have not been advanced.

6    Pursuant to the terms of the terms of the Security Agreement and the UCC-1 forms filed in support

7    thereof, all funds advanced under the Mezzanine Loan are secured by a second priority lien

8    against all property of the estate. FCCG, the holder of the FCCG Senior Mezzanine Note is the

9    collateral agent for the Mezzanine Lenders.

10        Concurrently with the execution of the Mezzanine Loan Agreement, the parties

11    thereto entered into certain related agreements. These included but were not limited to the

12    following:

13        a.   Preferred Stock Agreement. On March 5, 2003, the Debtor, as issuer, and

14    FCCG and Cruttenden, as purchasers, entered into that certain *Series 1 Preferred Stock*

15    *And Warrant Purchase Agreement* (the "Preferred Stock Agreement"). Pursuant to the

16    Preferred Stock Agreement, FCCG and Cruttenden each acquired 1,000,000 shares of

17    Series 1 Preferred Stock in the Debtor for a purchase price of $.10 per share, and received

18    therewith warrants entitling each party to acquire 23,191,739 shares of common stock in

19    the Debtor for a price of $.001 per share.

20        b.   Intercreditor Agreement. On March 5, 2003, FCCG, Cruttenden, TYF and

21    the Debtor entered into that certain *Intercreditor Agreement* pursuant to which Cruttenden

22    and TYF agreed that repayment of any and all obligations owed to such parties by the

23    Debtor would be subordinated to the payment in full of all obligations owed to FCCG by

24    the Debtor.

25        c.   Pledge Agreement. On or about March 5, 2003, Cruttenden pledged all of

26    his stock ownership in the Debtor and his Junior Mezzanine Note to FCCG as additional

27    security for the repayment of the obligations owed to FCCG under the Mezzanine Loan

28    Agreement.

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:06 AM

4.      The Subordinated Notes. On April 26, 2001, the Debtor executed that certain *10% Subordinated Promissory Note Due 2004* in the original principal amount of $4,000,000 (the "Cruttenden Subordinated Note") in favor of Cruttenden, and Cruttenden concurrently loaned the Debtor the sum of $4,000,000 referenced therein. Concurrently, the Debtor executed a second *10% Subordinated Promissory Note Due 2004* in favor of TYF in the original principal amount of $1,000,000 (the "TYF Subordinated Note"), and TYF concurrently loaned the Debtor the sum of $1,000,000 referenced therein. On July 31, 2002, Cruttenden acquired all of TYF rights in the TYF Subordinated Note.

The obligations in the Cruttenden Subordinated Note and in the TYF Subordinated Note were not originally secured. However, on January 17, 2003, the Debtor executed a UCC-1 in favor of Cruttenden to secure all obligations owed under these notes.

On March 5, 2003, the Cruttenden Subordinated Note was modified to increase the principal balance thereof from $4,000,000 to $4,437,390.11 and to reduce the interest rate to 5%. This increment represented the unpaid dividends that the company owed Cruttenden as the holder of the Series B Preferred Stock.

The following table summarizes the foregoing information, and lists the approximate balances owed on these loan positions as of the Petition Date:

| Lender | Loan Agreement | Approx. Principal Balance As of Petition Date |
|---|---|---|
| Fleet | Fleet Facility | $17,000,000 |
| FCCG | Mezzanine LoanAgreement | $900,000 |
| Junior Mezzanine Notes | Mezzanine Loan Agreement | $3,900,000 |
| Cruttenden | Subordinated Notes | $5,437,390 |

C.      **Debtor's Equity Holders.** Walter Cruttenden, III ("Cruttenden") and related entites own over 95% of the Debtor's outstanding common stock. Cruttenden and Fog Cutter Capital Group Inc. ("FCCG") each own 49.5% of the Debtor's Series 1 Preferred Stock. The Debtor board has five directors three of whom were designated by FCCG in accordance with its rights as a preferred shareholder. The other two members were appointed by Cruttenden (one of whom is Cruttenden).

1       **D.**    **Assets And Liabilities.**  Attached to the Mazursky declaration as Exhibit "2" is

2   the Debtor's March 31, 2003 balance sheet.  In summary, this balance sheet reflects

3   approximately $37,000,000 in assets and $44,900,000 in liabilities.  Approximately, $27,600,000

4   of the $44,900,000 in liabilities represents secured claims, and these claims would be paid first

5   from the proceeds of the liquidation, subject to the following to possible exceptions.  First, as

6   more fully explained above, the UCC-1 form filed with respect to the Subordinated Notes claim,

7   which comprises approximately $5,400,000 of the $27,600,000 secured claim total referenced

8   above, was filed in January of 2003, approximately 18 months after these notes were executed.

9   Accordingly, the secured status of these claims may be contested.  Second, the Equipment Loan in

10  favor of the Bank of Hemet is secured by certain itemized furniture, fixtures and equipment

11  purchased using the Hemet loan.  Accordingly, this creditor's secured claim would only have a

12  preference as to the proceeds generated from the sale of these particular items of equipment.

13       **E.**    **Debtor's Financial Difficulties.**  The Debtor's financial difficulties were

14  primarily caused by declining sales.  Macroeconomic conditions began to deteriorate in the first

15  quarter of 2001, and this trend continued throughout the year.  This downtrend coupled with the

16  Debtor's existing overcapacity, had a severe impact upon the Debtor's operating results.  As a

17  result of these problems, and the Debtor's poor fourth quarter 2002 results, the Debtor was unable

18  to meet its obligations under the Fleet Facility. To address its defaults under the terms of the Fleet

19  Facility, the Debtor entered into an agreement with Fleet pursuant to which Fleet agreed to waive

20  the Debtor's defaults in consideration for certain concessions. These concessions required the

21  Debtor (i) to operate under a strict budget that assumed a workout with trade creditors, (ii) to

22  refrain from paying any then outstanding indebtedness to trade creditors, and (iii) to obtain a

23  significant infusion of new working capital (the "Forbearance Agreement").

24       Pursuant to the Forbearance Agreement, in early 2003, the Debtor and its trade creditors

25  agreed to an out of court workout pursuant to which each trade creditor agreed to accept either

26  (1) installments totaling 40% of its claim with no prospect of further recovery and no further

27  business with the Debtor or (2) the promise of future orders from the Debtor, with each new

28  order being paid at 110% of the invoice amount until 70% of the pre-existing claim was paid.

1   Also in early 2003, the Debtor obtained commitments for new working capital in the form of a

2   combination of debt and equity from Cruttenden and FCCG.  As explained above, in March

3   2003, Cruttenden loaned the Debtor $1,900,000, FCCG loaned the Debtor $900,000, and The

4   Yogananda Foundation agreed to loan the Debtor $1,000,000 under the terms of the Mezzanine

5   Loan Agreement.

6          Unfortunately, the foregoing efforts were not sufficient.  Due to the Debtor's financial

7   difficulties it was unable to replenish its inventories on a timely basis.  This severely impacted

8   sales.  Although the Debtor recently initiated a costly Spring advertising promotion, the

9   unanticipated consequences of the war in Iraq rendered this campaign largely ineffective.

10   Continued operational losses and the lack of available capital forced the Debtor to file the instant

11   Chapter 11 proceeding in an effort to preserve and maximize the remaining value of its assets.

12                                             **III**

13           **THE DEBTOR'S CHAPTER 11 STRATEGY AND THE AGENCY AGREEMENT**

14          A.    **Debtor's Chapter 11 Strategy.**  Shortly before the Petition Date, the Debtor and

15   its financial advisors explored various strategic and financial alternatives, such as a going concern

16   sale or an internal reorganization.  However, the Debtor was unable to secure an offer for the

17   company as a going concern, and it was unable to secure the necessary infusion of capital to fund

18   an internal turnaround, assuming such a turnaround were even possible.

19          Given these facts, the Debtor was forced to explore various controlled liquidation options.

20   To assist the Debtor in this process of selecting and structuring the most favorable the Debtor

21   employed the services of Traub, Bonacquist & Fox, LLP, a law firm with expertise in this area.

22   With the assistance and advice of TB&F, the Debtor prepared a package of information for the

23   liquidation firms and solicited bids for this liquidation.  On May 15, 2003, the Debtor entered into

24   a Stalking Horse Agency Agreement with the joint venture of Tiger Capital Group, LLC, SB

25   Capital Group LLC and The Ozer Group LLC (collectively, the "Joint Venture"), which Stalking

26   Horse Agreement served as a basis upon which all bids submitted at the Auction were based.

27   The Stalking Horse Agreement also provided that in the event that the Joint Venture was not the

28   successful bidder at the auction, as compensation to the Joint Venture for the costs and expenses

-10-

1   incurred in connection with the negotiation of the Stalking Horse Agency Agreement, the Joint

2   Venture would be entitled to receive a Break-Up Fee in the amount of $75,000, plus

3   reimbursement of reasonable out-of-pocket expenses in an amount not to exceed $25,000.

4   Thereafter, the Debtor conducted an auction among all interested liquidating agents and secured

5   the most favorable offer , which is reflected in the Agency Agreement attached as Exhibit "1" to

6   the Storey Declaration, which resulting the Joint Venture being the successful bidder at the

7   Auction (hereinafter referred to as "Agent").

8         **B.**    <u>**The Agency Agreement**</u>. All creditors and parties in interest are urged to read the

9   Agency Agreement in its entirety, and all statements herein are expressly subject to and controlled

10  by the terms of the attached agreement.  However, in summary, the Agency Agreement provides

11  that the Agent will serve as the Debtor's sole and exclusive agent for the purpose of conducting

12  store closing or "going out of business" sales at the Debtor's stores.  The Agent will conduct these

13  sales in accordance with the Sale Guidelines attached to the Agency Agreement as Exhibit 8.1.

14  The Agent will sell the Debtor's inventory through these sales, and will pay the associated sale

15  expenses, including the per diem store level rents, the wages payable to the store level employees

16  retained to work on the sale, and the associated advertising costs.

17        Pursuant to the terms of the Agency Agreement, on or before May 22, 2003, to secure

18  Agent's performance under the Agency Agreement, the Agent will deliver to the Debtor an

19  irrevocable standby letter of credit in the amount of 15% of the Estimated Guaranteed Amount

20  (the "Guaranty L/C") and an irrevocable standby letter of credit in an amount equal to two (2)

21  weeks estimated Expenses.  Until the entry of the Approval Order proceeds from the sale of

22  inventory by means of the Agent run promotional sales shall first be applied to pay "Expenses"

23  and the towards the Guaranteed Amount.  Thereafter, on the first business day following the entry

24  of the Approval Order, Agent shall tender payment in cash an amount equal to (i) eighty-five

25  percent (85%) of the Guaranteed Amount, less (ii) the amount of proceeds generated by the

26  promotional sale that is applied towards the Guaranteed Amount.  Pursuant to Section 3.1(a) of

27  the Agency Agreement, the Guaranteed Amount is equal to 50.5% of the aggregate "Retail Price"

28  (as such term is defined in the Agency Agreement) of the Debtor's  inventory.  Since there are

-11-

1  various pricing adjustments and inventory qualifications provided for in the Agency Agreement, it

2  is difficult for the Debtor to predict the exact payment that the estate will receive in the form of

3  the Guaranteed Amount. However, using the minimum inventory threshold of at least $49.5

4  million (at retail) that the Debtor estimates to be on hand, the Debtor estimates that the

5  Guaranteed Amount will be approximately $24,623,000. As set forth above, 85% of the

6  Guarnateed Amount will be paid within two business days after entry of the Approval Order, and

7  the balance is payable within thirty days after the commencement of the sale, but subject to the

8  completion of an agreed upon inventory and accounting.

9       The amount of the Recovery Amount payable to the estate under the Agency Agreement is

10  entirely contingent upon the results of the sale effort. Under the formula in the Agency

11  Agreement, if the proceeds generated from the sale effort exceed the Guaranteed Amount, plus

12  the Agent's fee of 2% of the inventory, plus all expenses of the sale, then the Debtor will receive

13  50% of this excess and the Agent receives 50%. The Debtor cannot speculate as to the amount of

14  the Recovery Amount, if anything. This sum will be determined after the completion of the sale

15  and paid after the completion of the necessary accounting.

16       **C.**    **The Impact Upon Creditors**. The relief sought in this motion will result in the

17  disposition of substantially all of the assets of the estate. The remaining assets will be the

18  Debtor's real estate leases, the unencumbered furniture, fixtures and equipment at is corporate

19  location, any cash on hand net of the estates expenses, and assuming payment of the secured

20  claims. Since the exact amount payable pursuant to the Agency Agreement cannot be precisely

21  quantified, and the costs of completing the Chapter 11 effort may vary depending upon a number

22  of factors, it is difficult for the Debtor to predict exactly what funds will be available to pay the

23  claims of creditors. However, notwithstanding these limitations the Debtor's have endeavored to

24  develop a preliminary liquidation analysis. This analysis is attached to the Storey Declaration as

25  Exhibit "4". In summary, this analysis provides a range of potential distribution levels based

26  upon certain assumptions.

27       **D.**    **The Debtor Believes This Is The Only Viable Alternative**. In an effort to secure

28  the highest value for the assets of the Debtor, the Debtor's management made all reasonable effort

1    to sell the Debtor as a going concern prior to the Petition Date. It also endeavored to secure

2    additional financing for the Debtor's operations in an effort to finance the costs of an internal

3    reorganization. Unfortunately, neither of these effort was successful. At this juncture the Debtor

4    is virtually out of cash, and it continues to operate at monthly cash loss. Accordingly, the

5    proposed controlled liquidation herein represents not only the best opportunity for obtaining the

6    highest yield on the assets of the estate, but the only prudent and even possible course given the

7    Debtor's severe financial condition.

8                                                    **IV**

9                            **ASSUMPTION OF AGENCY AGREEMENT**

10                           **IS IN THE DEBTOR'S BEST INTERESTS**

11          Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor, "subject to

12   the court's approval, may assume or reject an executory contract or an unexpired lease." See

13   Borman's Inc. v. Allied Supermarkets Inc., 706 F.2d 187, 189 (6th Cir. 1983), cert. Denied 464

14   U.S.. 908 (1983). The assumption or rejection of executory contracts by a debtor is subject to

15   review under the business judgment standard. If such business judgment has been reasonably

16   exercised, a court should approve the assumption or rejection. See, e.g., NLRB v. Bildisco and

17   Bildisco, 465 U.S. 513, 523 (1984); Group of Institutional Investors v. Chicago, M. St. P., &

18   P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. National Fuel Gas Distribution, 872 F.2d

19   36, 39-40 (3d Cir. 1989); In re Minges, 602 F.2d 38, 42 (2d cir. 1979); In re RLR Celestial Homes

20   Inc., 108 B.R. 36, 46 (Bankr. S.D.N.Y. 1989); In re Fashion Two Twenty, Inc., 16 B.R.784, 787

21   (Bankr. N.D. Ohio 1982).

22          In the Debtor's business judgment, it is in the best interests of the Debtor's estates to

23   assume the Agency Agreement. As stated above, the Agency Agreement will enable the Debtor to

24   use the services of a liquidator to conduct Closing Sales, and ultimately close the Designated

25   Stores without the resulting distraction attendant to the Debtor having to conduct the store closing

26   process on its own. By assuming the Agency Agreement, the Debtor will be able to continue the

27   process of conducting Closing Sales, closing Designated Stores and rejecting leases related thereto

28   as quickly and efficiently as possible and without interruption, and the associated damage to the

1  reorganization effort that would undoubtedly result therefrom.  The Debtor further believe that

2  they can maximize the value of the inventory located within the Designated Stores and certain of

3  their inventory located elsewhere by conducting the Closing Sales with the assistance of the

4  Agent.A.          Assumption of Agency Agreement is in the Debtor's Best Interests

5          Section 365(a) of the bankruptcy code provides, in relevant part, that a debtor, "subject to

6  the court's approval, may assume or reject an executory contract or an unexpired lease."  See

7  Borman's Inc. V. Allied Supermarkets Inc., 706 F.2d 187, 189 (6th Cir. 1983), cert. denied 464

8  U.S. 908 (1983).  The assumption or rejection of executory contracts by a debtor is subject to

9  review under the business judgment standard.  If such business judgment has been reasonably

10 exercised, a court should approve the assumption or rejection.  See, e.g., NLRB v. Bildisco and

11 Bildisco, 465 U.S. 513, 523 (1984); Group of Institutional Investors v. Chicago, M. ST. P., &

12 P.R.R. Co., 318 u.s. 523 (1943); Sharon Steel Corp. V. National Fuel Gas Distribution, 872 F.2d

13 36, 39-40 (3d cir. 1989); In re Minges, 602 F.2d 38, 42 (2d Cir. 1979); In re RLR Celestial Homes

14 Inc., 108 B.R. 36, 46 (Bankr. S.D.N.Y. 1989); In re Fashion Two Twenty, Inc., 16 B.R. 784, 787

15 (Bankr. N.D. Ohio 1982).

16         In the Debtor's business judgment, it is in the best interests of the Debtor's estates to

17 assume the Agency Agreement.  As stated above, the Agency Agreement will enable the Debtor to

18 use the services of a liquidator to conduct closing sales, and ultimately close the Stores without the

19 resulting distraction attendant to the Debtor having to conduct the store closing process on its own.

20 By assuming the Agency Agreement, the Debtor will be able to continue the process of conducting

21 closing sales as quickly and efficiently as possible and without interruption, and the associated

22 damage to the liquidation effort that would undoubtedly result therefrom.  The Debtor further

23 believes that it can maximize the value of the inventory located within the Stores and certain of

24 their inventory located elsewhere by conducting the Closing Sales with the assistance of the Agent.

25                                              V

26              **THE RELIEF SOUGHT IS WARRANTED**

27      **UNDER SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE**

28 Section 363(b)(l) of the Bankruptcy Code provides:

-14-

1      The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

2    11 U.S.C. § 363(b)(l); See, In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y.

3    1992) (noting that "going-out-of-business" sales are governed by section 363(b)).  Further, section

4    105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or

5    judgment that is necessary or appropriate to carry out the provisions of this title."  Id. § 105(a)

6      To obtain court approval to use property under section 363(b) of the Bankruptcy Code for

7    the purpose of a store closing sale, the Debtor need only show a legitimate business justification

8    for the proposed action.  See, e.g., Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel

9    Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); Myers v. Martin (In re Martin), 91 F.3d 389, 395

10    (3d Cir. 1996); In re Wild Horse Enters., Inc., 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); In re

11    Walter, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988).  "Where the debtor articulates a reasonable basis

12    for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will

13    generally not entertain objections to the debtor's conduct."  Committee of Asbestos-Related

14    Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr.

15    S.D.N.Y. 1986).  When a valid business justification exists, the law vests the debtor's decision to

16    use property out of the ordinary course of business with a strong presumption "'that in making a

17    business decision the directors of a corporation acted on an informed basis, in good faith and in

18    the honest belief that the action taken was in the best interests of the company.'"  Official Comm.

19    of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650,

20    656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

21    Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-

22    interest or gross negligence."  Integrated Res., 147 B.R. at 656 (citations omitted).  Ample

23    business justification exists in this case.

24      The Debtor has determined that closure of its stores is both appropriate and absolutely

25    necessary.  In order to maximize the value of the merchandise located at the stores, the Debtor

26    entered into the Agency Agreement.  Approval of the Agency Agreement will provide the Debtor

27    with several benefits: First, allowing the Agent, a nationally-recognized professional liquidator, to

28    sell the inventory at the stores through GOB Sales will enable the Debtor to maximize the sale

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:06 AM

1    proceeds generated from the inventory, to minimize the costs of this effort, and it will allow

2    management the time to focus on the balance of the wind-down effort (such as the need to

3    efficiently and expeditiously dispose of their real estate leasehold interests).  Second, the Agency

4    Agreement also allows the Debtor to essentially shift the "risk of loss" associated with the GOB

5    sales to the Agent, thereby minimizing the estate's downside.

6        The Debtor also believes the terms of the Agency Agreement are not only fair and

7    reasonable, because they were generated through a professional marketing effort, and the final

8    contract was derived from a competitive auction process.  It is also true that the concept set forth

9    in the Agency Agreement is not only familiar to the bankruptcy courts in this District, but has

10    actually been approved by Court's in this district on a number of occasions.  See, e.g., In re

11    Federal Employees' Distributing Co. d/b/a FEDCO, Inc., Case No. LA 99-35700 AA; Krause's

12    Custom Crafted Furniture Corp., Case No. SA 01-16360 JB.

13        It is essential that the store sales commence as quickly as possible for a number reason

14    including the Debtor's inability to continue operations at the stores without the intervention of the

15    Agent, the daily decline in the Debtor's inventory totals, and the critical need to take full

16    advantage of the Memorial Day sales window.  In the face of this exigency the Debtor is

17    requesting that the Court schedule an expedited hearing on the relief requested in the within

18    Motion as soon as possible, but in no event later than May 23, 2003, In the even that the Court

19    does not enter an Approval Order approving the Agency Agreement on or before  May 23, 2003,

20    the Agency Agreement provides that the Guaranty Percentage Amount payable to Merchant under

21    the Agency Agreement is reduced by 1%, which translates to approximately $500.00.  If the

22    Approval Order is not entered by May 30, 2003, the Guaranty Percentage is reduced by another

23    1% or $500,000, and if it is not entered by June 6, 2003, the Agent can terminate the Agency

24    Agreement.

25        Each of the stores contains significant levels of inventory that will be subject to the sale.

26    (It is also possible that the Agent will sell certain of the Debtor's FF&E, if requested by the

27    Debtor.)  The Debtor estimates that the retail price of the merchandise will aggregate in excess of

28    $49.5 million.  The realization of fair value for these assets as promptly as possible will inure to

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:06 AM

1    the benefit of all parties in interest. Therefore, the Agency Agreement provides that until the

2    Approval Order is entered, the sales at the stores shall be promotional in nature, but upon entry of

3    the Approval Order, these promotional sales will be converted to GOB Sales. Conversion of the

4    promotional sales to GOB Sales will help increase the ultimate sale proceeds and increase the

5    possibility that the Debtor will be able to obtain a larger payment from this sales effort. In

6    summary, in the instant case, ample business justification exists to merit authorization of the GOB

7    Sales and the retention of the Agent to supervise and conduct the GOB sales.

8                                                    **VI**

9       **THE COURT SHOULD WAIVE COMPLIANCE WITH STATE AND LOCAL LAWS,**

10           **RULES, AND ORDINANCES RESTRICTING GOB SALES**

11           The state or localities in which the stores are located may have licensing requirements,

12    statutory or regulatory waiting periods, and/or time limits which would normally affect the

13    conduct of going-out-of-business or other similar store closing sales. The Debtor has not

14    conducted a comprehensive study of such requirements for the state and for every city and town in

15    which a store is located. Certain of the statutes and regulations may provide that if a going-out-of-

16    business sale is authorized by a bankruptcy or other court, then a debtor need not comply with

17    certain regulatory policies or requirements. Some of these localities may also have statutes or

18    regulations requiring creditor notification before bulk sales are conducted. In a bankruptcy case,

19    however, where creditors receive advance notice of the proposed sale and an opportunity to be

20    heard, the application of such statutes and regulations would be redundant and unnecessary.

21           As a general matter, under 28 U.S.C. § 959(b), a debtor-in-possession must "manage and

22    operate the property . . . according to the requirements of the valid laws of the state in which such

23    property is situated . . . ." Courts, however, have held that a debtor-in-possession that is

24    liquidating estate assets does not "manage and operate" the property for the purposes of section

25    959(b). See Alabama Surface Mining Comm'n v. N.P. Mining Co., Inc. (In re N.P. Mining Co.,

26    Inc.), 963 F.2d 1449, 1458, 1460-61 (11th Cir. 1992) (holding that section 959(b) does not apply

27    when debtor-in-possession is liquidating property and not operating business); Missouri v. United

28    States Bankruptcy Court, 647 F.2d 768, 778 n.18 (8th Cir. 1981) (same), vacated on other

-17-

1    grounds, Lindsay v. Ipock, 732 F.2d 619 (8th Cir. 1984); Missouri Dep't of Natural Res. v. Valley

2    Steel Prods. Co. (In re Valley Steel Prods. Co.), 157 B.R. 442, 447-48 (Bankr. E.D. Mo. 1993)

3    (same); In re Corona Plastics, Inc., 99 B.R. 231, 235-36 (Bankr. D.N.J. 1989) (same); In re Bourne

4    Chem. Co., 54 B.R. 126, 135 (Bankr. D.N.J. 1984) (holding that "[s]ection 959(b) is applicable

5    only where the property is being managed or operated for the purpose of continuing operations").

6    Because the Debtor seeks to liquidate the inventory and close the stores completely, section

7    959(b) does not require compliance with the state and local licensing procedures and other

8    regulations, especially when the Debtor will conduct the GOB Sales with the knowledge and

9    oversight of the creditors and this Court.

10    At least one bankruptcy court has explicitly recognized that federal bankruptcy law

11    preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.

12    Belculfine v. Aloa (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995)

13    ("[t]rustees and Debtor-in-possession have unique fiduciary and legal obligations pursuant to the

14    bankruptcy code. . . [A] state statute[] cannot place burdens on them where the result would

15    contradict the priorities established by the federal bankruptcy code"), aff'd, 112 F.3d 633 (3d Cir.

16    1997).  While preemption of state law is not always appropriate, see Baker & Drake, Inc. v. Public

17    Service Commission of Nevada (In re Baker & Drake, Inc.), 35 F.3d 1348, 1353-54 (9th Cir.

18    1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that

19    was promulgated in part as public safety measure), preemption is appropriate where, as here, the

20    only state laws involved concern economic regulation rather than the protection of public health

21    and safety. See id. at 1353 (finding that "federal bankruptcy preemption is more likely . . . where

22    a state statute is concerned with economic regulation rather than with protecting the public health

23    and safety").

24    Although the Debtor did not have sufficient time to conduct an exhaustive survey of all

25    state and local laws that may possibly affect or purport to govern the proposed GOB Sales, the

26    Debtor has found some such laws that may be applicable in this case.

27    California and Arizona have laws regulating bulk sales. Cal. Comm. Code § 6103; Ariz.

28    Rev. Stat. Ann. § 47-6103. (Nevada's and Minnesota's commercial code does not contain the bulk

1   sales provisions of UCC Article 6103.) These states' bulk sales laws do not apply, however, with

2   respect to a sales made by a debtor in possession in a bankruptcy case.  Cal. Comm. Code §

3   6103(c)(7); Ariz. Rev. Stat. Ann. § 47-6103(c)(7).  Thus, the bulk sales laws do not appear to be

4   implicated in the context of these Chapter 11 cases.

5           In addition, most states have laws in respect of false and misleading advertising.  For

6   example, California Business & Professions Code § 17500 prohibits false and misleading

7   advertising.  In addition, California has specific regulations concerning advertisements regarding

8   GOB sales.  Specifically, California Code of Regulations § 1312 provides that a business may not

9   by way of advertisement represent or imply that it is "going-out-of-business" or "liquidating"

10  unless such representations are true and not misleading in any way.  In this case, the Debtor is in

11  fact "going-out-of-business" and do not intend to publish or cause to be published any false or

12  misleading advertising regarding the GOB sales.

13          Based on some municipal codes that the Debtor was able to examine, it appears that only a

14  few cities require a permit to conduct a GOB or similar sale while most cities require a permit for,

15  or regulate, any banners or signs used to advertise GOB sales.  For example, the City of San

16  Bernardino requires that the permit application include a detailed description of the facts

17  surrounding the liquidation sale.  *See* City of San Bernardino Municipal Code § 5.16.030 (Ord.

18  MC-460, part 1861 (5-13-85)).  By contrast, the City of Los Angeles requires only a simple

19  application, and even this requirement does not apply if the sale is court ordered.  See, City of Los

20  Angeles Municipal Code §§ 7.40.030 (Ord. 6472 § 3, 1954), 7.40.020 (Ord. 6472 § 3, 1954).  The

21  City of Las Vegas also exempts bankruptcy-related GOB sales from its permit requirement.  *See*

22  City of Las Vegas Municipal Code §§ 6.14.030 (Ord. 3563 §§ 2, 5, (1991)), 6.14.160 (Ord. 3563

23  §§ 2, 18, (1991)).  The sign permit requirements do not vary greatly from city to city.  They

24  generally require the payment of a fee, and impose dimension restrictions on any banner or sign

25  used in connection with the sale.  The Debtor seeks relief from having to comply with these

26  regulations with respect to the proposed GOB Sales.

27          In the instant case, state and local licensing requirements, time limits or bulk sale

28  restrictions on liquidation sales would undermine the fundamental purpose of sections 363(b) of

-19-

1  the Bankruptcy Code by placing constraints on the Debtor's ability to marshal and maximize

2  estate assets for the benefit of creditors.  Accordingly, the Debtor respectfully requests that the

3  Court authorize it to conduct the GOB Sales and related transactions without the necessity of, and

4  the delay associated with, obtaining various state and local licenses, observing state and local

5  waiting periods or time limits, and/or satisfying any additional requirements with respect to

6  advertising and the like.  In addition, the Debtor requests that the Court waive any bulk sales laws,

7  to the extent applicable, since creditors are protected by the notice provided by this Motion and

8  the jurisdiction of this Court.

9        In addition, since the Debtor has an incentive to minimize the Expenses incurred in

10  connection with the Sale, the Debtor requests that the Court enter an order providing that that each

11  of the newspapers, other advertising mediums, and all those acting for or on their behalf, are

12  prohibited and enjoined from charging advertising rates in excess of the rates charged pursuant to

13  the Debtor's prepetition advertising agreements or, if no such agreements exist, charging

14  advertising rates in excess of rates regularly and customarily charged in the ordinary course to

15  customers outside of the bankruptcy context on account of prepetition outstanding obligations.

16        Finally, the Debtor requests that the Court enjoin any action by any lessor or any federal,

17  state or local agency, department or governmental authority or any other entity to prevent,

18  interfere with, or otherwise hinder consummation of the GOB sales or advertisement of such sales.

19  *See* Missouri v. United States Bankruptcy Court, 647 F.2d at 776 (holding that attempt to enforce

20  state regulations governing liquidation of grain warehouses directly conflicted with bankruptcy

21  court's control over property of debtor's estate and therefore violated automatic stay).

22        The requested waiver is narrowly tailored to facilitate the successful consummation of the

23  GOB Sales.  The Debtor will comply with all state and local laws with respect to the promotional

24  sale that will precede the GOB sale.  Moreover, the Debtor does not seek a general waiver of all

25  state and local requirements -- only those economic regulations that apply specifically to

26  liquidation sales but excluding health and safety laws applicable thereto.   The Debtor and the

27  Agent fully intend to be bound by and comply with state and local health and safety laws.

28

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:06 AM

# VII

## <u>LEASE RESTRICTIONS REGARDING THE GOB SALES ARE UNENFORCEABLE</u>

Certain of the leases governing the premises of the stores may contain provisions purporting to restrict or prohibit the Debtor from conducting GOB, store closing, liquidation, or similar sales. Such provisions have been held to be unenforceable in Chapter 11 cases, as they constitute an impermissible restraint on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code. See, In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992); In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (concluding that an anti-going-out-of-business sale clause in lease is unenforceable); In re Libson Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982); cf. In re R. H. Macy & Co., 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store).

In Ames, a lessor opposed the debtor's proposed GOB sale based on a lease provision prohibiting such sales. The court in that case rejected the lessor's argument, stating:

> to enforce the anti-GOB sale clause of the Lease would contravene overriding federal policy requiring Debtor to maximize estate assets by imposing additional constraints never envisioned by Congress . . . . Section 363(e) reserves for bankruptcy courts the discretion to condition the time, place and manner of GOB sales, thereby providing adequate safeguards to protect shopping center landlords and their other tenants, while allowing the Trustee to fulfill its fiduciary obligations.

136 B.R. at 359.

Similarly, in Tobago Bay Trading Co., a lessor argued that the debtor's liquidation sale violated a lease provision prohibiting "going-out-of-business, auction, distress, fire or bankruptcy or similar sale." 112 B.R. at 465. The court in that case, however, refused to enforce the lease provision finding that "[w]here provisions of an unexpired lease conflict with these policies [to facilitate the debtor's reorganization and maximize the returns for the benefit of creditors] to prevent or hinder reorganization, the court may find such provisions to be unenforceable." Id. at 466.

1       Here, the Sale Guidelines provide adequate safeguards to protect the Debtor's store

2  lessors, while at the same time permitting the Debtor to fulfill its fiduciary obligations to obtain

3  the greatest recovery for the bankruptcy estate.  The Debtor believes that the lessors cannot prove

4  that any real economic harm will result from the non-enforcement of any lease provisions

5  purporting to prohibit the GOB Sales.  On the other hand, the Debtor has provided evidence

6  demonstrating that the GOB Sales are in the best interest of their bankruptcy estate.  Indeed, the

7  GOB sales may actually benefit the lessors.  See, Libson Shops, 24 B.R. at 695 ("[a]s a result of

8  the continued operation of the debtor's Stores and the advertising in connection with the sale to

9  the public, the other shopping center tenants will benefit from the anticipated increased customer

10  traffic.").  In any event, even if the lessors could establish economic harm from the proposed GOB

11  sales, bankruptcy courts have recognized that these concerns are outweighed by the more

12  important goal of protecting the estates and all their creditors.  Tobago Bay, 112 B.R. at 467.

13       As such, to the extent that such provisions or restrictions exist in any of the Debtor's

14  leases, the lessors may not interfere with or otherwise seek to restrict the Debtor and/or the Agent

15  from conducting the GOB Sales.  Accordingly, the Debtor requests that the Court authorize the

16  Debtor and/or the Agent to conduct the GOB Sales without interference by any lessors or other

17  persons affected, directly or indirectly, by the GOB Sales.

18                          **VIII**

19        **THE COURT SHOULD AUTHORIZE THE SALE**

20        **OF MERCHANDISEFREE AND CLEAR OF LIENS**

21        **BASED ON THE SENIOR SECURED LENDERS' CONSENT**

22       The Debtor requests approval to sell the merchandise subject to the Agency Agreement

23  free and clear of any and all liens, claims, and other interests in accordance with section 363(f) of

24  the Bankruptcy Code.  A debtor in possession may sell property under sections 363(b) and 363(f)

25  "free and clear of any interest in such property of an entity other than the estate" if one of the

26  following conditions are satisfied:

27      (1)     applicable nonbankruptcy law permits sale of such property free and clear

28              of such interest;

1    (2)    such entity consents;

2    (3)    such interest is a lien and the price at which such property is to be sold is

3    greater than the aggregate value of all liens on such property;

4    (4)    such interest is in bona fide dispute; or

5    (5)    such entity could be compelled, in a legal or equitable proceeding, to

6    accept a money satisfaction of such interest.

7  <u>11 U.S.C. §363(f).</u>

8        The Debtor believes that the Secured Lenders are the only entities that have a security

9  interest in the merchandise or the proceeds.

10        In connection with the sale of the merchandise pursuant to the terms and conditions of the

11  Agency Agreement, the Debtor proposes that any liens, claims and encumbrances asserted against

12  the merchandise be transferred to and attach to the Guaranteed Amount and such other amounts

13  payable to the Debtor under the Agency Agreement, subject to the rights, claims, defenses, and

14  objections, if any, of all interested parties with respect thereto.  Pursuant to the Secured Lenders'

15  consent, which was required under the terms of the Agency Agreement, the Secured Lenders have

16  already consented to the sale of the merchandise and a transfer of their security interest to the

17  Debtor's interests under the Agency Agreement.

18  **IX**

19  **<u>THE DEBTOR SHOULD BE AUTHORIZED TO GRANT SECURITY</u>**

20  **<u>INTERESTS TO THE AGENT PURSUANT TO SECTION 364 OF</u>**

21  **<u>THE BANKRUPTCY CODE BASED ON THE SECURED LENDERS' CONSENT</u>**

22        As discussed above, the Agency Agreement requires the Debtor to grant the Agent certain

23  security interests (the "Liens") in the merchandise to secure the Debtor's potential obligation to

24  repay the Agent all or a portion of the Guaranteed Amount in the event the GOB Sales cannot be

25  completed through no fault of the Agent.  Section 364 of the Bankruptcy Code authorizes the

26  Debtor to grant these liens.  Specifically, section 364(c)(3) authorizes a debtor to incur debt

27  secured by a junior lien on property of the estate that is subject to a lien, if the debtor is unable to

28  obtain unsecured credit allowable as an administrative expense.  In addition, section 364(d) of the

1  Bankruptcy Code authorizes a debtor to incur debt secured by a senior or equal lien on property of

2  the estate that is subject to a lien under certain circumstances.

3      This Court should authorize the Debtor to grant the Liens to the Agent, as contemplated by

4  the Agency Agreement.  Under the Agency Agreement, the Agent will pay the Debtor the Initial

5  Guaranty Payment (which is 85% of the Guaranteed Amount), and post the Guaranty L/C securing

6  the remaining 15%% of the Guaranteed Amount, plus the Expense L/C in an amount equal to two

7  (2) weeks Expenses.  The Debtor intends to pay the amount it receives from the Agent to the

8  Secured Lenders shortly after receiving it from the Agent, on account of the Secured Lenders'

9  loans to the Debtor, in the same order and in the same priority as such Secured Lenders claims

10 were secured by the Debtor's inventory, the proceeds form the sale of the inventory, and/or the

11 Debtor's owned FF&E.  In these cases, the Merchandise and Proceeds are subject to a senior

12 perfected security interest of the Secured Lenders.  The Secured Lenders, however, have

13 consented to the granting of the Liens to the Agent in connection with the Agency Agreement.

14     From the Agent's perspective, the Liens are an integral aspect of the Agency Agreement,

15 and the Agent would not have entered into that agreement unless the Debtor agreed to provide

16 those liens.

17     Here, the Secured Lenders have consented to being "primed" by the Agent in accordance

18 with the terms of the Agency Agreement.  Thus, and because the Debtor desires to have the

19 Agency Agreement approved, and the Agency Agreement requires that the Debtor grant the Liens,

20 the Debtor requests that the Court authorize the Debtor to grant the Liens to the Agent.

21                                    X

22             **THE DEBTOR SHOULD BE AUTHORIZED TO**

23             **ABANDON OF CERTAIN PROPERTY IN**

24             **CONNECTION WITH THE GOB SALES**

25     During the course of the GOB Sales, the Debtor may determine that the costs associated

26 with holding and/or selling certain property (including, but not limited to, FF&E) exceeds the

27 likely proceeds that may be realized upon its sale.  As such, the property is of inconsequential

28 value and benefit to the Debtor's estate and may, in certain cases, be burdensome to the Debtor's

-24-

1   estates.  To maximize the value of the Debtor's estate to be realized in connection with the GOB

2   Sales, the Debtor requests authority under § 554(a) of the Bankruptcy Code to abandon property

3   the Debtor determine to be burdensome, or of inconsequential value and benefit, to the Debtor's

4   estate.

5                                                   XI

6   ## THE TRANSFER OF MERCHANDISE UNDER THE AGENCY AGREEMENT SHOULD

7   ## BE EXEMPT FROM ANY APPLICABLE STAMP OR SIMILAR TAX PURSUANT TO

8   ## SECTION 1146(c) OF THE BANKRUPTCY CODE

9           Section 1146(c) of the Bankruptcy Code provides:

10          The issuance, transfer, or exchange of a security, or the making or delivery of any
11          instrument of transfer under a plan confirmed under section 1129 of this title, may not be
            taxed under any law imposing a stamp tax or similar tax.

12   11 U.S.C. § 1146(c).  There is ample case law confirming that sales conducted prior to the

13   confirmation of a plan are encompassed by Section 1146(c), where the asset sale is a necessary

14   predicate to, or in furtherance of, a future plan effort.  See, In re Jacoby- Bender, Inc., 758 F.2d

15   840 (2d Cir.1985); In re Smoss Enter. Corp., 54 B.R. 950, 951 (E.D.N.Y.1985) (holding pre-

16   confirmation transfer essential to fund plan is exempt under § 1146(c)); In re Lopez Dev., Inc.,

17   154 B.R. 607, 609 n. 3 (Bankr.S.D.Fla.1993) (that transfer occurred prior to plan confirmation

18   irrelevant under § 1146(c)); In re Permar Provisions, Inc., 79 B.R. 530, 533-34

19   (Bankr.E.D.N.Y.1987)(same); In re Hechinger Inv. Co. of Delaware, Inc., 254 B.R. 306 (Bankr.

20   Dude. 2000: In re Amsterdam Ave. Development Associates, 103 B.R. 454 (Bankr. S.D.N.Y.

21   1989).  Here the Debtor intends to complete the liquidation process and then distribution the

22   resulting proceeds to creditors pursuant to a liquidating plan.  Although delineated as an agency

23   agreement, to the extent the transfer of the Debtor's inventory under the Agency Agreement is

24   construed as a sale of assets, the Debtor requests a finding of that the proposed transfers herein are

25   entitled the exemption provided in Section 1146(c) is entirely appropriate.

26

27

28

                                                  -25-

## XII

### WAIVER OF STAY OF ORDER

Pursuant to Bankruptcy Rule 6004(g), an order authorizing the sale of property is stayed for ten (10) days after the entry of the order unless the court orders otherwise. Although delineated as an agency agreement, to the extent the transfer of the Debtor's inventory under the Agency Agreement is construed as a sale of assets, the Debtor requests that the Court order waive the 10-day stay provided for in Bankruptcy Rule 6004(g) in connection with the relief sought herein. As explained above, waiting an extra ten (10) days before starting the store sales would severely impede the Debtor's efforts to maximize the value of its assets for the benefit of its creditors.

## XIII

### REQUEST FOR SHORTENED TIME HEARING REGARDING FINAL
### APPROVAL OF THE AGENCY AGREEMENT AND RELATED RELIEF

A.    **Request for Shortened Time Hearing on the Approval Order**. As explained above, the Debtor requests that the Court schedule a hearing on shortened notice to consider the Debtor' request for entry of the Approval Order, as set forth in this Motion. The Debtor request that such hearing be scheduled no later than May 23, 2003 – the first day of the Memorial Day weekend. As explained above, the Agency Agreement requires that the Debtor obtain the Approval Order by May 23, 2003, otherwise Guaranteed Amount reduces by approximately $500,000. If the Approval Order is not entered by May 30, 2003, the Guaranteed Amount reduces by another $500,000, and if the Approval Order is not entered by June 6, 2003, the Agency the Agent can terminate the Agency Agreement and is entitled to reimbursement of certain Expenses incurred by Agent in connection with the promotional sale. It is also necessary to expedite the approval of the Agency Agreement because the Debtor will not receive any payments from the Agent (other than the collection of all Proceeds) pursuant to the terms of the Agency Agreement until this Court has entered the Approval Order. The Debtor submits therefore that expedited relief is appropriate and warranted in these cases.

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:06 AM

**B.      Proposed Notice Regarding Shortened Time Hearing**. The Debtor has provided copies of the Motion and notice of the emergency hearing on this matter, by overnight mail, or electronic mail (to the extent such information is available) on the following:  (i) the United States Trustee for the Central District of California (hand delivery), (ii) the Secured Lenders and their attorneys, (ii) the holders of the twenty largest unsecured claims against the Debtor's estate, (iii) each landlord under a lease at a store, (iv) the Attorneys General of each state in which a store is located, (v) the taxing authorities in each state in which a store is located; (vi) the municipalities and counties in which a store is located; (vii) parties who have filed UCC-1 financing statements concerning the Debtor's Merchandise, Proceeds and FF&E; and (viii) the Securities and Exchange Commission (collectively, the "Notice Parties").

The Debtor proposes that notice of the shortened time hearing regarding the Debtor's request for entry of the Approval Order be provided to the Notice Parties (and parties who have requested special notice under Bankruptcy Rule 2002) by overnight mail within 24 hours of the Court providing the Debtor with the hearing date and time.  The Debtor submits that no other or further notice need be provided.

**XIV**

**CONCLUSION**

For the reasons set forth above, the Debtor respectfully requests that the Court grant the relief set forth in this Motion.

DATED: May 2⁄0/2003

**WINTHROP COUCHOT
PROFESSIONAL CORPORATION**

By: _____
    Marc J. Winthrop
    Sean A. O'Keefe
    Robert W. Pitts
    Charles Liu
[Proposed] General Insolvency Counsel for
Debtor and Debtor-in-Possession

## DECLARATION OF ALAN S. MAZURSKY

I, Alan S. Mazursky, hereby declare and state as follows:

1.      I have been the duly employed as the Chief Financial Officer of Strouds Acquisition Corporation, a Delaware corporation (the "Debtor") since April of 2003. The facts stated herein are within my personal knowledge, or I have obtained knowledge of these facts from the books and records of the Debtor.

2.      I am a licensed Certified Public Accountant but currently I am on inactive status. I have over twenty years of experience in the accounting and financial management fields. From 1980 to 1984, I was employed by the big eight accounting firm Ernst & Young. From 1984 through 1988 I was employed by the Federated Group, Inc., as controller, where I was responsible for all aspects of corporate accounting, financial and regulatory SEC reporting, budgeting, cash management, tax reporting and inventory control functions. From 1988 to 1996, I was employed as the Chief Financial Officer of the Hard Rock Cafe America. In this position I had overall responsibility for the areas of finance, accounting, management information systems and human resources for the operations of 13 company-owned and 4 franchised units operating under the Hard Rock Cafe trademark in certain domestic and international markets, and one fine dining establishment operating as Mortons. From 1996 to 1998, I was an independent consultant serving in various financial management capacities. From 1998 through 2001, I was employed as the Vice President Finance for US Search.com, Inc. Since 2001 I have served as an independent consultant to various businesses. In April of 2003, I was employed by the Debtor to serve as Chief Financial Officer.

3.      In my capacity as the Chief Financial Officer of the Debtor I am responsible for all internal accounting functions. These functions include oversight of the internal accounting department, preparing financial statements, and preparing cash forecasts. The Debtor's accounting records are retained in the ordinary course of business.

4.      The Debtor is a specialty retailer of bed, bath, tabletop and other home textile products. It operates a chain of forty-seven retail stores.

1    5.    During the ten month period ending March 31, 2003, the Debtor suffered a net loss of

2    approximately ($8,800,000).

3    6.    Attached hereto as Exhibit "3" is an income statement reflecting to the best of my

4    knowledge the Debtor's results of operations for the ten month period ended March 31, 2003.

5    7.    Attached hereto as Exhibit "2" is a balance sheet reflecting the Debtor's assets and

6    liability as of March 31, 2003.

7    8.    The Debtor filed the instant Chapter 11 proceeding on May 20, 2003 (the "Petition

8    Date") to effectuate a controlled but expedited liquidation of the Debtors assets.  This controlled

9    liquidation will be implemented the use of a liquidating agent (the "Agent").  The Agent will sell

10    substantially all of the Debtor's inventory through its existing chain of stores, with the agent paying

11    the associated sales costs.  Under the proposed contractual arrangement the liquidating agent will

12    guarantee the payment of fixed percentage for the Debtor's inventory, with the Debtor having

13    additional participatory rights if certain sales levels are achieved.

14    9.    At the conclusion of the sale process conducted by the Agent, the Debtor will then

15    liquidate the remainder of its assets to the extent they have value.

16    10.    The Debtor believes that the proceeds from this liquidation effort will be sufficient to

17    retire all valid secured claims, and that there is reasonable possibility that sufficient funds will be

18    available to pay a small dividend to unsecured creditors through a liquidating plan.  *However, there is*

19    *no assurance that such a dividend will be possible.*  Any future dividend to unsecured creditors will

20    depend upon the amount of the secured, priority and administrative claims, the amount payable under

21    the Agency Agreement, and the funds generated from the sale of the Debtor's remaining assets.

22    11.    The Debtor is seeking the relief sought herein on an emergency basis because it has no

23    other option.  The Debtor is all but completely out of the cash.  It lacks the funds to pay anything but a

24    skeleton crew of employees, and it cannot pay the expenses associated with ongoing operations.  But

25    for the limited financial support being made available by the Debtor's secured creditors it would have

26    to cease operations immediately.

27    12.    Emergency relief is also appropriate because the Debtor's potential yield under the

28    Agency Agreement improves if the sale is initiated sooner, and with the fast approaching Memorial

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:17 AM

1    Day sale window, the Debtor has a unique opportunity to jump start its sale effort.  In summary, the

2    Debtor believes that prompt judicial relief will avoid a costly closure and enable the Debtor to obtain

3    the highest yield for creditors.

4         13.    Attached hereto as Exhibit "5" is a cash budget that I believe fairly reflects the

5    Debtor's cash needs over the next 10 days. This budget was prepared based upon the assumption that

6    the Debtor files a Chapter 11 proceeding on May 20, 2003, and obtains an order authorizing the

7    Debtor proceed with the liquidation sales more fully discussed in the within motion.  Accordingly, this

8    budget is based upon a drastically reduced employee base, and the assumption that the carrying costs

9    associated with store level operations will be paid by the liquidating agent.  But for these assumptions,

10    the costs would be significantly higher and substantially in excess of the Debtor's cash resources.

11         14.    The Debtor is a party two four primary secured debt arrangements.  Each of these

12    arrangements is described below:

13              A.    Fleet Facility.  The Debtor and Fleet Retail, Inc., a Delaware corporation

14    ("Fleet") are parties to that certain *Loan And Security Agreement* dated April 26, 2001 (the "Fleet

15    Facility").  The Fleet Facility is a revolving credit agreement that was structured to provide the Debtor

16    working capital for operations.  As of the Petition Date the outstanding balance on the Fleet Facility

17    was approximately $17,000,000.  Pursuant to the terms of the Fleet Facility, and the UCC-1 forms

18    filed in support thereof, all funds advanced under the Fleet Facility are secured by a first priority lien

19    on all property of the Debtor.  FCCG holds a $2 million junior participation in the Fleet Facility.

20              B.    Equipment Loan.  On July 30, 2002, the Debtor and the Bank of Hemet entered

21    into that certain *Business Loan Agreement* (the "Hemet Loan Agreement") and related *Commercial

22    Security Agreement*.  Pursuant to the Hemet Loan Agreement, Hemet loaned the Debtor the sum of

23    $1,600,000 to acquire certain furniture, fixtures and equipment utilized in the Debtor's operations (the

24    "Hemet FF&E").  All proceeds advanced under the Hemet Loan Agreement are secured by a first

25    priority lien against the Hemet FF&E.  As of the Petition Date the approximate sum of $1,400,000 was

26    owed under the terms of the Hemet Loan Agreement.

27              C.    Mezzanine Loan Agreement.  On March 5, 2003, the Debtor as borrower,

28    and FCCG, Cruttenden and The Yogananda Foundation ("TYF") as lenders (collectively the

-30-

1  "Mezzanine Lenders"), entered into that certain *Loan Agreement* (the "Mezzanine Loan

2  Agreement") and related *Security Agreement*.  Pursuant to the terms of this agreement, each of the

3  Mezzanine Lenders agreed to loan the Debtor certain fixed amounts in two "stages".  The "Stage

4  1" loan amounts were the following: FCCG loaned the Debtor $900,000 (the "FCCG Senior

5  Mezzanine Note"); Cruttendon loaned the Debtor $1.9 million and TYF agreed to Loan the Debtor

6  $1,000,000 (the "Junior Mezzanine Notes").  The Junior Mezzanine Notes (and the liens securing

7  them) are expressly subordinated to the FCCG Senior Mezzanine Note.

8              All of the Stage 1 loan amounts have been advanced by the Mezzanine Lenders,

9  resulting in a principal indebtedness of $3,800,000, of which $900,000 in principal amount is

10  senior and the remainder subordinated.  The Stage 2 loan amounts have not been advanced.

11  Pursuant to the terms of the terms of the Security Agreement and the UCC-1 forms filed in support

12  thereof, all funds advanced under the Mezzanine Loan are secured by a second priority lien against

13  all property of the estate.  FCCG, the holder of the FCCG Senior Mezzanine Note is the collateral

14  agent for the Mezzanine Lenders.

15         Concurrently with the execution of the Mezzanine Loan Agreement, the parties thereto

16  entered into certain related agreements.  These included but were not limited to the following:

17         1.       Preferred Stock Agreement.  On March 5, 2003, the Debtor, as issuer, and FCCG

18                  and Cruttenden, as purchasers, entered into that certain *Series 1 Preferred Stock*

19                  *And Warrant Purchase Agreement* (the "Preferred Stock Agreement").  Pursuant to

20                  the Preferred Stock Agreement, FCCG and Cruttenden each acquired 1,000,000

21                  shares of Series 1 Preferred Stock in the Debtor for a purchase price of $.10 per

22                  share, and received therewith warrants entitling each party to acquire 23,191,739

23                  shares of common stock in the Debtor for a price of $.001 per share.

24         2.       Intercreditor Agreement.  On March 5, 2003, FCCG, Cruttenden, TYF and the

25                  Debtor entered into that certain *Intercreditor Agreement* pursuant to which

26                  Cruttenden and TYF agreed that repayment of any and all obligations owed to such

27                  parties by the Debtor would be subordinated to the payment in full of all obligations

28                  owed to FCCG by the Debtor.

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:17 AM

3.    <u>Pledge Agreement</u>.  On or about March 5, 2003, Cruttenden pledged all of his stock ownership in the Debtor and his Junior Mezzanine Note to FCCG as additional security for the repayment of the obligations owed to FCCG under the Mezzanine Loan Agreement.

4.    D.    <u>The Subordinated Notes</u>.  On April 26, 2001, the Debtor executed that certain *10% Subordinated Promissory Note Due 2004* in the original principal amount of $4,000,000 (the "Cruttenden Subordinated Note") in favor of Cruttenden, and Cruttenden concurrently loaned the Debtor the sum of $4,000,000 referenced therein.  Concurrently, the Debtor executed a second *10% Subordinated Promissory Note Due 2004* in favor of TYF in the original principal amount of $1,000,000 (the "TYF Subordinated Note"), and TYF concurrently loaned the Debtor the sum of $1,000,000 referenced therein.  On July 31, 2002, Cruttenden acquired all of TYF rights in the TYF Subordinated Note.

The obligations in the Cruttenden Subordinated Note and in the TYF Subordinated Note were not originally secured.  However, on January 17, 2003, the Debtor executed a UCC-1 in favor of Cruttenden to secure all obligations owed under these notes.

On March 5, 2003, the Cruttenden Subordinated Note was modified to increase the principal balance thereof from $4,000,000 to $4,437,390.11.  This increment represented the unpaid dividends that the company owed Cruttenden as the holder of the Series B Preferred Stock.

15.    The following table summarizes the foregoing information, and lists the approximate balances owed on these loan positions as of the Petition Date:

| Lender | Loan Agreement | Approx. Principal Balance As of Petition Date |
|---|---|---|
| Fleet | Fleet Facility | $17,000,000 |
| FCCG | Mezzanine LoanAgreement | $900,000 |
| Junior Mezzanine Notes | Mezzanine Loan Agreement | $3,900,000 |
| Cruttenden | Subordinated Notes | $5,437,390 |

-32-

1       16.      The Debtor currently lacks the cash to pay the operating expenses associated with

2      normal operations. It is in default with all of it real property leases, it has received disconnect

3      notices from its utilities, it has large balances owed to its vendors, and it is in default under all of

4      its major secured financing agreements. Most importantly it lacks the capital to operate and

5      correct these financial deficiencies. The liquidation effort proposed herein represents the only

6      viable opportunity for the Debtor to realize a fair return on its inventory.

7          I declare that the foregoing is true and correct under the penalty of perjury.

8      Executed this 20th day of May, 2003, in _CITY OF INDUSTRY_, California.

10      Alan S. Mazursky

-32-

4J6486 v2 - Strouds Revised Mtn re GOB Sale
05/19/2003 10:26 PM

### DECLARATION OF SUSAN L. STOREY

I, Susan L. Storey, hereby declare and state as follows:

1.      I have been the duly employed and interim Chief Executive Officer of Strouds Acquisition Corporation, a Delaware corporation (the "Debtor"), since March 10, 2003. The facts stated herein are within my personal knowledge, or I have obtained knowledge of these facts from the books and records of the Debtor.

2.      I have nearly 20 years of varied financial and operational restructuring experience on major domestic and international projects. I have managed or participated in numerous engagements involving financial and/or operational restructuring, due diligence, structured debt and equity financing, cash-flow management, asset disposition and recovery and liquidation and has acted as CEO and CFO in several turnaround situations. The Industries in which I have had experience include: aviation and aerospace services and manufacturing, financial services, furniture manufacturing, heavy equipment manufacturing, knitwear and textile manufacturing, real estate, retail.

3.      I am was employed by the Debtor pursuant to a contract between the Debtor and CSG, LLC, a firm in the business of providing operational restructuring and insolvency advisory services to troubled businesses. During my professional career I was a Partner in the Global Financial Strategies/Corporate Recovery Services Practice of KPMG, LLP, one of the largest accounting firms in the world. While employed with KPMG, LLP, I was responsible for managing both debtor and creditor restructuring engagements.

4.      The Debtor is a specialty retailer of bed, bath, tabletop and other home textile products in the United States. It stores offer an extensive selection of high quality, brand name as well as private-label merchandise for the home environment. The breadth and depth of linen category merchandise in the Debtor's stores exceeds what is generally available in department stores, and is more comprehensive than what is available in most other specialty stores.

5.      The Debtor markets it wares through a chain of 47 full-line stores and outlets that are located primarily in California. However, it also has stores in Nevada, Minnesota and

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:17 AM

1  Arizona. A list of the Debtor's stores is attached hereto as Exhibit "6." All of these locations are

2  leased.

3        6.     The Debtor's stores sell primarily brand name and private-label merchandise, while

4  its outlet stores carry discounted overruns, closeouts, and specialty products.

5        7.     The Debtor also sells it wares through catalogs and its website. The Debtor's

6  corporate office is located in the City of Industry, California.

7        8.     Prior to the Petition Date, the Debtor employed approximately 870 persons.

8        9.     The Debtor is a party to four primary secured loan arrangements. Each of these

9  arrangements is discussed below:

10        A.    Fleet Facility. The Debtor and Fleet Retail, Inc., a Delaware corporation

11  ("Fleet") are parties to that certain *Loan And Security Agreement* dated April 26, 2001 (the "Fleet

12  Facility"). The Fleet Facility is a revolving credit agreement that was structured to provide the

13  Debtor working capital for operations. As of the Petition Date the outstanding balance on the

14  Fleet Facility was approximately $17,000,000. Pursuant to the terms of the Fleet Facility, and the

15  UCC-1 forms filed in support thereof, all funds advanced under the Fleet Facility are secured by a

16  first priority lien on all property of the Debtor. FCCG holds a $2 million junior participation in the

17  Fleet Facility.

18        B.    Equipment Loan. On July 30, 2002, the Debtor and the Bank of Hemet

19  entered into that certain *Business Loan Agreement* (the "Hemet Loan Agreement") and related

20  *Commercial Security Agreement*. Pursuant to the Hemet Loan Agreement, Hemet loaned the

21  Debtor the sum of $1,600,000 to acquire certain furniture, fixtures and equipment utilized in the

22  Debtor's operations (the "Hemet FF&E"). All proceeds advanced under the Hemet Loan

23  Agreement are secured by a first priority lien against the Hemet FF&E. As of the Petition Date the

24  approximate sum of $1,400,000 was owed under the terms of the Hemet Loan Agreement.

25        C.    Mezzanine Loan Agreement. On March 5, 2003, the Debtor as borrower,

26  and FCCG, Cruttenden and The Yogananda Foundation ("TYF") as lenders (collectively the

27  "Mezzanine Lenders"), entered into that certain *Loan Agreement* (the "Mezzanine Loan

28  Agreement") and related *Security Agreement*. Pursuant to the terms of this agreement, each of the

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:17 AM

1  Mezzanine Lenders agreed to loan the Debtor certain fixed amounts in two "stages". The "Stage

2  1" loan amounts were the following: FCCG loaned the Debtor $900,000 (the "FCCG Senior

3  Mezzanine Note"); Cruttendon loaned the Debtor $1.9 million and TYF agreed to Loan the Debtor

4  $1,000,000 (the "Junior Mezzanine Notes"). The Junior Mezzanine Notes (and the liens securing

5  them) are expressly subordinated to the FCCG Senior Mezzanine Note. All of the Stage 1 loan

6  amounts have been advanced by the Mezzanine Lenders, resulting in a principal indebtedness of

7  $3,800,000, of which $900,000 in principal amount is senior and the remainder subordinated. The

8  Stage 2 loan amounts have not been advanced.

9          D.    The Subordinated Notes. On April 26, 2001, the Debtor executed that

10  certain *10% Subordinated Promissory Note Due 2004* in the original principal amount of

11  $4,000,000 (the "Cruttenden Subordinated Note") in favor of Cruttenden, and Cruttenden

12  concurrently loaned the Debtor the sum of $4,000,000 referenced therein. Concurrently, the

13  Debtor executed a second *10% Subordinated Promissory Note Due 2004* in favor of TYF in the

14  original principal amount of $1,000,000 (the "TYF Subordinated Note"), and TYF concurrently

15  loaned the Debtor the sum of $1,000,000 referenced therein. On July 31, 2002, Cruttenden

16  acquired all of TYF rights in the TYF Subordinated Note. The obligations in the Cruttenden

17  Subordinated Note and in the TYF Subordinated Note were not originally secured. However, on

18  January 17, 2003, the Debtor executed a UCC-1 in favor of Cruttenden to secure all obligations

19  owed under these notes. On March 5, 2003, the Cruttenden Subordinated Note was modified to

20  increase the principal balance thereof from $4,000,000 to $4,437,390.11. This increment

21  represented the unpaid dividends that the company owed Cruttenden as the holder of the Series B

22  Preferred Stock.

23          11.    Walter Cruttenden, III ("Cruttenden") and related entites own over 95% of the

24  Debtor's outstanding common stock. Cruttenden and Fog Cutter Capital Group Inc. ("FCCG")

25  each own 49.5% of the Debtor's Series 1 Preferred Stock. The Debtor board has five directors

26  three of whom were designated by FCCG in accordance with its rights as a preferred shareholder.

27  The other two members were appointed by Cruttenden (one of whom is Cruttenden).

28

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:17 AM

12.     Attached to the Mazursky declaration as Exhibit "2" is the Debtor's March 31, 2003 balance sheet. In summary, this balance sheet reflects approximately $37,000,000 in assets and $44,900,000 in liabilities. Approximately, $27,600,000 of the $44,900,000 in liabilities represents secured claims, and these claims would be paid first from the proceeds of the liquidation, subject to the following to possible exceptions. First, as more fully explained above, the UCC-1 form filed with respect to the Subordinated Notes claim, which comprises approximately $5,400,000 of the $27,600,000 secured claim total referenced above, was filed in January of 2003, approximately 18 months after these notes were executed. Accordingly, the secured status of these claims may be contested. Second, the Equipment Loan in favor of the Bank of Hemet is secured by certain itemized furniture, fixtures and equipment. Accordingly, this creditor's secured claim would only have a preference as to the proceeds generated from the sale of these particular items of equipment.

13.     The Debtor's financial difficulties were primarily caused by declining sales. Macroeconomic conditions began to deteriorate in the first quarter of 2001, and this trend continued throughout the year. This downtrend coupled with the Debtor's existing overcapacity, had a severe impact upon the Debtor's operating results. As a result of these problems, and the Debtor's poor fourth quarter 2002 results, the Debtor was unable to meet its obligations under the Fleet Facility.

14.     To address its defaults under the terms of the Fleet Facility, the Debtor entered into an agreement with Fleet pursuant to which Fleet agreed to waive the Debtor's defaults in consideration for certain concessions. These concessions required the Debtor (i) to operate under a strict budget that assumed a workout with trade creditors, (ii) to refrain from paying any then outstanding indebtedness to trade creditors, and (iii) to obtain a significant infusion of new working capital (the "Forbearance Agreement").

15.     Pursuant to the Forbearance Agreement, in early 2003, the Debtor and its trade creditors agreed to an out of court workout pursuant to which each trade creditor agreed to accept either (1) installments totaling 40% of its claim with no prospect of further recovery and no

1    further business with the Debtor or (2) the promise of future orders from the Debtor, with each

2    new order being paid at 110% of the invoice amount until 70% of the pre-existing claim was paid.

3    Also in early 2003, the Debtor obtained commitments for new working capital in the form of a

4    combination of debt and equity from Cruttenden and FCCG.  As explained above, in March

5    2003, Cruttenden loaned the Debtor $1,900,000, FCCG loaned the Debtor $900,000, and The

6    Yogananda Foundation agreed to loan the Debtor $1,000,000 under the terms of the Mezzanine

7    Loan Agreement.

8       16.     Unfortunately, the foregoing efforts were not sufficient.  Due to the Debtor's

9    financial difficulties it was unable to replenish its inventories on a timely basis.  This severely

10   impacted sales.  Although the Debtor recently initiated a costly Spring advertising promotion, the

11   unanticipated onset of the war in Iraq rendered this campaign largely ineffective.  Continued

12   operational losses and the lack of available capital forced the Debtor to file the instant

13   Chapter 11 proceeding in an effort to preserve and maximize the remaining value of its assets.

14      17.     Shortly before the Petition Date, the Debtor and its financial advisors explored

15   various strategic and financial alternatives, such as a going concern sale or an internal

16   reorganization.  However, the Debtor was unable to secure an offer for the company as a going

17   concern, and it was unable to secure the necessary infusion of capital to fund an internal

18   turnaround, assuming such a turnaround were even possible.

19      18.     Given the foregoing facts, the Debtor was forced to explore various controlled

20   liquidation options.  To assist the Debtor in this process of selecting and structuring the most

21   favorable the Debtor employed the services of Traub, Bonacquist & Fox LLP, a law firm with an

22   expertise in this area.  With the assistance and advice of TB&F, the Debtor prepared a package of

23   information for the liquidation firms and solicited bids for this liquidation.  Thereafter, the Debtor

24   conducted an auction among all interested liquidating agent and secured the most favorable offer,

25   which is reflected in the Agency Agreement attached as Exhibit "1" hereto.

26      19.     All creditors and parties in interest are urged to read the Agency Agreement in its

27   entirety, and all statements herein are expressly subject to and controlled by the terms of the

28   attached Agency Agreement.  However, in summary,  the Agency Agreement provides that the

1    Agent will serve as the Debtor's sole and exclusive agent for the purpose of conducting store

2    closing or "going out of business" sales at the Debtor's stores.  The Agent will conduct these sales

3    in accordance with the Sale Guidelines as attached to the Agency Agreement. The Agent will sell

4    the Debtor's inventory through these sales, and will pay the associated sale expenses, including

5    the per diem store level rents, the wages payable to the store level employees retained to work on

6    the sale, and the associated advertising costs.

7        20.    Pursuant to the terms of the Agency Agreement, the Agent will pay to the estate

8    what is defined in the agreement as the "Guaranteed Amount," and if certain sales thresholds are

9    achieved it will also pay what is defined as the "Recovery Amount".  In summary, the Guaranteed

10   Amount is equal to 50.5% of the aggregate retail price of the -qualifying inventory in the Debtor's

11   stores and distribution center as of the commencement of the sale by the Agent.  Since there are

12   various pricing adjustments and inventory qualifications provided for in the Agency Agreement, it

13   is difficult for the Debtor to predict the exact payment that the estate will receive in the form of

14   the Guaranteed Amount.  However, the Debtor estimates that this figure will be approximately

15   $24,623,000.

16       21.    Approximately 85% of the Guaranteed Amount is payable upon first business day

17   after the entry of the Approval Order, and the balance is payable within thirty days after the

18   commencement of the sale, but subject to the completion of an agreed upon inventory and

19   accounting.

20       22.    The amount of the Recovery Amount payable to the estate under the Agency

21   Agreement is entirely contingent upon the results of the sale effort.  Under the formula in the

22   Agency Agreement, if the proceeds generated from the sale effort exceed the Guaranteed Amount,

23   plus the Agent's fee of 2% of the inventory, plus all expenses of the sale, then the Debtor will

24   receive 50% of this excess and the Agent receives 50%. The Debtor cannot speculate as to the

25

26

27

28

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:17 AM

amount of the Recovery Amount, if anything. This sum will be determined after the completion
of the sale and paid after the completion of the necessary accounting.

23.    The relief sought in this motion will result in the disposition of substantially all of
the assets of the estate. The remaining assets will be the Debtor's real estate leases, the
unencumbered furniture, fixtures and equipment at is corporate location, any cash on hand net of
the estates expenses, and assuming payment of the secured claims.

24.    Since the exact amount payable pursuant to the Agency Agreement cannot be
precisely quantified, and the costs of completing the Chapter 11 effort may vary depending upon a
number of factors, it is difficult for the Debtor to predict exactly what funds will be available to
pay the claims of creditors. However, notwithstanding these limitations the Debtor has
endeavored to develop a preliminary liquidation analysis. This analysis is attached hereto as
Exhibit "4". In summary, this analysis provides a range of potential distribution levels based upon
certain assumptions.

25.    In an effort to secure the highest value for the assets of the Debtor, the Debtor's
management made all reasonable effort to sell the Debtor as a going concern prior to the Petition
Date. It also endeavored to secure additional financing for the Debtor's operations in an effort to
finance the costs of an internal reorganization. Unfortunately, neither of these efforts were
successful. At this juncture the Debtor is virtually out of cash, and it continues to operate at
monthly cash loss. Accordingly, the proposed controlled liquidation herein represents not only the
best opportunity for obtaining the highest yield on the assets of the estate, but the only prudent and
even possible course given the Debtor's severe financial condition.

I declare that the foregoing is true and correct under the penalty of perjury.

Executed this 29th day of May, 2003, in Los Angeles, California.

Susan E. Storey

L.

# Exhibits

# AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made as of this ___<sup>th</sup> day of May, 2003, by and between a joint venture composed of TIGER CAPITAL GROUP, LLC, SB CAPITAL GROUP, LLC, and THE OZER GROUP LLC, having a principal place of business at 84 State Street, Suite 420, Boston, MA 02109 (the "Agent") and STROUDS ACQUISITION CORPORATION, with a principal place of business at 280 Machlin Court, City of Industry, CA 91789 (the "Merchant").

## RECITALS

WHEREAS, Merchant desires to have Agent act as Merchant's exclusive agent for the limited purpose of (a) selling all of the Merchandise (as hereinafter defined) located or to be located in Merchant's retail store locations as identified in Exhibit 1A attached hereto (each a "Store" and collectively, the "Stores") and Merchant's distribution center identified on Exhibit 1B annexed hereto (the "Distribution Center"), by conducting a "going-out-of-business", "store closing", or similar theme sale (the "Sale") at the Stores; and (b) disposing of Merchant's owned FF&E located at the Stores and the Distribution Center, subject to the terms and conditions set forth herein;

WHEREAS, Agent is willing to serve as Merchant's exclusive agent to conduct the Sale and dispose of the FF&E, in accordance with the terms and conditions of this Agreement;

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.

1.1  Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
|---|---|
| Additional Inventory Taking | Section 5.1(a) |
| Adjustment Amount | Section 3.3(a) |
| Agency Accounts | Section 3.3(d) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Claim | Section 12.5 |
| Agent's Fee | Section 3.1(b) |
| Agent's Security Interest | Section 16.13 |
| Agreement | Preamble |

Exhibit ___1___
Page ___41___

| | |
|---|---|
| Approval Order | Section 2(c) |
| Bankruptcy Court | Section 2(c) |
| Benefits Cap | Section 4.1(c) |
| Central Service Expenses | Section 4.1 |
| Chapter 11 Case | Section 2(c) |
| Defective Merchandise | Section 5.2(b) |
| Designated Merchant Accounts | Section 3(d)(ii) |
| Distribution Center | Recitals |
| Event of Default | Section 14 |
| Estimated Guaranteed Amount | Section 3.3(a) |
| Excluded Benefits | Section 4.1 |
| Expenses | Section 4.1 |
| Expense L/C | Section 4.2(a) |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 3.4 |
| FF&E | Section 15 |
| FF&E Election | Section 15 |
| Fleet | Section 2(c) |
| GOB Laws | Section 2(b) |
| Guaranty Percentage | Section 3.1(a) |
| Guaranteed Amount | Section 3.1(a) |
| Guaranty L/C | Section 3.3(b) |
| Gross Rings | Section 6.3 |
| Initial Guaranty Payment | Section 3.3(a) |
| | |
| Inventory Completion Date | Section 5.1 |
| Inventory Date | Section 5.1 |
| Inventory Taking | Section 5.1 |
| Inventory Taking Service | Section 5.1 |
| Leases | Section 2(b) |
| Lenders | Section 2(c) |
| Merchandise | Section 5.2(a) |
| Merchant | Preamble |
| Occupancy Expenses | Section 4.1 |
| Payment Date | Section 3.3(a) |
| Proceeds | Section 7.1 |
| Recovery Amount | Section 3.1(b) |
| Remaining Merchandise | Section 3.2 |
| Retail Price | Section 5.3 |
| Retained Employee | Section 9.1 |
| Retention Bonus | Section 9.4 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1 |

Exhibit _____ 1

Page _____ 42

| | |
|---|---|
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3 |
| Sharing Threshold | Section 3.1(b) |
| Store(s) | Recitals |
| Third Party | Section 4.1 |

  1.2  <u>Exhibits</u>. The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section Reference | Description |
|---|---|---|
| Exhibit 1A | Recitals | List of Stores |
| Exhibit 1B | Recitals | The Distribution Center |
| Exhibit 3.3(b) | Section 3.3((b) | Form of Guaranty L/C |
| Exhibit 4.1(a) | Section 4.1(a) | Occupancy Expense Schedule |
| Exhibit 4.2(a) | Section 4.2(a) | Form of Expense L/C |
| Exhibit 5.1 | Section 5.1 | Inventory Taking Instructions |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |
| Exhibit 11.1(d) | Section 11.1(d) | List of Liens |
| Exhibit 11.1(q) | Section 11.1(q) | Inventory Adjustment Schedule |
| Exhibit 12.4 | Section 12.4 | Agent Insurance Policies |

  Section 1.3  <u>Currency</u>. Unless otherwise specified, all references to monetary amounts refer to United States dollars.

  Section 2.  <u>Appointment of Agent; Bankruptcy Court Approval</u>.

  (a)  Merchant hereby appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.

  (b) Agent shall conduct the Sale as a "going-out-of-business" or "store closing" sale in accordance with the GOB Laws (as defined below). It is expressly agreed that Agent shall be entitled to conduct and advertise the Sale consistent with the preceding sentence (subject to Merchant's prior approval as to the content and form of said advertising, as provided for below); <u>provided</u> <u>however</u> that Agent shall conduct and advertise the Sale in accordance with (i) all applicable laws, rules and regulations, including without limitation, any and all federal, state and local laws regulating "going out of business," "store closing," or similar theme sales (collectively, the "<u>GOB Laws</u>") and (ii) the terms and conditions of the leases and other lease instruments covering the Stores (collectively, the "<u>Leases</u>"). Agent, with Merchant's assistance, shall be responsible for obtaining any and all applicable licenses, permits and/or approvals under the GOB Laws (the costs of which shall constitute an Expense hereunder) or otherwise to conduct the Sale in accordance therewith, and as all such licenses, permits and/or approvals are

-3-



Exhibit _____ 1

Page _____ 43

obtained, Agent shall promptly notify Merchant. Promptly upon obtaining such licenses, permits and/or approvals, and, in any event, subject to the terms of the Leases, Agent may conduct a "store closing", "going out of business", or similar sale at the Stores for which all such required licenses, permits and/or the approvals referenced in this Section 2(b) have been obtained.

(c)  Notwithstanding the restrictions in Section 2(b) regarding the GOB Laws and the Leases, in the event that Merchant becomes a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, then, as soon as practicable after commencement of the Merchant's Chapter 11 Case (the "Chapter 11 Case"), Merchant shall apply to the applicable Bankruptcy Court (the "Bankruptcy Court") for an order approving the assumption of this Agreement in its entirety (the "Approval Order").  The Approval Order shall provide, in a form reasonably satisfactory to the Merchant and Agent, *inter alia*, that (i) assumption of this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (ii) Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iii) Agent shall be entitled to sell all Merchandise hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or the Proceeds attaching only to the Guaranteed Amount and other amounts to be received by Merchant under this Agreement; (iv) Agent shall have the right to use the Stores and all related services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person; (v) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale as a "going-out-of-business", "store closing" or similar type sale without further consent of any person (other than Merchant as provided herein below), in accordance with the Sale Guidelines (as the same may be modified and approved by the Court) and without further compliance with the GOB Laws or the Leases; (vi) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos and customer lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising and conducting the Sale in accordance with the terms of the Agreement; (vii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, conducting and advertising of the Sale in the manner contemplated by this Agreement; (viii) all utilities, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (ix) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (x) Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement, and Agent shall have no successorship liabilities whatsoever; and (xi) the lien granted to the Agent hereunder shall be a valid, duly perfected first priority lien and security interest in the Merchandise and any Proceeds, to the extent Agent has tendered payment of the Guaranteed Amount, the Recovery Amount, if any, and Expenses, to which Agent is entitled in accordance with the terms of this Agreement, as well as a superpriority administrative claim to such extent in the Chapter 11 Case, which claim

-4-

Exhibit _____ 1
Page _____ 44

shall be subordinate to the claims of Fleet Retail Finance Inc. ("Fleet"), Fog Cutter Capital Group, and Cruttenden Partners LLC, if any (collectively, the "Lenders"), solely to the extent of any unpaid amounts due Merchant hereunder. In addition to any other stated terms and conditions, any Approval Order shall be in form and substance reasonably acceptable to the Lenders.

> Section 3.    Guaranteed Amount and Other Payments

>> 3.1    Payments to Merchant and Agent.

(a)    As a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive the sum of (i) the Guaranty Percentage multiplied by (ii) the aggregate Retail Price of the Merchandise included in the Sale (the "Guaranteed Amount"). As used herein, "Guaranty Percentage" shall mean (A) 50.5%, if the Approval Order is issued on or before May 23, 2003, (B) 49.5%, if the Approval Order is issued after May 23, 2003 but on or before May 30, 2003, and (C) 48.5%, if the Approval Order is issued after May 30, 2003 but on or before June 6, 2003. In the event that the Approval Order shall not be entered by June 6, 2003, Agent may exercise its rights under the last sentence of Section 3.3(c) hereof.

(b)    To the extent that Proceeds exceed the sum of (x) the Guaranteed Amount, (y) Expenses of the Sale and (z) two percent (2%) of the aggregate Retail Price of the Merchandise (the "Agent's Fee") (the sum of (x), (y) and (z), the "Sharing Threshold"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared fifty percent (50%) to Merchant and fifty percent (50%) to Agent. All amounts, if any, to be received by Merchant from Agent in excess of the Sharing Threshold shall be referred to as the "Recovery Amount". Agent shall pay to Merchant the Guaranteed Amount and the Recovery Amount, if any, in the manner and at the times specified in Section 3.3 below. The Guaranteed Amount and the Recovery Amount will be calculated based upon the aggregate Retail Price of the Merchandise as determined by (A) the Final Inventory Report, (B) the aggregate amount of Gross Rings (as adjusted for shrinkage per this Agreement), and (C) the aggregate Retail Price of On-Order Merchandise included in the Sale.

>> 3.2    Payments to Agent. Agent shall receive as its compensation for services rendered to Merchant, all remaining Proceeds of the Sale after payment of the Guaranteed Amount, the Recovery Amount, if any, and all Expenses. All unsold Merchandise remaining, if any, in the Stores at the Sale Termination Date ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims and encumbrances and shall be removed by Agent prior to vacating the Stores; provided, however, that Agent shall use its reasonable best efforts to sell all of the Merchandise during the Sale; provided, further, any proceeds received by Agent from the disposition of such Remaining Merchandise shall constitute Proceeds hereunder.

>> 3.3    Time of Payments and Control of Proceeds

(a)    Until such time as the Approval Order is entered, during each week's

-5-

reconciliation as provided for in Section 8.7 below and until the Payment Date (as defined below), (x) Merchant shall pay the Expenses of the Sale as such Expenses are incurred and become due and owing for that week, and (y) all Proceeds for such week shall be paid to Merchant on account of such Expenses and the Guaranteed Amount until such Expenses and the Guaranteed Amount shall have been paid in full.  Notwithstanding the foregoing, on the first business day following issuance of the Approval Order (the "Payment Date"), Agent shall pay to Merchant eighty-five percent (85%) of the unpaid Estimated Guaranteed Amount (the "Initial Guaranty Payment"), calculated based upon the estimated aggregate Retail Price of the Merchandise to be included in the Sale (the "Estimated Guaranteed Amount") by wire transfer to an account as shall be designated by Merchant.  Following the Payment Date, the unpaid portion of the Guaranteed Amount, if any, or of the Estimated Guaranteed Amount shall be paid by Agent to Merchant on the date (the "Final Payment Date") which is the *earlier* of: (i) the date thirty (30) days after the Sale Commencement Date (in which case payment shall be of the undisputed portion of the Estimated Guaranteed Amount); and (ii) the first business day following the completion of (A) the Inventory Taking at each of the Stores and issuance of the final audited report by the Inventory Taking Service, after verification thereof by Agent and Merchant (the "Final Inventory Report (B) the final reconciliation of On-Order Merchandise which has been received at the Stores and the calculation of the Guaranteed Amount attributable thereto, to the extent not paid as part of the weekly reconciliations provided for in Section 8.7 hereof, and (C) the final reconciliation of Merchandise that is the subject of Gross Rings.  The Agent and Merchant shall use their reasonable best efforts to reconcile the results of the Inventory Taking within seven (7) days following issuance of the Final Inventory Report.  In the event that the Final Inventory Report is issued after payment by Agent of the unpaid portion of the Estimated Guaranteed Amount in accordance with clause (i) hereof, the Agent or Merchant, as the case may be, shall, within two (2) business days after reconciliation of the Inventory Taking (and in any event within ten (10) days after issuance of the Final Inventory Report), pay to the Merchant or Agent, as the case may be, the amount (the "Adjustment Amount") by which the actual Guaranteed Amount exceeds or is less than the Estimated Guaranteed Amount actually paid as set forth above.  In the event there is any dispute with respect to the calculation of the Variance and/or reconciliation of the aggregate Retail Price of the Merchandise following the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 3.4(b) hereof.

(b)     To secure payment of the unpaid balance of the Guaranteed Amount, the Recovery Amount (if any), and any other amounts due from Agent to Merchant hereunder, Agent shall deliver to Merchant an irrevocable and unconditional standby letter of credit, naming the Merchant as beneficiary, in the original face amount equal to the unpaid fifteen percent (15%) of the Estimated Guaranteed Amount, substantially in the form of Exhibit 3.3(b) attached hereto (the "Guaranty L/C").  The Guaranty L/C shall be delivered to Merchant no later than two (2) business days following the Sale Commencement Date, shall be issued by a bank selected by Agent and reasonably acceptable to Merchant and Fleet, as Merchant's senior secured lender, and shall contain terms, provisions and conditions mutually acceptable to Merchant, Fleet, as Merchant's senior secured lender, and Agent.  The Guaranty L/C shall expire no earlier than sixty (60) days after the Sale Termination Date.  Unless the parties shall have mutually agreed

-6-

Exhibit _____ 1
Page _____ 46

that they have completed the Final Reconciliation, then, at least thirty (30) days prior to the initial or any subsequent expiry date of the Guaranty L/C, Merchant shall receive an amendment to the Guaranty L/C extending (or further extending, as the case may be) the expiry date by at least sixty (60) days.  If Merchant fails to receive such amendment to the Guaranty L/C no later than thirty (30) days before the applicable expiry date, then Merchant shall be permitted to draw under the Guaranty L/C in payment of amounts owed in respect of the Guaranteed Amount, Expenses and the Recovery Amount (if any), and Merchant shall hold the balance of the amount drawn under the Guaranty L/C in escrow as security for amounts that may become due and payable to Merchant hereunder.  In the event that Agent, after receipt of five (5) days written notice from Merchant fails to pay any unpaid portion of the Guaranteed Amount or other obligation due hereunder which is not the subject of a good faith dispute between Merchant and Agent, Merchant may draw on the Guaranty L/C in an amount equal to the unpaid, past due portion of the Guaranteed Amount or other obligations hereunder.  Merchant and Agent agree that after payment of the unpaid portion of the Guaranteed Amount (whether the Estimated Guaranteed Amount or the Guaranteed Amount calculated pursuant to the Final Inventory Report) pursuant to Section 3.3(a), the face amount of the Guaranty L/C shall be reduced in an amount(s) to be agreed upon by Merchant and Agent.

(c)     To the extent that any payments by the Agent to the Merchant, including payments on account of the Estimated Guaranteed Amount, exceed the actual amount that the Merchant is entitled to receive, including on account of the Guaranteed Amount (such excess, an "Excess Payment", then the Merchant shall promptly reimburse such Excess Payment(s) to Agent.  In the event that one or more of the Lenders shall have received such Excess Payment(s), then the Lender(s) who received such Excess Payment(s) shall promptly remit to the Agent such Excess Payment(s) in the inverse order of priority of the Lenders respective security interests.  In the event that the Bankruptcy Court does not enter the Approval Order by June 6, 2003, then (x) Merchant and/or the Lenders shall reimburse Agent's Reimbursable Expenses, or (y) to the extent Merchant or Lenders fail to, within ten (10) days of Agent's demand therefor, reimburse Agent's Reimbursable Expenses, Agent shall have the immediate right to enforce its security interest in the Merchandise and the Proceeds, as granted pursuant to Section 16.13 hereof.

(d)     (i)  From the Sale Commencement Date through the date of issuance of the Approval Order, all Proceeds of the Sale (including credit card proceeds), shall be collected by Agent and deposited on a daily basis into Merchant's existing accounts designated for the Stores (the "Designated Merchant Accounts").  Prior to payment of the Initial Guaranty Payment by the Agent and delivery of the Guaranty L/C and the Expense L/C, all Proceeds shall be applied by Merchant against the Guaranteed Amount and Expenses as provided in Section 3.3(a) above.

(ii)  Provided that Agent has paid the Initial Guaranty Payment and delivered the Guaranty L/C and the Expense L/C, within ten (10) business days after issuance of the Approval Order, Agent may establish its own accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder  (the "Agency Accounts"), over which accounts Agent shall exercise sole signatory authority and control.

-7-

Exhibit _____1_____

Page _____47_____

Merchant shall promptly upon Agent's request execute and deliver all necessary documents to open and maintain the Agency Accounts. Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to the Agency Accounts. Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term. Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts as provided in this Section 3.3(d) and 7.2 hereof. At Agent's election, agent may designate the Designated Merchant Accounts as the Agency Accounts hereunder, and such accounts shall thereafter be used solely for the deposit of Proceeds of the Sale (including credit card proceeds) and the disbursement of amounts payable by Agent hereunder.

(iii) Commencing on the first business day following the establishment of the Agency Accounts, and on each business day thereafter (or as soon thereafter as is practicable), Merchant shall promptly pay to Agent by wire funds transfer all collected funds constituting Proceeds deposited in the Designated Merchant Accounts (but not any other funds, including, without limitation, any proceeds of Merchant's inventory sold prior to the Sale Commencement Date, such as special order goods or collections of accounts receivable at the Store level, if any). Following payment of the Initial Guaranty Payment and delivery of the Guaranty L/C and the Expense L/C, Agent shall control the Proceeds of the Sale, and the Lenders shall not take any action with respect to such Proceeds deposited into the Designated Merchant Accounts or the Agency Accounts, which Proceeds shall inure solely for the benefit of Agent, subject only to Agent's payment obligations hereunder.

(e)    Agent shall be permitted to satisfy a portion of its payment obligations under this Section 3.3 by offsetting undisputed Proceeds held by Merchant against such payment obligations; provided however, nothing contained in this Section 3.3(e) shall be deemed to amend, modify or otherwise affect the timing of Agent's obligations to pay the Guaranteed Amount or the Estimated Guaranteed Amount pursuant to Section 3.3(a).

3.4    Final Reconciliation. (a) Within thirty (30) days after the Sale Termination Date, Agent and Merchant, in consultation with the Lenders, shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, taxes, Expenses, and any other accountings required hereunder (the "Final Reconciliation"). Within five (5) days of completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid from Proceeds or, if there are insufficient Proceeds deposited by Agent with Merchant, by Agent. In the absence of an order of the Bankruptcy Court, no such amount(s) which are disputed by the parties shall be paid until the dispute has been resolved by agreement of the parties or as determined in the manner prescribed in Section 3.4(b) hereof. During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, each party shall have reasonable access to the records maintained by the other with respect to Proceeds, taxes and Expenses, to review and audit such records.

(b)    In the event that there is any dispute with respect to the Final

-8-

Exhibit _____ 1
Page _____ 48

Reconciliation, such dispute shall be promptly (and in no event later than the third business day following the request by either Merchant or Agent) submitted to the Bankruptcy Court for a determination. Merchant and Agent hereby agree to submit to the jurisdiction of the Bankruptcy Court for such determination.

Section 4.    Expenses of the Sale.

    4.1    Expenses. Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale during the Sale Term, which expenses may be funded and paid from the Proceeds of the Sale, to the extent available and in accordance with Section 4.2 below. No later than two (2) business days after the Sale Commencement Date, Agent shall furnish to Merchant an Expense budget for the Sale Term, which budget shall be subject to Merchant's reasonable approval. As used herein, "Expenses" shall mean all Store operating expenses of the Sale which arise during the Sale Term at the Stores, limited to the following (unless otherwise specified herein):

    (a) From and including the Sale Commencement Date through and including the Vacate Date for each Store, Occupancy Expenses, on a per Store, per diem basis, in an aggregate amount for each Store equal to the applicable per diem amounts set forth on Exhibit 4.1(a) annexed hereto;

    (b) Payroll for all Store-level Retained Employees used in conducting the Sale for the actual days worked (or in the case of hourly employees, the hours worked) in connection with the Sale;

    (c) Any amounts payable or accrued by Company for benefits for Retained Employees used in the Sale (including, but not limited to, FICA, unemployment taxes, workers' compensation and health care insurance benefits, pension and 401-K benefits, but excluding Excluded Benefits) in an amount not to exceed eighteen percent (18 %) of base payroll for each Retained Employee ("Benefits Cap");

    (d) Actual costs of Agent's on-site supervision, supervisor travel and supervisor bonuses;

    (e) In-Store signs and banners which are produced for the Sale;

    (f) Promotional costs including, without limitation, advertising, and direct mail;

    (g) The costs and expenses of obtaining additional supplies as may be required by Agent to conduct the Sale;

    (h) Long distance telephone charges from the Stores,

-9-

Exhibit _____1/2_____

Page _____49_____

(i) Bank fees and charges, including wire transfer charges, Credit card and bank card fees (including processing fees), chargebacks and discounts;

(j) Costs of moving, transferring or consolidating Merchandise between Stores;

(k) A pro rata share of Merchant's casualty, property, and general liability insurance premiums attributable to the Stores;

(l) Trash removal and ordinary course third party cleanings;

(m) Store security and building alarm services, to the extent not included as an Occupancy Expense;

(n) Fifty percent (50%) of cost of the physical inventory taking (Agent's portion) by the Inventory Taking Service;

(o) Agent's actual cost of capital, costs of establishing and maintaining the Agency Accounts, letter of credit fees and legal fees and expenses;

(p) Armored car fees;

(q) Retention Bonuses for Retained Employees as provided for in Section 9.4 hereof;

(r) Third party payroll processing costs; and

(s) Postage/overnight or delivery/courier charges; and

(t) Subject to Merchant's prior consent (which consent will not be unreasonably withheld or delayed), such other costs related to the Sale directly authorized, incurred or deemed appropriate by the Agent.

"Expenses" shall not include: (i) Central Service Expenses; (ii) Excluded Benefits; (iii) any rent or other occupancy expenses other than Occupancy Expenses in accordance with Section 4.1(a) hereof; and (iv) any costs, expenses or liabilities arising during the Sale Term, other than the Expenses listed above, all of which shall be paid by Merchant promptly when due during the Sale Term.

As used herein, the following terms have the following respective meanings:

"Central Services Expenses" means costs and expenses for Merchant's central

-10-

Exhibit _____ 1 _____

Page _____ 50 _____

administrative services necessary for the Sale, including, but not limited to, MIS services, inventory processing and handling, data processing and reporting, and payroll processing, to the extent such services are normally provided by Merchant, in house.

"Excluded Benefits" means vacation days or vacation pay, sick days or sick leave, maternity leave or other leaves of absence, termination or severance pay, ERISA coverage and similar contributions (other then pension and 401(k) contributions), that accrued prior to or after the Sale Commencement Date, and amounts payable in respect of employee benefits in excess of the Benefits Cap .

"Occupancy Expenses" means rent (including, base rent and any portion of percentage rent specifically allocable to the period of the Sale Term on an annualized basis), CAM (including, but not limited to, trash removal, snow removal, sprinkler expense and landscaping), real estate and use taxes, HVAC, utilities, telephone charges (including base telephone, leased line charges and data circuit charges), personal property leases (including, point of sale equipment), personal property taxes, equipment repair and maintenance (including cash register maintenance), building maintenance, systems repair and systems maintenance (including POS systems, store servers, signature pads, routers).

"Third party" means, with reference to any Expenses to be paid to a "third party", a party that is not affiliated with or related to Merchant.

Notwithstanding anything to the contrary contained herein, to the extent that any item of Expense listed in Section 4.1 is also included within Occupancy Expenses, then Exhibit 4.1(a) shall control and such Expense shall not be double counted.

4.2   Payment of Expenses; Security. (a) All Expenses incurred during each week of the Sale (i.e. Sunday through Saturday) shall be offset from Proceeds held by Merchant or, following payment of the Initial Guaranty Payment, paid by Agent to or on behalf of Merchant, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7 below, based upon invoices and other documentation reasonably satisfactory to Agent; except with respect to Occupancy Expenses, which, following payment of the Initial Guaranty Payment, shall be funded weekly in advance by Agent during the Sale Term. To secure Agent's obligations to pay Expenses, Agent shall deliver to Merchant an irrevocable and unconditional standby letter of credit substantially in the form of Exhibit 4.2(a) (the "Expense L/C") in an original face amount equal to two (2) weeks' estimated Expenses), naming Merchant as beneficiary.  The Expense L/C shall be delivered to Merchant no later than two (2) business days after the Sale Commencement Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to the Merchant and Fleet, as Merchant's senior secured lender.

(b)   Following the issuance of the Approval Order, in the event that Agent fails to pay any Expense(s) within three (3) business days after Merchant notifies Agent in writing that any Expense(s) is/are unpaid and past due, or in the event the Expense L/C will expire

-11-

Exhibit _____ 1
Page _____ 5 1

within 5 business days and certain Expenses are unpaid, Merchant shall be entitled to draw on the Expense L/C to fund such unpaid Expense which is not the subject of a good faith dispute between Merchant and Agent. The Expense L/C shall expire not earlier than the date that is sixty (60) days after the Sale Termination Date.

Section 5.    Inventory Valuation; Merchandise.

5.1    Inventory Taking.    (a) Merchant, Agent and Fleet, as Senior Secured Lender, shall cause to be taken a SKU and retail physical inventory of the Merchandise located in the Stores (the "Inventory Taking"), which Inventory Taking shall be completed in all of the Stores no later than five (5) days after the Sale Commencement Date (the "Inventory Completion Date", and the date of the Inventory Taking at each Store being the "Inventory Date" for each such Store). Merchant and Agent shall jointly employ RGIS or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions attached hereto as Exhibit 5.1 (the "Inventory Taking Instructions"). As an Expense, Agent shall be responsible for 50% of the fees and expenses of the Inventory Taking Service and the balance of such fees and expenses shall be paid by Merchant. Except as provided in the immediately preceding sentence, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking. Merchant and Agent shall each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the conduct of the Inventory Taking in each of the Stores, the applicable Stores shall be closed to the public and no sales or other transactions shall be conducted. Agent shall provide Merchant with a budget concerning the cost of the Inventory Taking prior to the Sale Commencement Date.

(b)    The Retail Price of On-Order Merchandise shall be determined based upon receipts of such Merchandise at the Stores.

5.2    Merchandise Subject to this Agreement.    (a) For purposes of this Agreement, including, without limitation, the calculation of the Guaranteed Amount and the Recovery Amount, if any, "Merchandise" shall mean (i) all finished goods inventory that is owned by Merchant located in the Stores on the Sale Commencement Date, including, but not limited to, (A) Defective Merchandise for which Merchant and Agent can mutually agree upon a "Retail Price", (B) Merchandise subject to Gross Rings, (C) Color Wave Clearance Merchandise, and (D) Holiday Merchandise, and (ii) On-Order Merchandise. Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees or concessionaires of Merchant, unless Merchant, Agent and the respective sublessees, licensees or concessionaires otherwise agree; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) customer owned goods that have been placed in Merchant's care for purposes of repair or storage, or special orders which are awaiting customer pick-up; (4) defective

-12-

Exhibit _____/_____
Page _____5ᵈ_____

merchandise for which Merchant and Agent cannot agree upon the appropriate Retail Price; (5) goods identified in Merchant's books and records in "Department 996" and "Department 997", to the extent such goods are non-saleable in the ordinary course of business; and (6) furnishings, trade fixtures furniture and equipment and improvements to real property which are located in the Stores and the Distribution Center. Merchant shall have the obligation and bear all cost and expense (including all costs of labor, freight, supplies and insurance) of transferring the On-Order Merchandise from the Distribution Center to the Stores. Merchant shall allocate On-Order Merchandise between and amongst the Stores consistent with its past practices, provided, however, that if Agent elects to reallocate such On-Order Merchandise and to the extent such reallocation causes such goods to arrive in the Stores after the fourteenth (14th) day after the Sale Commencement Date, Agent shall not be entitled to apply the prevailing discount adjustment in determining the Retail Price for such goods.

(b)     As used herein, the following terms shall have the respective meanings set forth below:

"Holiday Merchandise" shall mean (i) holiday goods relating exclusively to holidays falling outside of the Sale Term, including Christmas and Valentines Day, and (ii) goods relating primarily to the winter season such as flannel sheets.

"Color Wave Clearance Merchandise" shall mean  any goods which have been marked with colored dots evidencing that such item has been placed on "clearance" at a predetermined discount as evidenced by the color of the dot affixed to such item

"Defective Merchandise" shall mean any goods reasonably agreed upon by Merchant and Agent during the Inventory Taking as damaged or defective or otherwise not customarily offered by Merchant in the ordinary course at full price because they are torn, shopworn, or faded. Display Merchandise shall not be deemed defective per se.

"On Order Merchandise" shall mean merchandise currently ordered by Merchant, as identified on **Exhibit 5.2(b)** annexed hereto or stocked in Merchant's Distribution Center as of the Sale Commencement Date, but which is not received in the Stores until after  the Sale Commencement Date.

5.3     Valuation. (a) For purposes of this Agreement, "Retail Price" shall mean, for each item of Merchandise, except with respect to Defective Merchandise, Color Wave Clearance Merchandise, Holiday Merchandise, and On-Order Merchandise received in the Stores more than fourteen (14) days after the Sale Commencement Date, the lower of (a) the lowest ticketed or marked price affixed to such item of Merchandise, or regular, non-temporary pricing signage for such item of Merchandise, and  (b) the SKU, price look up, scan or item fixed price in effect on the Sale Commencement Date; in each case excluding all Excluded Pricing Adjustments (the "Base Retail Price"). With respect to: (i) Defective Merchandise, "Retail Price" shall mean such price as Merchant and Agent shall mutually agree; (ii) Holiday Merchandise, "Retail Price" shall mean the lower of (x) the ticketed, marked or signed price, or (y) fifty percent (50%) of the

-13-

Exhibit _____ 1 _____

Page _____ 53 _____

original retail price of such item;  (iii) Color Wave Clearance Merchandise, "Retail Price" shall mean such retail price as established by the colored dots affixed to said item of Merchandise or the lowest ticketed, marked or signed price of such merchandise; and (iv) On-Order Merchandise received at the Stores more than fourteen (14) days after the Sale Commencement Date, "Retail Price" shall mean the Base Retail Price for such item of Merchandise, multiplied by the inverse of the prevailing discount in effect on the date such On Order Merchandise is received in the applicable Store.

       (b)     The Retail Price of any item of Merchandise shall be determined as provided for by this Agreement and in accordance with the Inventory Taking Instructions set forth in **Exhibit 5.1**.  For the purposes of this Agreement, "Excluded Pricing Adjustments" shall mean the following discounts or price adjustments offered by Merchant during the applicable period: (i) employee discounts; (ii) rewards points, coupons, or newspaper inserts; (iii) multi-unit purchase discounts; (iv) adjustments for damaged or defective items; (v) point-of sale discounts, temporary toppers or signage, or similar discounts, except with respect to Color Wave Clearance Merchandise; and (vi) similar customer specific or employee non-product specific discounts or pricing accommodations.

      ( c)     Merchant and Agent agree that in lieu of other pricing adjustments for various categories of Merchandise, other than as expressly set forth in Section 5.3(a) hereof, for purposes of determining the Guaranteed Amount (and not for purposes of calulating whether the Merchandise Threshold has been satisfied), the aggregate Retail Price of the Merchandise, as determined by the Final Inventory Report,  shall be subject to a single global downward adjustment (ie. reduction) equal to one and one-half percent (1.5%) (the "Global Inventory Adjustment").

      (d)     In the event of a conflict between this Agreement and the Inventory Taking Instructions, the terms of this Agreement shall control.  The Retail Price of any item of Merchandise shall exclude all Sales Taxes, and Merchant represents that the ticketed prices of items of Merchandise at the Stores do not and shall not include any Sales Taxes.  If an item of Merchandise has more than one ticketed price, or if multiple items of the same SKU are ticketed or marked at different prices, or have a different SKU or PLU price, the lowest ticketed, marked, SKU or PLU price on any such item shall prevail for such item or for all such items within the same SKU (as the case may be, the "Lowest Store Price"), as the case may be, that are located within the same Store, unless it is reasonably determined by Merchant and Agent that the applicable Lowest Store Price was mismarked or marked as "as is", in which case the higher price shall control; provided however, in determining the Lowest Store Price with respect to any item of Merchandise at the Stores, the Lowest Store Price shall be determined based upon the lowest ticketed, marked, SKU, or PLU price for such item on a per Store basis.  No adjustment to Retail Price shall be made with respect to different ticketed price, marked price, SKU or PLU prices for items located in different Stores.

    5.4    **[Intentionally Left Blank]**

-14-

Exhibit _____/_____

Page ____54____

5.5    Excluded Goods. Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder. At Merchant's election, to be exercised on or before the Sale Commencement Date, Agent shall accept goods not included as "Merchandise" hereunder for sale as "Merchant Consignment Goods" at prices established by the Agent. The Agent shall retain twenty percent (20%) of the sale price for all sales of Merchant Consignment Goods, and Merchant shall receive eighty percent (80%) of the receipts in respect of such sales. Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7 . If Merchant does not elect to have Agent sell Defective Merchandise or other merchandise not included as Merchandise, then all such items will be removed by Merchant from the Stores at its expense as soon as practicable after the Sale Commencement Date. Except as expressly provided in this Section 5.5, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.    Sale Term.

6.1    Term. Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at all Stores on or before May 20, 2003 (the "Sale Commencement Date"). Subject to any restrictions that may exist by virtue of applicable law or regulation (except as may otherwise be provided in the Approval Order), the Agent shall complete the Sale at each Store, and shall vacate each Store's premises in favor of Merchant or its representative or assignee on or before August 10, 2003 (the "Sale Termination Date"). The period from the Sale Commencement Date to the Sale Termination Date with respect to any Store shall be referred to herein as the "Sale Term." Subject to applicable law or regulation (except as may otherwise be provided in the Approval Order), the Sale Termination Date may be (a) extended by mutual written agreement of Agent and Merchant; or (b) accelerated by Agent, in which case Agent shall provide Merchant with not less than seven (7) days advance written notice of any such planned accelerated Sale Termination Date.

6.2    Vacating the Stores. Subject to the terms of Section 6.1 hereof, Agent shall provide Merchant with not less than seven (7) days' advance written notice of the date Agent shall vacate any Store (as to each Store, the "Vacate Date"). On the Vacate Date, Agent shall vacate in favor of Merchant or its representatives or assignee, remove all Remaining Merchandise and leave the Stores in "broom clean" condition (ordinary wear and tear excepted). Agent's obligation to pay all Expenses, including Occupancy Expenses, for each Store shall continue until the applicable Vacate Date for such Store. All assets of Merchant used by Agent in the conduct of the Sale (e.g. FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores' premises at the end of the Sale Term to the extent the same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent (other than Remaining Merchandise, which shall be Sold). Where reference is made in this Section 6 to vacating the Stores, such shall mean vacating the Stores in favor of Merchant, its representatives or assignee and shall not mean vacating possession or disclaimer of lease in favor of the landlord or owner of the Store premises unless otherwise ordered by the Bankruptcy Court

-15-

Exhibit _____/_____

Page _____55_____

or consented to by Merchant.

 6.3 <u>Gross Rings</u>.  In the event that the Sale commences at any Store prior to the completion of the Inventory Taking at such Store, then for the period from the Sale Commencement Date until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes ("<u>Gross Rings</u>"), and (ii) cash reports of sales within such Stores.  Register receipts shall show for each item sold the Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in connection with such sale.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of 101.5% of the aggregate Retail Price of Merchandise sold at the applicable Stores during the Gross Rings period (without taking into account any point of sale discounts or point of sale markdowns granted by Agent in connection with the Sale).

 <u>Section 7.</u> <u>Sale Proceeds</u>.

 7.1 <u>Proceeds</u>.  For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement, exclusive of Sales Taxes, and specifically excluding (i) proceeds from Merchant's sale of merchandise prior to the Sale Commencement Date, such as special order goods, and (ii) collections of accounts receivable at the Store level, if any; and (b) all proceeds of Merchant's insurance for loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term; <u>provided</u> however, to the extent that such insurance proceeds exceed the sum of the portion of the Guaranteed Amount attributable to the damaged Merchandise, Expenses incurred to date and directly attributable to the sale of such lost or damaged Merchandise and/or the applicable Store, and Agent's Fee attributable or that would have been attributable to such lost or damaged Merchandise (the "<u>Insurance Proceeds Threshold</u>"), then the excess insurance proceeds above the Insurance Proceeds Threshold shall be shared equally between Merchant and Agent.  Proceeds shall also include any and all proceeds received by Agent from the disposition, in a commercially reasonable manner, of Remaining Merchandise at the end of the Sale whether through salvage, bulk sale or otherwise.

 7.2 <u>Credit Card Proceeds</u>.  Agent shall use its reasonable best efforts to establish its own merchant identification numbers under Agent's name to enable Agent to process all credit card sales for Agent's account within ten (10) business days after issuance of the Approval Order.  During the Sale Term, Agent may use Merchant's credit card facilities (including Merchant's credit card terminals and processor(s), credit card processor coding) for credit card sales; <u>provided</u> <u>however</u>, until such time as Agent establishes its own identification numbers, to the extent available, Agent shall also have the right to use Merchant's identification number(s) and existing bank accounts, to process credit card sales.  Merchant shall process credit card transactions, applying customary practices and procedures.  Merchant shall cooperate with Agent to down-load data from all credit card terminals each day during the Sale Term and to effect settlement with Merchant's credit card transactions under Merchant's merchant

-16-

Exhibit _____/_____

Page _____5 6_____

identification number(s). Until such time as Agent establishes its own merchant identification numbers, Merchant shall deposit the net settlement received from any credit card sales receipts into the Designated Merchant Accounts. Merchant shall prepare a weekly reconciliation of the amounts deposited to the designated account in respect of the sales of Merchandise by credit, plus Sales Taxes, less credit card and bank card fees, chargebacks and service charge adjustments, returns, allowances and customer credits. Merchant shall not be responsible for paying and Agent shall pay as an Expense hereunder, all credit card fees charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Merchant shall cooperate and assist Agent with respect to investigation of chargebacks.

      7.3    <u>Petty Cash</u>. In addition to the Guaranteed Amount, Agent shall reimburse Merchant on and as of the start of business on the Sale Commencement Date for all cash in the Stores.

<u>Section 8.</u>    <u>Conduct of the Sale.</u>

      8.1    <u>Rights of Agent</u>. Subject to applicable federal, state, and local law and the terms of the applicable Store Leases, mortgages, or other occupancy agreements, and subject to Agent's satisfaction of any applicable licensing or registration requirements under GOB Laws, except as may otherwise be provided in the Approval Order, Agent shall be permitted to conduct the Sale as a "going-out-of-business", "store closing," or similar theme sale in the Stores throughout the Sale Term in a manner consistent with the Sale guidelines annexed hereto as **Exhibit 8.1** (the "Sale Guidelines"). In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the right:

      (a)    to establish Sale prices and Stores hours which are consistent with the terms of applicable Store Leases, mortgages or other occupancy agreements, and local laws or regulations, including, without limitation, Sunday closing laws, except to the extent otherwise provided in the Approval Order;

      (b)    to use without charge during the Sale Term all FF&E, bank accounts (subject to Section 3.3(d) (other than Agent's obligation to pay bank fees pursuant to Section 4.1 hereof), Store-level customer lists and mailing lists, computer hardware and software, existing supplies located at the Stores, intangible assets (including Merchant's name, logo and tax identification numbers), Stores keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses. Agent shall exercise due care and return to the Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

      (c)    to use Merchant's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant in house, at no cost to Agent, <u>provided</u> however, that in the event Agent requests Merchant to

-17-

Exhibit _____1_____

Page _____5 7_____

provide services other than those normally provided to the Stores and relating to the sale of merchandise by Merchant in the ordinary course of business and as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant for the actual incremental cost of such services incurred by Merchant as an Expense of the Sale hereunder;

(d)    to establish and implement advertising, signage (including interior and exterior banners), and promotion programs consistent with a "going-out-of-business", "store closing," or similar theme sale, and as otherwise provided in the Approval Order and the Sale Guidelines (including, without limitation, by means of media advertising, A-frame, and similar signage and interior and exterior signs and banners); and

(e)    to transfer Merchandise between and among the Stores, and between the Distribution Center and the Stores.

8.2    Terms of Sales to Customers, Compliance With Applicable Law.

(a)    Subject to Agent's compliance with applicable law, all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same. Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers. All sales will be made only for cash, nationally recognized bank credit cards and, in Agent's discretion, personal checks, provided, however, if Agent determines to accept personal checks, Agent shall bear the risk of loss therefore. Agent shall not accept any coupons issued by Merchant prior to the Sale Commencement Date.

(b)    For the first thirty (30) days of the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, merchandise credits, and merchandise certificates issued by Merchant prior to the Sale Commencement Date. Merchant shall reimburse Agent in cash for such amounts during the weekly sale reconciliation provided for in Section 8.7 hereof.

(c)    Except as may otherwise be provided in the Approval Order, Agent shall comply with all applicable laws and regulations in its conduct of the Sale, including laws and regulations governing the advertising of the Sale, merchandise pricing and employment. If Agent fails to perform its responsibilities in accordance with this Section 8.2, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to comply with applicable laws and regulations.

8.3    Sales Taxes. During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, and deposited into Merchant's existing accounts, trust accounts or

Exhibit _____1_____
Page _____58_____

other accounts, as designated by Merchant. Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections. Provided Agent performs its responsibilities in accordance with this Section 8.3, Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

8.4   Supplies. Agent shall have the right to use all existing supplies necessary to conduct the Sale (e.g., bags, twine) but not gift certificates, rain checks, merchandise credits or the like, located at the Stores at no charge to Agent. In the event that additional supplies are required in any of the Stores during the Sale, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense hereunder; provided, however, that Merchant shall assist Agent in obtaining supplies from Merchant's vendors at Merchant's cost.

8.5   Returns of Merchandise. (a) During the first fourteen (14) days of the Sale Term, Agent shall accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date("Returned Merchandise"); provided that (i) such item was purchased within thirty (30) days prior to the date of such return; (ii) the customer has the original register receipt; and (iii) such return is not being made in contemplation of such customer repurchasing the item at the sale price being offered by Agent. Returned Merchandise shall be included in Merchandise and valued at the Retail Price applicable to such item less the prevailing Sale discount at the time of the return. The aggregate Retail Price of the Merchandise shall be increased by the Retail Price of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5), and the Guaranteed Amount shall be adjusted accordingly. Merchant shall provide Agent with the name and contact information for a Merchant representative to coordinate with any customers regarding any Returned Merchandise not accepted by Agent.

(b)   Agent shall reimburse customers for Returned Merchandise in the same tender as such item was purchased (the "Refund"). Merchant shall reimburse Agent in cash Refunds made by Agent in accordance with this Section 8.5, as part of the weekly reconciliation process.

-19-

Exhibit _____1_____

Page _____59_____

(c)     Any increases in the Guaranteed Amount or reimbursements to Agent in connection with Returned Merchandise shall be accounted for on a weekly basis, in connection with the weekly reconciliation process.  Any Returned Merchandise not included in Merchandise shall be disposed of by Agent in accordance with instructions received from Merchant or, in the absence of such instructions, returned to Merchant at the end of the Sale Term.

8.6     <u>Omitted.</u>

8.7     <u>Sale Reconciliation</u>.  On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant shall cooperate to reconcile Expenses, Gross Rings, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (*i.e.* Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent. Within thirty (30) days after the end of the Sale Term, Agent and Merchant shall complete the Final Reconciliation, the written results of which shall be certified by representations of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.

8.8     <u>Force Majeure</u>.  If any casualty, act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any Store, such Store and the Merchandise located at such Store shall, in Agent's discretion, be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; <u>provided, however,</u> that (i) subject to the terms of Section 7.1 above, the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds.

<u>Section 9.</u>     <u>Employee Matters.</u>

9.1     <u>Merchant's Employees</u>.  Subject to the terms of any collective bargaining agreement or employment contract, and with due regard to Merchant's past practices, policies and procedures relating to the employment of its employees, Agent may use Merchant's Store-level employees in the conduct of the Sale to the extent Agent, in consultation with Merchant, deems expedient.  Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "<u>Retained Employee</u>") and any employees who will not be used in connection with the Sale prior to the Sale Commencement Date.  Employees will be selected by seniority and status where possible or where required by the terms of any collective bargaining agreement.  Agent acknowledges that the selection and scheduling of Retained Employees and the decision to cease using Retained Employees in connection with the Sale shall be made with due regard to, but Agent shall not be obligated to comply with, Merchant's desire to minimize severance and termination costs to Merchant and to the extent reasonably possible shall be made

-20-

Exhibit_____
Page _____

so as not to interrupt any statutory working notice, provided that Agent's ability to terminate the Sale at any Sale Store under the terms of this Agreement shall not be impaired thereby. Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent. Merchant and Agent agree that, except to the extent that wages, vacation pay and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees. Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of its employees in anticipation of the Sale or prior to the Sale Termination Date. Merchant has not terminated and shall not during the Sale Term terminate any employee benefits or benefit programs, without prior written notice to Agent. It is understood and agreed that Agent's on-site supervisors shall not be employees of Merchant under any circumstances.

   9.2 <u>Termination of Employees</u>. Agent may in its discretion stop using any Retained Employee at any time during the Sale. In the event of Agent's termination of the services of any Retained Employee, Agent will provide written notice to Merchant at least seven (7) days prior thereto, except for a termination of services "for cause" (such as dishonesty, fraud or breach of employee duties), in which event no prior notice to Merchant shall be required, provided Agent shall notify Merchant as soon as practicable after such termination. Upon delivery to Merchant of a notice of termination of services of a Retained Employee, then Agent's obligations with respect to such Retained Employee terminate on the effective date of such termination, as provided for herein; provided however, although such Retained Employee will no longer be used in connection with the Sale, Merchant shall have the responsibility for terminating the employment of such Retained Employee. From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld). Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any claims by Retained Employees arising from Agent's treatment of such Retained Employees. Merchant shall consult with Agent prior to providing WARN Act notice of termination or layoff to the Retained Employees.

   9.3 <u>Payroll Matters</u>. During the Sale Term, Merchant shall process and pay the base payroll and all related payroll taxes, worker's compensation, employment and unemployment insurance, and benefits for all Retained Employees in accordance with its usual and customary procedures. Any additional personnel hired by Agent for the Sale shall not be deemed to be employees of Merchant, nor shall Merchant be obligated to process the payroll therefor or offer benefits to said additional personnel.

   9.4 <u>Employee Retention Bonuses</u>. Agent shall pay, as an Expense, retention

-21-

Exhibit _____/_____

Page _____6 /_____

bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable), up to a maximum of 10% of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause". The amount of such Retention Bonuses, shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system. Agent shall not utilize the Retention Bonus as a mechanism to incentivize Retained Employees to act contrary to Merchant's best interests.

Section 10.   Conditions Precedent. The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)   All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date.

(b)   The Sale shall commence in all of the Stores (subject only to the scheduling of the Inventory Taking at the Stores) no later than May 20, 2003. The Bankruptcy Court shall have entered an Approval Order in conformity with the requirements set forth in Section 2(c) hereof no later than June 6, 2003.

Section 11.   Representations, Warranties and Covenants.

11.1   Merchant's Representations, Warranties and Covenants. Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)   Merchant (i) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)   Subject to issuance and entry of the Approval Order, Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder. Subject to the issuance and entry

-22-

Exhibit ___1___

Page ___62___

of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval on the part of Merchant is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms. No court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for the Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Other than for any consent as shall be obtained prior to the Sale Commencement Date, and those contracts or agreements identified by Merchant to Agent on or prior to the Sale Commencement Date, if any, no contract or other agreement to which the Merchant is a party or by which the Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)    Since March 1, 2003, Merchant has not conducted any promotions or advertised sales at the Stores except promotions and sales in the ordinary course of business consistent with historic promotions and sales for comparable periods last year, except that Merchant has discontinued and cancelled substantially all POS promotions initially scheduled to take place during period covered by the Sale Term, except as was disclosed at the Auction.

(d)    Except for such pre-existing liens and security interests as shall have been disclosed by Merchant to Agent and identified in **Exhibit 11.1(d)** hereof (all of which, pursuant to the Approval Order shall attach only to the Guaranteed Amount, the Recovery Amount (if any), Expenses and other amounts payable to Merchant hereunder), Merchant owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise free and clear of all liens, claims and encumbrances of any nature.  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds, except for such pre-existing liens and security interests as shall have been disclosed by Merchant to Agent and identified in **Exhibit 11.1(d)** hereof.

(e)    Merchant has maintained its pricing files in the ordinary course of business consistent with historic practices, and prices charged to the public for goods (whether in-Store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein, including promotions and sales (including temporary POS markdowns).

(f)    As of the Sale Commencement Date, the levels of goods (as to quantity) and the mix of goods (as to type, category, style, brand and description) at the Stores are in all

-23-

Exhibit ___1___

Page ___63___

material respects described in the pricing and cost files made available to Agent, except as same may be affected by goods sold by Merchant in the ordinary course of business consistent with historic practices or otherwise affected by the lack of replenishment as provided for in Section 11.1(l) below.

(g)     Except as otherwise disclosed herein, as of the Sale Commencement Date, all normal course markdowns (either by means of POS markdowns or permanent markdowns) on inventory (including, without limitation, out of season, Holiday Merchandise, clearance and packaway merchandise) located at the Stores will have been taken in an amount consistent with Merchant's past practices and policies and have been programmed into Merchant's registers and point of sales equipment.

(h)     Since March 1, 2003, Merchant has not and shall not up to the Sale Commencement Date, marked up or raised the price of any items of Merchandise, or removed or altered any tickets or any indicia of clearance merchandise, except in the ordinary course of business consistent with historic practices and except for the effects of the termination of promotional events.

(i)     Merchant shall ticket or mark all items of inventory received at the Stores prior to and following the Sale Commencement Date (including, without limitation, On Order Merchandise) in a manner consistent with similar Merchandise located at the Stores and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

(j)     Merchant has not and shall not purchase, or transfer to or from the Stores, any merchandise or goods outside the ordinary course in anticipation of the Sale or of the Inventory Taking, except to the extent that Merchandises has been or will be moved from the Distribution Center, including Merchandise in Department 996 and Department 997 that is saleable in the ordinary course of business, to the Stores.

(k)     Merchant covenants to continue to operate the Stores in the ordinary course of business consistent with historic practices from the date of this Agreement to the Sale Commencement Date, except as otherwise expressly set forth in this Agreement, (i) selling inventory during such period at customary prices, (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public (except for Merchant's historic and customary promotions for all its locations), (iii) not returning inventory to vendors and not transferring inventory or supplies between or among the Stores, except for Department 996 and Department 997 Merchandise, and (iv) not making any management personnel moves or changes at the Stores without Agent's prior written consent (which consent will not be unreasonable withheld).

(l)     On or about May 1, 2003, Merchant ceased operating in the ordinary course of business consistent with historic practices, in that: (i) on or about such date, Merchant has not had sufficient cash flow to replenish its inventory at its customary levels and has notified

-24-

Exhibit _____/_____

Page ____64_____

its vendors that it is unable to continue to accept goods on credit; and (ii) Merchant has cancelled and/or discontinued certain advertising and sale promotions.

(m)    Merchant makes no representation as to what portion, if any, of the On-Order Merchandise scheduled to be delivered will be delivered.

(n)    To the best of Merchant's knowledge, all Merchandise is in material compliance with all applicable federal, state or local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(o)    Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, each of the Stores, the assets currently located at the Stores to the extent Merchant is entitled to use the same, and the services provided at the Stores to the extent Merchant is entitled to such services. Merchant shall throughout the Sale Term maintain in a manner consistent with its customary and historic practices, at its sole expense (except as otherwise provided herein), all cash registers, heating systems, air conditioning systems, elevators, escalators, alarm systems, and all other mechanical devices used in the ordinary course of operation of the Stores or, if applicable, use reasonable efforts to cause any applicable landlord to comply with its obligations under applicable lease and occupancy agreements with respect to any such matter.

(p)    Merchant had paid and will continue to pay throughout the Sale Term, all self-insured or Merchant funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(q)    The Guaranty Percentage has been calculated and agreed upon based upon the aggregate Retail Price of the Merchandise (without taking into account the Global Inventory Adjustment) not being less than $49,500,000 (the "Merchandise Threshold"). In the event that the aggregate Retail Price of the Merchandise included in the Sale is less than the Merchandise Threshold, then such deviation from the Merchandise Threshold shall not constitute a material breach of a representation or warranty, or an Event of Default; provided however, the Guaranty Percentage shall be adjusted in accordance with **Exhibit 11.1(q)** annexed hereto, as and where applicable.

(r)    On or about May 12, 2003, Merchant attempted to cancel all scheduled advertisements and promotions for the Stores. While substantially all such advertisements and promotions were cancelled (except as was disclosed at the Auction), Merchant was unable to cancel the following: (a) a newspaper insert in the San Francisco Chronicle that contained a "20% Off Any One Item" coupon; and (b) a Private Sale and Home Decorating Event invitation that went out to preferred customers inviting them to a One Night Only sale event at the following Stores on the following dates: (i) Store #22 – Costa Mesa, on May 20, 2003, (ii) Store

-25-

Exhibit _____

Page _____ 65

#45 - Laguna Niguel, on May 21, 2003, and (iii) Store #38 – Del Amo, on May 23, 2003.

(s)     All documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agency Agreement was true and accurate in all material respects.

11.2    Agent's Representations, Warranties and Covenants.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Each member of the Agent: (i) is a corporation or limited liability company, as the case may be, duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and, constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, provincial, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     Except as may be otherwise provided in the Approval Order, the Sale shall be conducted in compliance with all applicable federal, state, and local laws, rules and regulations.

Section 12.     Insurance.

-26-

Exhibit _____/____

Page _____66____

12.1    Merchant's Liability Insurance. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall cause Agent to be named an additional named insured with respect to all such policies. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change. In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts to the extent said claim arises from or relates to the alleged acts or omissions of Merchant or its employees, agents (other than Agent's employees), or independent contractors (other than Agent and independent contractors hired by Agent in conjunction with the Sale).

12.2    Merchant's Casualty Insurance. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the cost value thereof. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise (net of any deductible) shall constitute Proceeds. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date or the Extended Sale Termination Date, as the case may be, without Agent's prior written consent.

12.3    Worker's Compensation Insurance. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements. Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4    Agent's Insurance. Agent shall maintain at Agent's cost and expense throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies. Exhibit 12.4 attached hereto contains a description of all such policies. Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonable satisfactory to Merchant. In the event of a claim under such policies Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, to the extent said claim arises

-27-

from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors).

### 12.5    Risk of Loss.

Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing. Agent shall not be deemed to be a successor employer. Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises directly from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Stores (an "Agent Claim"). In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement. To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the foregoing address.

### Section 13.    Indemnification.

13.1    Merchant Indemnification. Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from, or related to:

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)    subject to Agent's performance and compliance with its obligations pursuant to Sections 4.1(b) and 4.1(c) and Section 9 hereof, any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

-28-

Exhibit 1

Page 68

(c)    subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)    the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent) or representatives.

13.2    <u>Agent Indemnification</u>.  Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against, Merchant resulting from, or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of the Agent):

(a)    Agent's material breach of or failure to comply with any local, state, or federal laws or regulations, or any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)    any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its  employees, agents, independent contractors or other officers, directors or representatives of Agent;

(c)    any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(d)    any Agent Claims; and

(e)    the gross negligence or willful misconduct of Agent or any of its officer, directors, employees, agents or representatives.

Section 14.    <u>Defaults</u>.  The following shall constitute "Events of Default" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)    Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term; or

(c)    The Sale is terminated or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or

-29-

Exhibit _____/_____

Page _____

action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder.

Section 15. Fixtures. With respect to furniture, fixtures and equipment (other than artwork and visuals) owned by Merchant and located at the Stores and the Distribution Center and home office facility (collectively, the "FF&E"), at Merchant's sole option, exercisable by Merchant in writing within fourteen (14) days after the Sale Commencement Date, Agent shall, at Merchant's election ("FF&E Election"), sell the FF&E in any such location; provided however, Merchant, with the consent of the Lenders, shall have the right to designate certain FF&E that Merchant does not elect to have Agent sell. In the event Merchant exercises the FF&E Election with respect to the FF&E, Agent shall be entitled to receive a commission equal to twenty percent (20%) of the net proceeds from the sale of such FF&E (net of sales taxes and expenses incurred with the disposition of the FF&E). Expenses incurred in connection with the disposition of the FF&E shall be paid by Merchant, in accordance with a budget to be mutually agreed upon between Merchant and Agent; provided however, Merchant may elect to receive, in lieu of proceeds net of expenses and Agent's commission, a lump sum payment in an amount to be agreed upon between Merchant, in consultation with the Lenders, and Agent, in which case all costs and expenses associated with the disposition thereof shall be borne by Agent. In either event, as of the Sale Termination Date, Agent may abandon in place in a neat and orderly manner any unsold FF&E at the Stores. In the event that Merchant elects to have someone other than the Agent dispose of the FF&E, Agent agrees that it shall cooperate with such party, provided however, it is understood that such third party's efforts shall not unreasonably interfere with Agent's conduct of the Sale, and, removal of any such FF&E shall be done in coordination with, and the consent of, the Agent.

Section 16. Miscellaneous.

16.1 Notices. All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

If to the Merchant:    STROUDS ACQUISITION CORPORATION
                       280 Machlin Court
                       City of Industry, CA 91748
                       Attn: Susan Storey
                       Tel:   909/569-0520 Ext. 2005
                       Fax:   909/569-0540

with a copy to:

                       TRAUB, BONACQUIST & FOX LLP
                       655 Third Avenue

-30-

Exhibit _____ /

Page _____ 70

<table>
<tr><td></td><td>New York, NY 10017</td></tr>
</table>

|  | New York, NY 10017 |
|---|---|
|  | Attn: Paul Traub |
|  | Maura I. Russell |
|  | Tel: (212) 476-4770 |
|  | Fax: (212) 476-4787 |
| If to Agent: | Tiger Capital Group, LLC |
|  | 84 State St - Suite 420 |
|  | Boston, MA 02109 |
|  | Attn: Stephen A. Goldberger |
|  | Tel: (617) 523-5001 |
|  | Fax: (617) 523-3007 |
| With a copy to: | Greenberg Traurig LLP |
|  | One International Place, Suite 300 |
|  | Boston, MA 02110 |
|  | Attn: Jeffrey M. Wolf |
|  | Tel: (617) 310-6041 |
|  | Fax: (617) 310-6001 |

16.2   Governing Law; Consent to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of California, without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court shall retain jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

16.3   Entire Agreement.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

16.4   Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

16.5   No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

-31-

Exhibit _____ /

Page _____ 77

16.6    Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, including, but not limited to, any chapter 11 or chapter 7 trustee. Merchant and Agent may not assign their respective obligations under this Agreement; provided however, it is understood that Merchant and/or Agent may assign their respective rights under this Agreement to their respect lenders.

16.7    Execution in Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement. This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

16.8    Section Headings. The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9    Survival. All representations, warranties, covenants and agreements made herein, by the parties hereto, shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

16.10    Reporting. If requested by Merchant, Agent shall prepare weekly reports including, without limitation, reports that comply with the Merchant's current weekly cash reporting to its central office, reflecting the progress of the Sale which shall specify the Proceeds received to date. The Agent will maintain and provide to Merchant sales records to permit calculation of and compliance with any percentage rent obligations under Stores leases. During the course of the Sale, Merchant shall have the right to have representatives continually act as observers of the Sale in the Stores so long as they do not interfere with the conduct of the Sale.

16.11    Termination. This Agreement shall remain in full force and effect until the first to occur of: (i) receipt by Merchant or Agent, as the case may be, of written notice from the other that any of the conditions specified in Section 10 hereof have not been satisfied; or (ii) the expiration of the Sale Term and completion and certification by Merchant and Agent of the Final Reconciliation pursuant to Section 3.4 above. Notwithstanding the foregoing, the representations and warranties of Merchant and Agent contained herein and the provisions of Section 11 above and the indemnification obligations contained in Sections 13.1 and 13.2 shall survive the termination of this Agreement pursuant to this Section 16.11. In the event that Merchant does not obtain the Approval Order as contemplated hereunder and Agent elects to exercise its rights under the last sentence of Section 3.3(c) hereof, Merchant and/or the Lenders shall reimburse Agent for all Expenses incurred through the date on which Agent vacates the Stores which have been paid or incurred directly by Agent in connection with the Sale(the "Reimbursable Expenses").

16.12    Bankruptcy Matters. Merchant contemplates filing the Chapter 11 Case on or before May 20, 2003. In conjunction with the filing of the Bankruptcy Case, Merchant

Exhibit _____1_____

Page _____72_____

·shall immediately file a motion seeking the issuance of the Approval Order by the Bankruptcy Court and shall take all such action as shall be required in order to obtain the same.

16.13   Security Interest. In consideration of the Agent's payment of the Guaranteed Amount, the Recovery Amount, if any, proceeds from the sale of the FF&E, if any, and Expenses, and the provision of services hereunder to Merchant, to the extent that Agent has tendered payment of the Guaranteed Amount, the Recovery Amount, and/or Expenses, Merchant hereby grants to Agent a first priority security interest in and lien upon the Merchandise and the Proceeds to secure all obligations of Merchant to Agent hereunder ("Agent's Security Interest"). Until the payment of the Guaranteed Amount in full, the Agent's Security Interest shall remain junior to the security interest of the Lenders (in the same order and priority as such existed on the date of this Agreement), to the extent of the unpaid portion of the Guaranteed Amount. Upon entry of the Approval Order the Agent's Security Interest shall be deemed properly perfected without the need for further filings or documentation. Agent further agrees that in the event Agent fails to pay Merchant any undisputed portion of the Guaranteed Amount, Expenses, the Recovery Amount, or any other undisputed amounts due Merchant under this Agreement, and such failure shall continue for five (5) days after written notice by Merchant to Agent, then the security interest granted to Agent hereunder shall be deemed subordinated to the security interest of the Lenders (in the same order and priority as such existed on the date of this Agreement) in an amount equal to such unpaid amounts; provided however, that Agent's Security Interest shall remain in full force and effect to the extent of any other amounts paid by Agent on account of the Guaranteed Amount, the Recovery Amount, Expenses or otherwise hereunder. Notwithstanding anything to the contrary contained herein, the Agent's Security Interest shall not be junior or subordinated to the security interests of Merchant's pre- and post-petition lenders to the extent of the Reimbursable Expenses.

Exhibit _____ 1 _____

Page _____ 73 _____

-33-

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

STROUDS ACQUISITION CORPORATION


By: _____
Name:
Title:


**TIGER CAPITAL GROUP LLC
On Behalf of itself and SB CAPITAL
GROUP, LLC AND THE OZER GROUP
LLC**


By: _____
Name: Stephen A. Goldberger
Title:   Managing Member


CONSENTED AND AGREED TO
AS TO SECTIONS 3.3(c), 3.3(d)(ii), 16.11
 and 16.13
BY FLEET RETAIL FINANCE, INC


By: _____
Name:
Title:

CONSENTED AND AGREED TO
AS TO SECTIONS 3.3(c), 3.3(d)(ii), 16.11
 and 16.13
BY FOG CUTTER CAPITAL GROUP


By: _____
Name:
Title:

Exhibit _____
Page _____

-34-

-35-

Exhibit 1

Page 75

## Exhibit 1
## List of Stores

| Store # | Store Location | |
|---|---|---|
| 1 | Pasadena Outlet | 3741 E. Foothill Blvd. Pasadena, CA 91107 |
| 2 | Torrance Outlet | 20026 Hawthorne Blvd. Torrance, CA 90503 |
| 4 | Northridge Outlet | 8752 Corbin Ave. Northridge, CA 91324 |
| 5 | Laguna Outlet | 24291 Ave De La Carlota #P4-7 Laguna Hills, CA 92653 |
| 6 | La Jolla | 8867 Villa La Jolla Dr. La Jolla, CA 92037 |
| 8 | Lakewood Outlet | 5031 Lakewood Blvd. Lakewood, CA 90712 |
| 9 | Beverly Outlet | 8104 Beverly Blvd. Los Angeles, CA 90048 |
| 10 | Studio City | 12160 Ventura Blvd. Studio City, CA 91604 |
| 12 | Menlo Park | 700 El Camino Real Menlo Park, CA 94025 |
| 13 | Sunnyvale | 1236-A W. El Camino Real Sunnyvale, CA 94087 |
| 18 | Fullerton Outlet | 1381 S. Harbor Blvd. Fullerton, CA 92831 |
| 19 | Pleasant Hill | 555 Contra Costa Blvd. Pleasant Hill, CA 94523 |
| 22 | Costa Mesa | 1835 B129 Newport Blvd. Costa Mesa, CA 92627 |
| 23 | Corte Madera | 435 Corte Madera Town Center Corte Madera, CA 94925 |
| 26 | San Mateo | 4 E. 4th Ave. San Mateo, CA 94401 |
| 28 | Santa Barbara Outlet | 3883 La Cumbre Plaza Lane Santa Barbara, CA 93105 |
| 31 | Stevens Creek | 3111 Stevens Creek Blvd. San Jose, CA 95117 |
| 35 | Lake Avenue | 440 S. Lake Ave. Padadena, CA 91101 |
| 36 | Orange | 2380 N. Tustin Ave. Orange, CA 92856 |
| 37 | West Las Vegas | 204 S. Decatur Las Vegas, NV 89107 |
| 38 | Del Amo | 23000 Hawthorne Blvd. Torrance, CA 90505 |
| 39 | Rancho Mirage | 72014 Highway 111 Rancho Mirage, CA 92270 |
| 40 | Beverly Connection | 100 N. La Cienga Blvd #218 Los Angeles, CA 90048 |
| 41 | Walnut Creek | 1333 S. California Blvd. Walnut Creek, CA 94596 |
| 42 | Dublin | 7256 San Ramone Valley Blvd. Dublin, CA 94588 |
| 43 | Westside Outlet | 10830 Santa Monica Blvd. Los Angeles, CA 90025 |
| 45 | Laguna Niguel | 28001 Greenfeild Dr. Laguna Niguel, CA 92677 |
| 46 | Brea | 835 E. Birch Brea, CA 92821 |
| 49 | Montclair | 5427 Moreno St. #D Montclair. CA 91763 |
| 50 | Ventura | 4300-B E. Main Ventura, CA 93006 |
| 51 | Lake Elsinore Outlet | 17600 Collier Ave. STE G-160 Lake Elsinore, CA 92530 |
| 53 | Tracy Outlet | 1005 Pescadero  Ave. #127 Tracey, CA 95376 |
| 55 | Edina | 3140 Galleria Edina, MN 55435 |
| 57 | Vacaville Outlet | 311-B Nut Tree Rd. Vacaville, CA 95687 |
| 62 | Point Loma Outlet | 3361-A Rosecrans St. San Diego, CA 92110 |
| 65 | Mission Valley | 980 Camino De La Reina San Diego, CA 92108 |
| 66 | Marina Pacifica | 6346-A E. Pacific Coast Hwy. Long Beach, CA 90803 |
| 75 | Monterey | 960 Del Monte Center Monterey, CA 93940 |
| 76 | Saratoga Outlet | 650 El Paseo De Saratoga San Jose, CA 95130 |

Exhibit _____

Page _____

| 77 | Thousand Oaks | 33 N. Moorpark Rd. Thousand Oaks, CA 91360 |
| 79 | Glendale Fashion Ctr | 223 N. Glendale Ave. Glendale, CA 91206 |
| 80 | Tustin Outlet | 13230 Jamboree Rd, Irvine CA 92620 |
| 81 | Arrowhead Outlet | 8154 Bell Rd Glendale AQZ 85308 |
| 82 | Scottsdale Pavilion Outlet | 8939 Indian Bend Rd., Scottsdale AZ 82325 |
| 84 | Colonnade Outlet | 1919 E. Camelback Rd., Suite 128 Phoenix AZ 85016 |
| 85 | Paradise Valley | 12805 N. Tatum Blvd Phoenix AZ 85302 |
| 86 | Woodland Hills | 6263 Topanga Canyon Blvd, Woodland Hills CA |

Exhibit _____1_____

Page _____77_____

-37-

**Exhibit 3.3(b) – FORM GUARANTY L/C**

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____,2003

Irrevocable Standby Letter of Credit Number: _____

BENEFICIARY:    STROUDS ACQUISITION CORPORATION
780 S Nogales Street
City of Industry, CA  91748

Credit Number:
Opener's Reference No:

Gentlemen:

BY ORDER OF:    **[Agent's Name]**

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of {**Agent's Name**} for a sum or sums not exceeding a total of $_____ U.S. Dollars (_____) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS on _____, 2003, or such earlier date on which the beneficiary shall notify us in writing that this Standby Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original Letter of Credit and a signed statement in the form attached hereto as **Exhibit A**.

This Letter of Credit may be reduced from time to time when accompanied by a signed statement in the form attached as **Exhibit B**.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. _____ dated _____ _____of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practices for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500".

-38-

Exhibit _____
Page _____

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this letter of credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,

Authorized official

Exhibit _____ 1 _____

Page _____ 79 _____

-39-

## EXHIBIT A

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Drawing for Amounts Due to:

**STROUDS ACQUISITION CORPORATION**
780 S Nogales Street
City of Industry, CA  91748

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit").  The undersigned, duly authorized officer of Strouds Acquisition Corporation (the "Merchant") and the beneficiary of the Letter of Credit hereby certifies to you that:

(i)      **{Agent's Name}**  (the "Agent") has not made a payment when due of or for the Guaranteed Amount, the Recovery Amount, or other amounts due by Agent to Merchant pursuant to, and as such terms are defined in, that certain Agency Agreement dated as of _____, 2003 between the Merchant and Agent.

(ii)      The amount to be drawn is $_____ (the "Amount Owing").

(iii)      Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the amount available on the date hereof to be drawn under the Letter of Credit.

(iv)      The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v)      The payment hereby demanded is requested to be made no later than two (2) business days after the date of delivery of this certificate, by wire transfer to the following account:

FLEET RETAIL FINANCE INC.
40 Broad Street
Boston, MA 02109
ABA No: _____
Further Credit to: [Account Title]
[Account No.]

-40-

Exhibit ____1____

Page ____80____

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this _____ day of _____, 200_.

Very truly yours,

STROUDS ACQUISITION CORPORATION

By: _____
Name:
Title:

Exhibit _____
Page _____

-41-

## **EXHIBIT B**

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Reduction of Face Amount:

STROUDS ACQUISITION CORPORATION
780 S Nogales Street
City of Industry, CA  91748

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit").  The undersigned, duly authorized officer of Strouds Acquisition Corporation, the beneficiary of the Letter of Credit, hereby certifies to you that the face amount of the Letter of Credit No. _____ hereby shall be reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this ____ day of _____, 200_.

Very truly yours,

STROUDS ACQUISITION CORPORATION

By: _____
Title:

Exhibit _____1_____

Page _____82_____

-42-

**Exhibit 4.2(b) – FORM EXPENSE L/C**

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____,2003

Irrevocable Standby Letter of Credit Number: _____

BENEFICIARY:    STROUDS ACQUISITION CORPORATION
780 S Nogales Street
City of Industry, CA  91748

Credit Number:
Opener's Reference No:

Gentlemen:

BY ORDER OF:    **[Agent's Name]**

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of
{**Agent's Name**} for a sum or sums not exceeding a total of $_____ U.S. Dollars
(_____) available by your draft(s) at SIGHT on OURSELVES effective
immediately and expiring at OUR COUNTERS on _____, 2003, or such earlier date on
which the beneficiary shall notify us in writing that this Standby Letter of Credit shall be
terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original Letter of Credit and a signed statement in the form
attached hereto as **Exhibit A**.

This Letter of Credit may be reduced from time to time when accompanied by a signed statement
in the form attached as **Exhibit B**.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. _____
dated _____of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform
Customs and Practices for Documentary Credits (1993 Revision), International Chamber of
Commerce Publication No. 500".

-43-

Exhibit _____

Page _____

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this letter of credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,


Authorized official

Exhibit ___1___

Page ___84___

-44-

## EXHIBIT A

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Drawing for Amounts Due to:

STROUDS ACQUISITION CORPORATION
780 S Nogales Street
City of Industry, CA  91748

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit").  The undersigned, duly authorized officer of Strouds Acquisition Corporation (the "Merchant') and the beneficiary of the Letter of Credit hereby certifies to you that:

(i)      {Agent's Name}  (the "Agent") has not made a payment when due of or for Expenses, due by Agent to Merchant pursuant to, and as such terms are defined in, that certain Agency Agreement dated as of _____,2003 between the Merchant and Agent.

(ii)      The amount to be drawn is $_____ (the "Amount Owing").

(iii)     Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the amount available on the date hereof to be drawn under the Letter of Credit.

(iv)  ι The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v)      The payment hereby demanded is requested to be made no later than two (2) business days after the date of delivery of this certificate, by wire transfer to the following account:

FLEET RETAIL FINANCE INC.
40 Broad Street
Boston, MA 02109
ABA No: _____
Further Credit to: [Account Title]
[Account No.]

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this

-45-

Exhibit _____

Page _____

_____ day of_____,_____, 200_.

Very truly yours,

STROUDS ACQUISITION CORPORATION

By: _____
Name:
Title:

Exhibit _____ 1

Page _____ 86

## EXHIBIT B

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Reduction of Face Amount:

**STROUDS ACQUISITION CORPORATION**
780 S Nogales Street
City of Industry, CA  91748

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit").  The undersigned, duly authorized officer of Strouds Acquisition Corporation, the beneficiary of the Letter of Credit, hereby certifies to you that the face amount of the Letter of Credit No. _____ hereby shall be reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this ____ day of _____, 200_.

Very truly yours,

STROUDS ACQUISITION CORPORATION

By: _____
Title:

Exhibit _____ 1

Page _____ 87

-47-

**EXHIBIT 5.1**

**INVENTORY TAKING INSTRUCTIONS**

TO BE MUTUALLY AGREED UPON BY MERCHANT AND AGENT

Exhibit _____

Page _____

**EXHIBIT 5.2(b)**
**Schedule of On-Order Merchandise**

TO BE PROVIDED BY MERCHANT

-49-

Exhibit

Page

## EXHIBIT 8.1

### GUIDELINES FOR CONDUCT OF THE SALES

1.      The Sale shall be conducted so that the subject Store remains open during that Store's normal hours of operation provided for in the Lease for that Store, and, except as may be provided for in any Approval Order, the existing terms of the Merchant's Leases for the Stores shall control (i) the operation of the Stores during the Sales and (ii) the conduct of the Sales.

2.      The Sale shall be conducted in accordance with applicable state and local "Blue Laws".

3.      Agent shall not use flashing lights or any type of amplified sound on the leased premises or on any common areas to advertise the Sales or solicit customers for the Sale at that Store.

4.      With respect to the advertising of the Sales, Agent shall be permitted to promote and advertise the Sale as a "going-out-of-business", "store closing" or similar theme sale, in accordance with the Agency Agreement, including, without limitation, by means of electronic and print media advertising and in-store and exterior signage and banners; provided that all signage shall be professionally lettered, and all banners and hanging signs shall be hung in a professional manner.

5.      Conspicuous signs shall be posted at the stores to the effect that all sales are "final." All receipts will state that all sales are "final".

6.      Agent shall not make any alterations to the storefront or exterior walls of any of the stores, provided however, Agent is permitted to hang signage and banners on the exterior of the Stores, provided further however, Agent shall be obligated to restore the exterior walls or facade of the Stores, at Agent's expense, to the condition in which it existed on the Sale Commencement Date.

7.      Agent shall not make any alterations to interior or exterior store lighting.

8.      Except as modified by agreement with any lessor, or by any Approval Order, all provisions of any Lease with respect to the affected premises shall remain in full force and effect.

9.      Removal by Agent of Merchandise or FF&E (to the extent Merchant elects to have Agent disposes of the FF&E) will be conducted in the ordinary course of the Merchant's business.

10.     Agent shall not remove from any store any property so affixed to the real estate that an interest therein arises under real estate law (i.e., "fixtures" within the meaning of the Uniform Commercial Code).

-50-

Exhibit _____

Page _____

Exhibit _____/_____

Page _____$91$_____

-51-

**EXHIBIT 11.1(D)**

**LIST OF LIENS**

To Be Provided by Merchant

Exhibit _____ 1

Page _____ 92

-52-

**EXHIIBIT 12.4**

**AGENT'S INSURANCE POLICIES**

To Be Provided By Agent

Exhibit _____ 1

Page _____ 93

-53-

# Exhibits

**Strouds Acquisition Corporation**
**Balance Sheet**
**March, 2003**

|  | Adjusted MAR |
|---|---|
| Cash | 858,012 |
| Accounts Receivable | 947,415 |
| Merchandise Inventory | 26,980,360 |
| Prepaid Expenses | 2,191,656 |
| Prepaid Taxes | 399,893 |
| **Total Current Assets** | 31,377,337 |
| Property & Equipment | 7,211,733 |
| Accum. Depreciation | (2,100,474) |
| Other Assets | 563,381 |
| **Total Assets** | 37,051,976 |
| Accounts Payable | (8,513,998) |
| Accrued Expenses | (4,581,908) |
| **Total Current Liabilities** | (13,095,905) |
| Loan - Fleet | (15,086,038) |
| Loan - FCCG (CP) | (2,000,000) |
| Notes - WC | (7,337,390) |
| Notes - YN | (1,000,000) |
| Loan - Hemet | (1,411,102) |
| Notes - FCCG | (900,000) |
| Swap Liability | (342,961) |
| Other Non- Current Liability | (3,796,745) |
| - Option 1 | (2,042,260) |
| - Option 2 | (1,038,584) |
| - Amortization - Option 1 | - |
| - Straight-line Rent | (715,901) |
| Dividends Payable | (833) |
| **Total Liabilities** | (44,970,975) |
| Common Stock | (2,952,427) |
| Preferred Stock | (200,000) |
| PIC - common | (47,573) |
| PIC - Preferred | 438,223 |
| Comprehensive Loss | 342,961 |
| Retained Earnings | 10,337,814 |
| **Total Liabilities & Stock Equity** | (37,051,976) |

Exhibit _2_

Page _94_

# Exhibits

**Strouds Acquisition Corporation**
**Profit and Loss Statement**
**Ten Months Ending April 5, 2003**

|  | Adj YTD 3/03 |
|---|---|
| Sales | 119,569,313 |
|  |  |
| Cost of Goods Sold | 73,911,524 |
| Shrink | 1,090,286 |
| Shuttle Services |  |
| Gross Margin | 44,567,503 |
|  | 37.3% |
|  |  |
| Occupancy | 14,537,053 |
|  |  |
| Gross Profit | 30,030,450 |
|  |  |
| Advertising | 4,746,189 |
| Store Operating Costs | 22,943,456 |
| General & Admin | 6,583,361 |
| Operating Income | (4,242,556) |
|  |  |
| Other Income / (Expense) | (2,084,890) |
| Management Fees | 300,832 |
| Interest | 2,188,883 |
| Net Income / (Expense) | (8,817,160) |
|  | -7.37% |

Exhibit _3_

Page _95_

Summary March Financials.xls

Prepared by: R. Fu

# EXHIBITS

**Strands Acquisition Corp.**
**Liquidation Analysis**
**May 20, 2003**

| | Projected Balance 20-May-03 | Estimated % Recovery | Offsets/ Secured | Estimated Recovery | Proceeds |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash in Accounts | 250,000 | | | 250,000 | |
| Credit Card Receivables estimated @ 5/30 | 440,000 | | | | |
| Less Outstanding Fees Estimated | (120,000) | | | | |
| Net Credit Card Collections | 320,000 | | | 208,000 | |
| **Net Cash and Credit Card Collections** | | | | | **458,000** |
| | | | | | |
| **Inventory** | | | | | |
| Estimated at 5/20/03 - Sale to Liquidator - Retail | 52,356,000 | | | | |
| Less Reserve of 1.5% | (785,340) | | | | |
| Estimated Liquidation Value | 51,570,660 | | | 26,043,183 | |
| Other Obsolete Inventory | 334,000 | | | 50,100 | |
| **Total Inventory** | | | | | **26,093,283** |
| | | | | | |
| **Prepaid Expenses** | | | | | |
| All accounts | 2,460,407 | | | - | |
| Pre-paid Rent and CAM | 105,678 | | | - | |
| Personal Property Tax | 25,464 | | | - | |
| **Total Pre-paid** | 2,591,549 | | | | **-** |
| | | | | | |
| **PP&E** | | | | | |
| Machinery & Equipment Assumed Pledged to Hemet | 1,939,759 | | | | |
| Depreciation | (83,294) | | | | |
| Net Hemet Machinery & Equipment | 1,856,465 | | 185,647 | | |
| Furniture & Fixtures | 1,924,090 | | | 384,818 | |
| Other Machinery & Equipment | 690,345 | | | 69,035 | |
| Leasehold Improvements | 2,077,983 | | | - | |
| Computer & Software | 1,159,624 | | | 57,981 | |
| Accumulated Depreciation | (2,017,180) | | | - | |
| **Total PP&E** | 7,547,792 | | | | **511,834** |
| | | | | | |
| **Other Assets** | | | | | |
| Miscellaneous Deposits (Loan Fee - Amortized) | 87,399 | | | - | |
| Pre-paid Deposit - So. Cal. Edison | 281,135 | | 281,135 | - | |
| Deferred Rent - Machlin Ct. | 194,848 | | | - | |
| **Total Other Assets** | 563,382 | | | | |
| | | | | | |
| **Total Asset Value** | | | | | **27,063,117** |
| | | | | | |
| **Administrative Claims** | | | | | |
| Post-petition Administrative Expenses | | | | 2,849,000 | |
| Reimbursements from Liquidators - Insurance | | | | (200,000) | |
| Reimbursements from Liquidators - Payroll 5/20-5/24 | | | | (140,000) | |
| Less Deposit Refunds | | | | (70,000) | |
| Less Over-funded Worker's Comp | | | | (145,000) | |
| Accrued Vacation | | | | 191,000 | |
| Estimated Cost of Counsel - Debtor (net of Retainer) | | | | 300,000 | |
| Estimated Cost of Counsel - Creditors | | | | 100,000 | |
| Estimated Cost of Secured Creditor Counsel | | | | 150,000 | |
| **Estimated Administrative Claims** | | | | | **3,035,000** |
| | | | | | |
| **Available for Secured Creditors** | | | | | **24,028,117** |

*4*

Exhibit _____

Page _____ *96*

**Liabilities**
**First Security Interest**

**Strouds Acquisition Corp.**
**Liquidation Analysis**
**May 20, 2003**

| | Projected Balance 20-May-03 | Estimated % Recovery | Offsets/ Secured | Estimated Recovery | Proceeds |
|---|---|---|---|---|---|
| Fleet Interest Rate Swap | | | | 385,000 | |
| Fleet Accrued Interest | | | | 75,000 | |
| Fleet Senior Debt - Legal Fee | | | | 50,000 | |
| **Estimated Outstanding Loan Balance @ 5/20/03** | | | | | **16,565,000** |
| | | | | | |
| **Available for Distribution** | | | | | **7,463,117** |
| | | | | | |
| Fog Cutter Capital Group, Inc. Sub Debt | | | | | 900,000 |
| Cruttenden Partners Sub Debt | | | | | 1,900,000 |
| Yogananda Sub Debt | | | | | 1,000,000 |
| Accrued Interest | | | | | 60,556 |
| | | | | | |
| **Total Sub Debt** | | | | | **3,860,556** |
| | | | | | |
| **Available for Distribution** | | | | | **3,602,561** |
| | | | | | |
| Hemet Loan | | | | 1,411,101 | |
| Less Assumed Liquidation Value of Equipment (no Appraisal) | | | | (185,647) | |
| Hemet Loan Unsecured | | | | 1,225,455 | |
| | | | | | |
| **Available for Unsecured Creditors** | | | | | |
| | | | | | |
| **Proceeds from Inventory Sale** | | | | | **3,602,561** |
| **Estimated Lease Value** | | | | | **350,000** |
| **Available for Distribution** | | | | | **3,952,561** |
| | | | | | |
| **Total Liabilities** | | | | | |
| Trade Payable | | | | | 9,691,000 |
| Accounts Payable - Expenses | | | | | 2,622,886 |
| Less Utility Deposits | | | | | (281,135) |
| Bank of Hemet (Security Validity Uncertain) | | | | | 1,225,455 |
| Unpaid Vacation Accrual | | | | | 467,000 |
| Cruttenden Partners - Sub Debt Prior to March Transaction | | | | | 5,437,390 |
| Accrured Interest | | | | | 150,982 |
| Past Due Rents | | | | | 1,422,114 |
| Real Estate Related Offsets | | | | | - |
| Estimated Landlord Liabilities | | | | | 14,000,000 |
| **Total Unsecured Creditor Liabilities** | | | | | **34,735,692** |
| | | | | | |
| **Percentage Dividend to Unsecured Creditors** | | | | | **11.38%** |

Exhibit _4_

Page _97_

UNAUDITED/ NOT REVIEWED

# Exhibits

**Strouds Acquisition Corp.**
Cash Collateral Budget

| | S 18-May | M 19-May | T 20-May | W 21-May | T 22-May | F 23-May | S 24-May | W/E 24-May | S 25-May | M 26-May | T 27-May | W 28-May | T 29-May | F 30-May | S 31-May | W/E 31-May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Expenses** | | | | | | | | | | | | | | | | |
| Health Insurance | | | | | | | | | | | | | | | | |
|   Cigna | | | | | | | | | | | | | | | | |
|   Nevada | | | | | 5 | | | 5 | | | | | | | | |
| Capital Expenditure | | | | | | | | | | | | | | | | |
| Freight (Includes outbound, Truck Leases & | | | 4 | 5 | 6 | | | 15 | | | | | 10 | | | 10 |
|   Equipment Leases | | | | | | | | | | | | | | | | |
|   GATX Telcon | | | | | | | | | | | | | | | | |
|   IBM Credit-AS400 | | | | | | | | | | | | | | | | |
|   IMAGISTICS Copiers | | | | | | | | | | | | | | | | |
| Telephone | | | | | | | | | | | | | | | | |
|   ATT Long Distance | | | | | | | | | | | | | | | | |
|   ATT SC Local Access | | | | | | | | | | | | | | | | |
|   Network Rep. & Maint. | | | | | | | | | | | | | | | | |
|   ATT Network | | | | | | | | | | | | | | | | |
|   ATT Internet | | | | | | | | | | | | | | | | |
|   IBM Hardware Maint. | | | | | | | | | | | | | | | | |
| Payroll and Payroll Taxes | | | | | 18 | | | 18 | | | | 353 | 88 | 147 | | 588 |
| 401(k) Withholding | | | | | | 10 | | 10 | | 4 | | | | 10 | | 14 |
| Contract Financial | | | | | | | | | | | | | | | | |
| Incentive/Retention Bonus | | | | | | | | | | | | | | | | |
| Employee Expenses | | | | | | | | | | | | | | | | |
| Rent | | | | | | | | | | | | | | | | |
| Security/Alarm | | | | | | | | | | | | | | | | |
| Utilities | | | | | | | | | | | | | | | | |
| Professional Fees | | | | | 9 | | | 9 | | | | | | | | |
| Bank Fees/Credit Card Fees | | | | | | | | | | | | | | | | |
| Overhead Reimbursement from Liquidator | | | | | | | | | | | | | | (20) | | (20) |
| Sales taxes | | | | | | | | | | | | | | 1 | | 1 |
| Other Lease Obligations | | | | | | | | | | | | | | | | |
| Post-sale Clean-up | | | | | | | | | | | | | | | | |
| Other | | | | | | | 50 | 50 | | | | | | 50 | | 50 |
|   Total Operating Disbursements | - | - | 4 | 5 | 38 | 60 | 50 | 107 | - | 4 | - | 353 | 98 | 188 | - | 643 |
| | | | | | | | | | | | | | | | | |
| Interest | | | | | | | | | | | | | | | | |
|   Fleet- Line | | | | | | | | | | | | | | | | |
|   Fog Cutter Capital | | | | | | | | | | | | | | | | |
|   Walter Crutenden | | | | | | | | | | | | | | | | |
|   Yogananda Foundation | | | | | | | | | | | | | | | | |
|   Total Interest Expense | | | | | | | | | | | | | | | | |
| Extraordinary Items: | | | | | | | | | | | | | | | | |
| Deposit for Insurance | | | | | | | | | | | | | | | | |
|   Wk/Comp/Prop/GL/Other | | | | | | 455 | | 455 | | | | | | | 70 | 70 |
|   Employers Practices Liab. | | | | | | | | | | | | | | | | |
|   Other | | | | | | | | | | | | | | | | |
|   Creditor Committee Counsel | | | | | | | | | | | | | | | | |
|   Winthrop Couchot | | | | | | | | | | | | | | | | |
|   Bank Counsel | | | | | | | | | | | | | | | | |
|   Secured Creditor Counsel | | | | | 8 | | | 8 | | | | 8 | | | | 8 |
|   Physical Inventory/Security | | | | | | | | | | | | | | | | |
|   Utility Deposits | | | | 100 | | | | 100 | | | | | | | | |
|   Traub Bosequist | | | | | | | | | | | | | | | | |
| **Total Extraordinary & Interest Expense** | - | - | - | 100 | 8 | 455 | - | 563 | - | - | - | 8 | - | - | 70 | 78 |
| **Total Disbursements** | - | - | 4 | 105 | 46 | 515 | - | 670 | - | 4 | - | 361 | 98 | 188 | 70 | 721 |

Exhibit 5

Page 98

**Strouds Acquisition Corp.**
**Cash Collateral Budget**

| Line Item | S 1-Jun | M 2-Jun | T 3-Jun | W 4-Jun | T 5-Jun | F 6-Jun | S 7-Jun | W/E 7-Jun | W/E 14-Jun | W/E 21-Jun | W/E 28-Jun | W/E 5-Jul | W/E 12-Jul | W/E 19-Jul | W/E 26-Jul | W/E 2-Aug | Total Post 19-May-03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Expenses** | | | | | | | | | | | | | | | | | |
| **Health Insurance** | | | | | | | | | | | | | | | | | |
| Cigna | | | | | | | | | | | | | | | | 5 | 5 |
| Nevada | | | | | | | | | | | | | | | | | - |
| Capital Expenditure | | | | | | | | | | | | | | | | 30 | 30 |
| Freight (Includes outbound, Truck Leases & | | | | | | | | | | | | | | | | | |
| **Equipment Leases** | | | | | | | | | | | | | | | | | - |
| GATX Telcon | | | | | | | | | 5 | | | 5 | | | | 5 | 15 |
| IBM Credit-AS400 | | | | | | | | | 12 | | | 12 | | | | 12 | 36 |
| IMAGISTICS Copiers | | | | | | | | | 1 | | | 1 | | | | 1 | 3 |
| **Telephone** | | | | | | | | | | | | | | | | | - |
| ATT Long Distance | | 3 | | | | | | 3 | 2 | | | 2 | | | | 2 | 7 |
| ATT SC Local Access | | 2 | | | | | | 2 | 1 | | | 1 | | | | 1 | 4 |
| **Network Rep. & Maint.** | | | | | | | | | | | | | | | | | - |
| ATT Network | 16 | | | | | | | 16 | | | 12 | | | | | 8 | 36 |
| ATT Interest | | | | | | | | | 2 | | 1 | | 2 | | | 2 | 6 |
| IBM Hardware Maint. | | | | | | | | | | | | | | | | 1 | - |
| Payroll and Payroll Taxes | | 2 | | | 15 | | | 15 | 60 | | 1 | | 36 | | 36 | 36 | 812 |
| 401(k) Withholding | | | 15 | | | | | 12 | 50 | 25 | 56 | 25 | | 25 | | 25 | 33 |
| Contract Financial | | | | | | 10 | | | | | | | | | | | 186 |
| Incentive/Retention Bonus | | | | | | | | | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 195 |
| Employee Expenses | | | | | | | | 2 | | | | | | | | | 40 |
| Rent | | | | | | | | | | | | | | | | 284 | 284 |
| Security/Alarm | | 2 | | | | | | 2 | | | | | | | | | 2 |
| Utilities | | 10 | | | | | | 10 | | | 8 | | | | | | 23 |
| Professional Fees | | | | | | | | | | | | | | | | | - |
| Bank Fees/Credit Card Fees | | | | | | | | | 5 | 5 | 8 | 5 | 5 | 5 | | 5 | 29 |
| Overhead Reimbursement from Liquidator | | | | | | (20) | | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (200) |
| Sales taxes | | | | | | | | | 3 | | | | 3 | | 3 | | - |
| Other Lease Obligations | | | | | | | | | | | | | | | | | 7 |
| Post-sale Clean-up | | | | | | | | 2 | | | | | | | | | 40 |
| Other | | | | | | 5 | | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 145 |
| **Total Operating Disbursements** | - | 23 | 12 | - | 15 | (5) | - | 45 | 128 | 15 | 56 | 39 | 46 | 15 | 39 | 607 | 1,740 |
| | | | | | | | | | | | | | | | | | |
| **Interest** | | | | | | | | | | | | | | | | | |
| Fleet- Line | | 77 | | | | | | 77 | 10 | | | | | | | | 77 |
| Fog Cutter Capital | | 1 | | | | | | 1 | | | | 35 | | | | 28 | 73 |
| Walter Crutenden | | 11 | | | | | | 11 | | | | 5 | | | | 4 | 10 |
| Yogananda Foundation | | 2 | | | | 118 | | 2 | | | | | | | | | 160 |
| **Total Interest Expense** | | 91 | | | | | | 91 | 10 | | | 39 | | | | 31 | 160 |
| **Extraordinary Items:** | | | | | | | | | | | | | | | | | |
| Deposit for Insurance | | | | | | | | 126 | | | | | | | | | 455 |
| WkComp/Prop/GL/Other | | | | | | | | | | | | | | | | | 70 |
| Employers Practices Liab. | | | | | | | | | | | | | | | | | |
| **Other** | | | | | | | | | | | | | | | | | |
| Creditor Committee Counsel | | | | | | | | | | 50 | | | | | 50 | | 100 |
| Winthrop Couchot | | | | | | | | | | 100 | | | | | 100 | | 200 |
| Bank Counsel | | | | | | | | | | | | | | | | 150 | 150 |
| Secured Creditor Counsel | | | | | | | | | 8 | 8 | 8 | 8 | | | | | 174 |
| Physical Inventory/Security | | 8 | | | | | | | | | | | | | | | 100 |
| Utility Deposits | | | | | | | | | | | | | | | 100 | | 100 |
| Traub Bonequist | | | | | | | | | | | | | | | | | 100 |
| | | | | | | | | | | | | | | | | | |
| **Total Extraordinary & Interest Expense** | - | 99 | - | 15 | | 118 | - | 217 | 18 | 158 | 8 | 47 | 46 | 15 | 250 | 181 | 1,599 |
| **Total Disbursements** | - | 23 | 111 | - | 15 | 113 | - | 261 | 146 | 173 | 64 | 86 | 46 | 15 | 289 | 788 | 3,249 |

2 of 2

Cash Collateral Budget:051903-v2.xlsBudget

5/20/03

**STROUDS ACQUISITION CORPORATION**
**PROJECTED LOAN BALANCE AND PROCEEDS AT MAY 20, 2003**

| | | | |
|---|---|---:|---:|
| Inventory at Retail at May 19, 2003 | | | **52,651** |
| Less: Sales | | 244 | |
| Estimated Markdowns @ 21% | | 51 | 295 |
| | | | |
| Estimated Opening Inventory @ retail on 5/20/03 | | | **52,356** |
| | | | |
| Global Reduction | 1.5% | | (785) |
| Liquidation Inventory Value | | | **51,570** |
| | | | |
| Guaranteed Minimum Amount | 50.5% | | 26,043 |
| | | | |
| Initial Payment | 85.0% | | **22,137** |
| | | | |
| Estimated Fleet Loan Balance 5/20/03 (from below) | | | 16,576 |
| Net Available For Distribution | | | **5,561** |

**Calculation of Estimated Loan Balance:**

| | | | |
|---|---|---:|---:|
| **Loan Balance at 5/19/03 (excluding Letters of Credit)** | | | **16,395** |
| | | | |
| Credit Card Receivables | | 440 | |
| Less amount held by processor for chargebacks | | (220) | |
| Less Credit Card Fees | | (120) | |
| Excess cash receipts not applied to Fleet Loan (1) | | 100 | |
| | | | |
| Sales Receipts May 19 | | (555) | (555) |
| | | | |
| Legal Fees | | | 50 |
| Accrued Interest | | | 75 |
| Funding of outstanding Letters of Credit (@105%) | | | 226 |
| Swap Agreement Cancellation | | | 385 |
| | | | |
| **Estimated Loan Balance at 5/20/03** | | | **16,576** |

(1) Outstanding A/R not assumed to pay down Fleet balance.

Exhibit _____ 5 _____

Page _____ 100 _____

**PROJECTED BALANCES AT AUGUST 2, 2003**

**Opening Cash Collateral Balance**          5,561

| | |
|---|---:|
| Credit Card Receivables | 440 |
| Less amount held by processor for chargebacks | (220) |
| Less Credit Card Fees | (120) |
| Excess cash receipts not applied to Fleet Loan | 100 |

**Administrative Cash Flows**

|  |  |  | Weekly Cash Balance |
|---|---|---:|---:|
| | | | 5,561 |
| **Week Ending** | | | |
| 5/24 | Collections from pre-petition sales (2) | 261 | |
| 5/24 | Collection of credit card receivable | 100 | |
| 5/24 | Budgeted Expenditures | (670) | |
| | Net Cash Flow for week | (309) | 5,252 |
| | | | |
| 5/31 | Proceeds of sale of obsolete inventory | 50 | |
| 5/31 | Reimbursement of pre-petition payroll by liquidator | 140 | |
| 5/31 | Budgeted Expenditures | (721) | |
| | Net Cash Flow for week | (531) | 4,721 |
| | | | |
| 6/7 | Budgeted Expenditures | (261) | 4,460 |
| 6/14 | Budgeted Expenditures | (196) | 4,264 |
| 6/14 | Repayment of Fog Cutter Loan | (900) | 3,364 |
| 6/21 | Budgeted Expenditures | (173) | 3,191 |
| 6/28 | Budgeted Expenditures | (64) | 3,127 |
| 7/5 | Budgeted Expenditures | (86) | 3,040 |
| 7/12 | Budgeted Expenditures | (46) | 2,994 |
| | | | |
| 7/19 | Final Liquidation Payment @15% | 3,906 | |
| 7/19 | Budgeted Expenditures | (15) | |
| | Net Cash Flow for week | 3,891 | 6,886 |
| | | | |
| 7/26 | Budgeted Expenditures | (289) | 6,597 |
| | | | |
| 8/2 | Workers Comp Insurance Refund | 145 | |
| 8/2 | Return of Utility Deposits (@ 70%) | 70 | |
| 8/2 | Return of Credit Card Chargeback Deposit (@50%) | 110 | |
| 8/2 | Proceeds of FF&E sale | 512 | |
| 8/2 | Budgeted Expenditures | (738) | |
| | Net Cash Flow for week | 99 | 6,695 |

(2) Represents the balance of Cash Receipts from sales of May 15-20 that are not applied to Fleet loan

Exhibit _____ 5 _____

Page _____ 101 _____

## SUMMARY OF ADMINISTRATIVE EXPENSES

**Through the week ending July 26, 2003**

| | | |
|---|---:|---:|
| Payroll | 776 | |
| Insurance Deposits | 525 | |
| Contract Financial Labor | 161 | |
| Debtor's Counsel/Special Counsel | 300 | |
| Creditor Committee Counsel | 100 | |
| Utility Deposits | 100 | |
| Interest | 129 | |
| Physical Inventory Costs | 174 | |
| Other | 246 | 2,510 |

**Week ending August 2, 2003**

| | | |
|---|---:|---:|
| Payroll | 36 | |
| Retention Bonuses | 195 | |
| Rent | 284 | |
| Interest | 31 | |
| Contract Financial Labor | 25 | |
| Senior Creditor's Counsel | 100 | |
| Other | 67 | 738 |
| | | 3,249 |

## SUMMARY OF CASH RECEIPTS

| | | |
|---|---:|---:|
| Excess of Guaranteed Payment over Bank loan | 9,467 | |
| Proceed of sale of other assets | 562 | |
| Pre-petition sales | 350 | |
| Deposit and Insurance Refunds | 325 | |
| Reimbursed by liquidator | 140 | 10,844 |

## NET AVAILABLE FOR DISTRIBUTION

| | |
|---|---:|
| | 7,595 |
| Repayment of Fog Cutter Loan | (900) |
| | 6,695 |

Exhibit _5_

Page _102_

# Exhibits

Strouds Acquisition Corp. * Lease Information

600 Corporate Office
900 Distribution Center Warehouse

280 Machlin Court
City of Industry, CA 91789

909-598-0520
FAX 909-598-0536

July 2002
Los Angeles County

Strouds Building LLC
4800 Campus Dr
Newport Beach, CA

949-399-0328

March 7, 2002

Commencement Date
Apr 1, 2002

15

Apr 1, 2017

| | |
|---|---|
| Apr 1, 2002 | $96,729.00 |
| Apr 1, 2003 | $98,830.87 |
| Apr 1, 2004 | $99,528.60 |
| Apr 1, 2005 | $102,515.70 |

Exhibit 6
Page 103

Strouds Acquisition Corp. * Lease Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 Pasadena * Clearance Center<br><br>3741 E Foothill Blvd,<br>Pasadena, CA 91107<br><br>626-351-9805<br><br>Nov 1, 1979<br>June 1989 Clr Ctr<br>Jan 3, 1995 new location<br><br>Los Angeles County | Hastings Ranch Investment Co, LP<br>c/o The Arcis Group<br>6399 Wilshire Blvd, Suite 1105<br>Los Angeles, CA 90048<br>213-651-1808, FAX 213-651-2222<br>Denise Gerstenberg, Prop Mgr | 6,276 | Sep 14, 1994<br><br>Commencement Date<br>June 3, 1995<br><br>OPTION<br>Written notice 180 days<br>prior to expiration.<br><br>OPTION<br>Written notice 180 days<br>prior to expiration.<br><br>OPTION<br>Written notice 180 days<br>prior to expiration. | 10 Jun 30, 2005<br><br><br>5 Jun 30, 2010<br><br>5 Jun 30, 2015<br><br>5 Jun 30, 2020 | Dec 31, 2004<br><br><br>Dec 31, 2009<br><br>Dec 31, 2014 | Jun 3, 1995<br>Jun 3, 2000<br>30 day month<br><br>Jul 1, 2005<br><br>Jul 1, 2010<br><br>Jul 1, 2015 | $10,355.40<br>$11,924.40<br><br><br>$13,881.66<br><br>$15,752.78<br><br>$18,137.84 |

Exhibit 6
Page 104

5/20/03

Strouds Acquisition Corp. * Lease Information

Lease Limit Schedule 050303.xls

| Location | Landlord / Contact | Lease Info | Term / Options | Increase Dates | Rent |
|---|---|---|---|---|---|
| **2 Torrance * Clearance Center**<br>20026 Hawthorne Blvd<br>Torrance, CA 90503<br>Best Plaza<br>310-371-4632<br><br>Dec. 20, 1979<br>June 1990 Clr Clr<br>Los Angeles County | Union Bank<br>Real Estate Services - Rent Clk<br>PO Box 85552<br>San Diego, CA 92186-5552<br><br>619-230-4479, FAX 619-230-4563<br>Heather Rogers<br><br>PAY:<br>Escondido Mission Village<br>c/o Colliers Seeley Asset Services<br>333 So. Grand Ave., Ste. 3030<br>Los Angeles, CA 90071<br>(213) 689-9873 Fax (213) 689-1028 | Sep 20, 1979<br>OPTION ** Exercised **<br>OPTION ** Exercised **<br>OPTION ** Exercised **<br><br>7,880 OPTION ** Exercised ** | 10<br>5<br>5<br><br>5 Feb 15, 2005 | Jul 1, 1985<br>Feb 15, 1990<br>Jul 1, 1993<br>Nov 1, 1994<br>Jan 1, 1995<br><br>Feb 15, 2000 | $5,725.00<br>$5,970.00<br>$6,030.00<br>$6,000.00<br>$6,487.00<br><br>$9,780.05 |
| **4 Northridge * Clearance Center**<br>8782 Corbin Ave<br>Northridge, CA 91324<br>818-701-5026<br><br>Nov 28, 1980<br>Close original str Jul 6, 1997<br>Open as Clr Clr Jul 12, 1997<br>Los Angeles County | Louis Borick<br>c/o Piken Mgt Group<br>13251 Ventura Blvd., Suite 2<br>Studio City, CA 91604<br><br>818-981-7440   FAX 818-501-2716<br><br>Herbert Piken / Ernie Meyer<br><br>Pay:<br>Northridge Plaza<br>c/o Louis Borick<br>Superior Industries<br>7800 Woodley Ave.<br>Van Nuys, CA 91406 | 11,900 blank (Aug 12, 1980)<br>Commencement Date<br>Jan 1, 1999<br><br>(4,400) 1st Amendment<br>7,500 Aug 3, 1998<br>Amendment<br>Jan 17, 2001 | 10 | Jan 1, 1999<br>Jan 1, 1992<br>Jan 1, 1995<br>Jan 1, 1997<br><br>Jan 1, 1999<br>Mar 1, 1999<br>Feb 1, 2001 | $20,833.33<br>$22,916.67<br>$25,000.00<br>$27,083.33<br><br>$17,650.00<br>$11,250.00<br>$9,375.00 |
| **5 Laguna * Clearance Center**<br>24261 Ave de la Carlota<br>Laguna Hills, CA 92653<br>714-855-9995<br><br>May 7, 1981<br>Clr Clr 10/96<br>Orange County | All correspondence:<br>Laguna Hills Investment Co<br>c/o Fritz Duda Co.<br>3471 Via Lido, Suite 207<br>Newport Beach, CA 92663-3929<br><br>714-729-7100<br>Robin Ryan, Prop Mgr<br>Stephanie Jones, Lease Admin.<br>FAX 714-723-1141<br><br>Pay:<br>Laguna Hills Investment Co<br>c/o Fritz Duda Co.<br>PO Box 841757<br>Dallas, TX 75284-1757 | 10,840 May 1, 1991<br>Term Commencement Date<br>First Amendment<br>Dec. 14, 1991<br>Nov ___ 1998<br>Minimum Annual Rent Adj.<br><br>OPTION<br>Written notice 180-240<br>days prior to expiration. | 10 Jan 31, 2002<br><br>5 Jan 31, 2007 | Option exercised<br>Jul 30, 2001<br>No paperwork in file<br><br>Dec 14, 1991<br>Dec 14, 1994<br>Nov 1, 1998<br>Sept 1, 1999<br>Sept 1, 2000<br>Sept 1, 2001<br><br>partial month @ 1/265<br><br>Feb 1, 2002<br>Feb 1, 2005 | $14,617.00<br>$17,196.67<br>$12,500.00<br>$15,500.00<br>$17,500.00<br>$19,500.00<br><br>$22,706.33<br>$28,125.00 |

Exhibit _____ 6

Page _____ 105

Strouds Acquisition Corp. * Lease Information

| Store | Property / Contact | Landlord / Payment | Sq Ft | Dates | Term | Expiration | Rent Schedule |
|---|---|---|---|---|---|---|---|
| 6 La Jolla | 8667 Villa La Jolla Dr<br>La Jolla, CA 92037<br><br>619-457-0525<br><br>Dec 12, 1981<br>Jul 24, 1992 extended<br><br>San Diego County | Alecta Real Estate La Jolla, Inc.<br>c/o Madison Marquette Retail Services, Inc.<br>P.O. Box 12288<br>La Jolla, CA 92039<br>858-484-5330  FAX 858-484-0052<br><br>Amy Del Negro<br>Administrative Asst.<br><br>All correspondence, sales, insur:<br>Madison Marquette Retail Services<br>8160 - B1 Mira Mesa Blvd<br>San Diego, CA 92126<br><br>Pay:<br>La Jolla Village Center<br>Alecta Real Estate La Jolla, Inc.<br>c/o Madison Marquette Retail Services<br>PO Box 842535<br>Dallas, TX 75284-2535<br><br>(Prop Mgt) | 9,456 | Oct 1, 1991<br><br>Commencement Date<br>Jul 23, 1992<br><br>OPTION "Exercised" | 10 | 5 Jul 31, 2007 | Jul 23, 1992  $17,340.00<br>Jul 23, 1994  $18,918.00<br>Jul 23, 1997  $21,753.00<br><br>Aug 1, 2002  $25,016.00 |
| 8 Lakewood * Clearance Center | 5031 Lakewood Blvd<br>Lakewood, CA 90712<br><br>562-630-2062<br><br>Nov 26, 1992<br>Close original str 02-15-97<br>Open Clr Ctr 02-20-97<br><br>Los Angeles County | Owner, PAY & Sales Rpts:<br>M&H Realty Partners III L.P.<br>Fed ID 94-3209903<br>353 Sacramento Street, Suite 2180<br>San Francisco, CA 94111<br><br>Specify Strouds acct: unit #633<br>415-983-9000  FAX 415-983-0480<br><br>Prop Mgt Co:<br>M&H Property Mgt., Inc.<br>1721 W. Imperial Hwy., Suite 3G<br>La Habra, CA 90631<br><br>Carol Karno<br>562-691-5996  FAX: 562-691-2172 | 5,600 | Jun 17, 1992<br><br>Commencement Date<br>Nov 25, 1992<br><br>OPTION "Exercised"<br><br>Extension Amendment<br><br>4th Amendment<br>Mar 9, 2000 | 10<br><br>3<br><br>5<br><br>5 Dec 31, 2005 | | Nov 26, 1989  $7,824.40<br><br>30 day month<br>Nov 26, 1992  $6,066.67<br>Dec 1, 1993  $6,533.33<br>Dec 1, 1994  $7,000.00<br><br>Jan 1, 1996  $7,233.33<br>Jan 1, 1999  $7,700.00<br><br>Jan 1, 2001  $7,700.00<br>Jul 1, 2003  $8,000.00 |

5/2003

Leases Limit Schedule 052003.xls

Exhibit _____ 6

Page _____ 106

Stroud's Acquisition Corp.   *   Lease Information

5/20/03

**9 Beverly * Clearance Center**
8104 Beverly Blvd
Los Angeles, CA 90048
213-655-5780

May 14, 1963

Los Angeles County

---

Beverly Crescent Ltd.
9312 Civic Center Drive
Suite 105
Beverly Hills, CA 90210
310-550-1210   FAX 310-550-1941
Yehuda Naftali

Payments & inquiries to mgt co.:
Sachse Real Estate Co. Inc.
Attn. Edmond A. Sachse
315 S. Beverly Drive, Suite 415
Beverly Hills, CA 90212
310-284-7100   FAX 310-284-7817
Al Dominguez, Property Mgr

Kichiwan Enterprises

Pay & Property Management Co.:
8110 Beverly Boulevard
c/o A.J. Morgan & Company
8362 1/2 West Third Street
Los Angeles, CA 90048

Paula Jacob
323-658-8494, ext. 2 # 03
FAX 323-658-9492

Charlie Jacob
323-658-8496

Helen C Williams
11520 Greyford St
Whittier, CA 90606
310-692-5582

| Area | Terms | | Date | Rent |
|---|---|---|---|---|
| 6,800 | 1982 Commencement Date Jan 1, 1983 Rent Commencement, Apr 1, 1983 | 10 | Apr 1, 1989 | $9,896.82 |
| | | | Apr 1, 1990 | $10,322.38 |
| | | | Apr 1, 1991 | $10,529.00 |
| | | | Apr 1, 1992 | $10,540.00 |
| | | | # days in month | |
| | OPTION ** Exercised ** | 5 | Jan 1, 1993 | $12,670.00 |
| | | | Jan 1, 1994 | $13,087.57 |
| | | | Jan 1, 1995 | $13,292.04 |
| | | | Jan 1, 1996 | $13,537.40 |
| | | | Jan 1, 1997 | $18,500.00 |
| | New Lease, Sep 15, 1997 OPTION "Exercised" First Amendment, Mar 12, 1999 Expansion Effective Date Jan 21, 1990 | 5 Dec 31, 2002 / 5 December 31, 2007 | Jan 1, 1998 | $22,000.00 |
| | | | Jan 21, 2003 | $25,025.00 |
| 3,500 | Aug 15, 1995 | | Feb 23, 1989 | $6,078.00 |
| | | | Feb 23, 1990 | $6,382.00 |
| | | | Feb 23, 1991 | $6,700.00 |
| | | | Feb 23, 1992 | $7,056.00 |
| | | | 30 day/month | |
| | OPTION ** Exercised ** | 5 | Jan 1, 1993 | $7,036.00 |
| | | | Jul 1, 1995 | $7,388.00 |
| | | | Jul 1, 1996 | $7,757.00 |
| | | | Jul 1, 1997 | $8,146.00 |
| | Second Amendment, Sep 11, 1997 | 5 | Jan 1, 1998 | $8,146.00 |
| | OPTION ** Exercised ** | 5 December 31, 2007 | Jan 1, 2000 | $8,230.00 |
| | | | Jan 1, 2001 | $8,575.00 |
| | | | Jan 1, 2002 | $8,655.00 |
| 2,400 / 9,000 | Mar 7, 1996 Commencement Date Mar 16, 1996 | 7 | Mar 16, 1989 | $752.48 |
| | | | Mar 16, 1990 | $790.08 |
| | | | Mar 16, 1991 | $828.58 |
| | OPTION ** Exercised ** | 5 | Mar 16, 1992 | $871.08 |
| | | | # days in month | |
| Parking lot | Second Lease Extension Sep 2, 1997 | 10 Mar 15, 2008 | Mar 16, 1993 | $950.00 |
| | | | Mar 16, 1994 | $997.50 |
| | | | Mar 16, 1995 | $1,047.38 |
| | | | Mar 16, 1996 | $1,099.75 |
| | | | Mar 16, 1997 | $1,154.74 |
| | | | Mar 16, 1998 | $1,212.00 |
| | | | Mar 16, 1999 | $1,272.60 |
| | | | Mar 16, 2000 | $1,336.23 |
| | | | Mar 16, 2001 | $1,403.04 |
| | | Last two months paid as a deposit $14,072.00 | Mar 16, 2002 | $1,473.19 |
| | | December 31, 2008 | Mar 16, 2003 | $1,546.85 |
| | | | Mar 16, 2004 | $1,624.20 |
| | | | Mar 16, 2005 | $1,705.41 |
| | | | Mar 16, 2006 | $1,700.68 |
| | | | Mar 16, 2007 | $1,800.21 |

Exhibit 6
Page 107

| # / Location | Landlord / Contact | Lease info | Term | | | Rent schedule |
|---|---|---|---|---|---|---|
| **10 Studio City**<br>12160 Ventura Blvd<br>Studio City, CA 91604<br>Los Angeles County<br>818-762-2600<br>Jun 14, 1983 - Dec 26, 1990<br>Oct 25, 1991 | HDR Investment Co.<br>Rita C Rothman<br>21660 Burbank Blvd, #110<br>Woodland Hills, CA 91367<br>818-783-8945, FAX 818-760-9758 | 12,483  June 12, 1991<br>Commencement Date<br>Oct 25, 1991<br>Amendment 7/1/201 | 10 | | Oct 25, 2001 | April 24, 2004 | Oct 25, 2001 | Oct 25, 1991  $18,374.00<br>Apr 25, 1994  $19,374.00<br>Oct 25, 1996  $21,228.00<br><br>$21,228.00 |
| **12 Menlo Park**<br>700 El Camino Real<br>Menlo Park, CA 94025<br>415-327-7600<br>Oct 12, 1983<br>San Mateo County | Menlo Station Development<br>c/o Cottana<br>800 El Camino Real, Suite 175<br>Menlo Park, CA 94025<br>415-325-7600<br>Sandy May<br>FAX 415-325-7870 | 16,298  Jul 25, 1983<br>Commencement Date<br>Oct 12, 1983<br>Sep 1, 1991 Storage<br>Amendment, expansion<br>Commencement Date<br>June 1, 1994 | 10 + 8 mo | 10 + 5 mo Jan 31, 2005 | | Nov 1, 1988  $12,166.77<br>May 1, 1991  $13,568.25<br>Sep 1, 1991  $13,568.25<br><br>Sep 1, 1994  $31,206.00<br>Dec 1, 1996  $33,092.98<br>Jun 1, 1999  $38,456.51<br>Dec 1, 2001  $30,459.00<br>May 31, 2003  CPI |
| **13 Sunnyvale**<br>1236-A W El Camino Real<br>Sunnyvale, CA 94087<br>408-733-0810<br><br>Oct 7, 1983<br>Re-open Aug 30, 1993<br><br>Santa Clara County | Rite Aid Corporation (Notices & Sls Rpt)<br>PO Box 3165<br>Harrisburg, PA 17105<br>717-761-2633 or 800-292-7875<br>FAX 717-972-3663<br><br>Sales Rpts to Harrisburg - Attn: Victoria Kosdowski<br><br>213-251-6000<br>Prop Mgt, Greg Wyman, John O'Donnell<br><br>PAY:<br>Rite Aid Corporation-Tenant Receivables<br>PO Box 460<br>Camp Hill, PA 17001<br><br>Billing questions, Debbie DiPinto, Tenant Acctg Clk<br>717-761-2633 ext 5593 | 17,385  Sublease  Apr 27, 1993<br>Commencement Date<br>Sep 1, 1993<br><br>OPTION<br>Notice 90 days prior<br>to expiration. | 12 May 30, 2005 | 5 May 30, 2010 | Feb 28, 2005 | Sep 1, 1993  $12,315.00<br>Sep 1, 1996  $13,750.00<br>Sep 1, 2003  $15,208.00<br><br>May 31, 2005  $36,000.00 |

Exhibit 6

Page 108

Strouds Acquisition Corp. * Leases Information

| 18 Fullerton * Clearance Ctr<br>3220 E Yorba Linda Blvd<br>Fullerton, CA 92831<br>714-879-1030<br>Jun 19, 1984<br>Feb 17, 1995, new location<br>& Clr Ctr<br>1361 S. Harbor Blvd<br>Fullerton, CA 92632<br>SW corner Harbor Blvd &<br>Orangethorpe<br>Orange County<br>Fullerton Metrocenter | Avalon Associates<br>c/o Williams Real Estate Mgt., Inc.<br>125 East Baker Street, Suite 206<br>Costa Mesa, CA 92626<br><br>Audrey Williams<br>714-427-5977  FAX 714-427-5922 | 7,400 | May 31, 1994 Commencement Date<br>February 17, 1995<br><br>OPTION Written notice 12 months prior to expiration<br><br>OPTION Written notice 12 months prior to expiration | 10 / Feb 16, 2005<br><br>5 Feb 16, 2010<br><br>5 Feb 16, 2015 | Feb 15, 2004<br><br>Feb 15, 2009 | Feb 17, 1995<br>Feb 17, 1999<br>Feb 17, 2002<br>30 day/month<br><br>Feb 17, 2005<br><br>Feb 17, 2010 | $8,880.00<br>$9,879.60<br>$10,941.00<br><br>$12,497.00<br><br>Fair Mkt Rate |
| 19 Pleasant Hill<br>555 Contra Costa Blvd<br>Pleasant Hill, CA 94523<br>925-682-4480<br>Jul 17, 1984<br>Oct 1991, new location<br><br>Contra Costa County | Contra Costa Boulevard Ltd Partnership<br>c/o Frank Hall<br>3 Millican Ct.<br>Martinez, CA 94553-9786<br>Frank Hall 925-370-6226<br>FAX 925-370-6227<br>Notices (also)<br>Contra Costa Boulevard Ltd<br>c/o Group II Realty<br>1850 Mt. Diablo Blvd, #430<br>Walnut Creek, CA 94596 | 9,600 | Mar 1, 1991 Term Commencement<br>Nov 11, 1991 Lease Commencement<br>Dec 1, 1991<br>1st Amendment Sep 1, 1996<br><br>OPTION Written notice prior to expiration<br><br>OPTION Notice 180 days prior to expiration. | 5<br><br>5 Jan 31, 2002<br><br>5 Jan 31, 2007<br><br>5 January 31, 2012 | January 31, 2006 | Nov 11, 1991<br>Dec 1, 1993<br><br>Feb 1, 1997<br>Feb 1, 1999<br>Feb 1, 2002<br>February 1, 2007<br><br>February 1, 2012 | $14,400.00<br>$14,960.00<br><br>$13,440.00<br>$14,400.00<br>$15,360.00<br>$17,760.00<br><br>$19,200.00 |

Lease Limit Schedule.050303.xls

Lamuit _____

Page _____ 109

Stroub Acquisition Corp. * Lease Information

Lease Limit Schedule 05/2003.xls

| 22 Costa Mesa | Teachers' Retirement System of the State of Illinois (Tax ID 52-1723454) c/o Festival Management Corporation 9841 Airport Blvd., Suite 700 Los Angeles, CA 90045 | 14,350 4,650 19,000 | Mar 2, 1994 Commencement Date May 21, 1994 | 11 | Jan 31,2006 | | | |
| 1835 B 130 Newport Blvd Costa Mesa, CA 92627 | | | | | | | | |
| 949-722-7655 | | | Expansion Amendment Sep.25, 1995 Expansion Commencement Date est. Sep 26, 1996 Expan Rent Commencement Date Jan 1, 1996 | | | | | $19,133.33 $26,106.33 $27,992.08 $28,832.08 $30,147.50 |
| Costa Mesa Courtyard | Karen Kennedy, SR VP 310-665-9500 | | | | | | | |
| Dec. 10, 1985 | | | | | | | | May 21, 1994 Jan 1, 2000 Feb 1, 2001 Feb 1, 2005 |
| May 21, 1994, new location | Sales reports & On-site: 949-548-0638 Festival Management Corp. FAX 949-548-3102 Costa Mesa Courtyard Patricia Snow, Prop Mgr 949-650-9732 | | OPTION Notice 180 days prior to expiration. | 5 | Jan 31,2011 | Jul 31,2010 | Feb 1, 2006 | |
| Orange County | Costa Mesa Courtyard 1835 Newport Blvd., Suite D-252 Costa Mesa, CA 92627 | | | | | | | $31,947.08 |

Exhibit _____ 6

Page _____ 110

Stroub Acquisition Corp. - Lease Information

5/20/03

| | | | | | |
|---|---|---|---|---|---|
| 23 Corte Madera<br><br>435 Corte Madera Town Ctr.<br>Corte Madera, CA 94925<br><br>415-924-4504<br><br>Jul 22, 1987<br><br>Marin County | 770 Tamalpais Drive Inc.<br>c/o Farallon Real Estate Services<br>Co. Inc.<br>100 Corte Madera Town Ctr.<br>Corte Madera, CA 94925<br><br>Stan Hoffman<br>415-924-2961<br>FAX 415-924-7092 | 14,091<br><br>4,801<br>18,892 | Jan 13, 1987<br>Amendment Dec 29, 1992<br>2nd Amendment Sep 23, 1994<br>Term Commencement Date<br>Jul 22, 1987<br>Rent Commencement Date<br>Dec. 1, 1987<br>Effective Date of Expansion<br>Jan 14, 1993<br><br>3rd Amendment Sep 17, 1994<br>Extension & expiration | 10<br><br><br><br><br>10 Jan 30, 2013<br>- - - -expected expansion 08-01-01<br>See pg 2 for rent - - - - - - | Dec. 1, 1987<br>Dec 1, 1990<br>Jan 14, 1993<br>Jul 1, 1995<br>Jul 1, 1996<br>Jul 1, 2000<br><br>Jul 1, 2003<br>Jul 1, 2006<br>Jul 1, 2009<br>Jul 1, 2012 | $10,263.50<br>$11,842.50<br>$21,135.50<br>$23,485.00<br>$26,420.63<br>$27,007.75<br><br>$29,706.00<br>$32,676.60<br>$35,947.68<br>$39,542.68 |
| 26 San Mateo<br><br>4 East 4th Avenue<br>San Mateo, CA 94401<br><br>415-342-4743<br><br>Sep 26, 1987<br><br>Central Park Plaza<br><br>San Mateo County | Sand Hill Property Management Co.<br>30 E. Fourth Avenue<br>San Mateo, CA 94401<br><br>Rose Koot-Landes  650-344-1500 | 25,838<br><br>ground<br>12,640<br><br>lower level<br>13,198 | Sep 13, 1983<br><br>Rent Commencement Date<br>Aug 1, 1994<br><br>OPTION<br>Notice 6 to 12 months prior<br>to expiration. | 10 Jul 31, 2004<br><br><br>5 Jul 31, 2009 | Aug 1, 1994<br>Aug 1, 1999<br><br># days in month | $23,417.00<br>$26,897.00<br><br><br>$30,250.00 |

Lease Limit Schedule 052003.xls

Exhibit _____
Page _____

**28 Santa Barbara * Clearance Ctr**
3383 La Cumbre Plaza Lane
Santa Barbara, CA 93105

805-682-2711
Nov 27, 1987
Close original lse 07-13-97
Open Ctr 07-23-97

Santa Barbara County

James D. Andros, Andros Family Trust
Jack G. Duncan & Lois A. Duncan,
Trustees of the Jack G. Duncan
Family Revocable Trust dated 5/26/89

Pay and mailing address:
James D. Andros, Trustee
(cell 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)
Jack G. Duncan, Trustee
(cell 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)
(Each to receive 1099 for 50% amt pd)
Duncan & Duncan
CPAs Accountancy Corp
416 East Canon Perdido Street
Santa Barbara, CA 93101
Voice mail 805-963-5911
Fax 805-963-3075

5,700   May 14, 1987   5.25

| Term / Option | Count | Expiration | | Rent Start | Amount |
|---|---|---|---|---|---|
| Term Commencement Date Nov 27, 1987 | | | | Dec 1, 1989 | $11,115.00 |
| OPTION ** Exercised** | 5 | | | Jan 1, 1993 / Jan 1, 1996 | $11,115.00 / $11,885.00 |
| 2nd Amend-Extend-May 7, 1987 Effective Jul 15, 1997 | 9 mos | | | Jul 16, 1987 | $10,000.00 |
| OPTION ** EXERCISED Notice 120 days prior to expiration. | 1 | | | Apr 18, 1996 | $10,000.00 |
| 3rd Amend-Extend-Jan 4, 1999 Effective Apr 18, 1999 | 2 / Apr 30, 2001 | | | May 1, 2001 / May 1, 1999 | $10,500.00 / $11,000.00 |
| 4th Amend-Options-Jan 24, 2001 OPTION ** EXERCISED | 5 + | Sep 30, 2006 | | Oct 1, 2002 / Oct 1, 2005 | $11,273.00 / $12,100.00 |
| OPTION Notice 120 days prior to expiration. | | Sep 30, 2011 | Jun 1, 2006 | Oct 1, 2006 | CPI |
| OPTION Notice 120 days prior to expiration. | 5 | Sep 30, 2016 | Jun 1, 2011 | Oct 1, 2011 / Oct 1, 2014 | CPI / CPI |
| OPTION Notice 120 days prior to expiration. | 5 | Sep 30, 2021 | Jun 1, 2016 | Oct 1, 2016 / Oct 1, 2017 | same as 10/1/14 / CPI |
| OPTION Notice 120 days prior to expiration. | 5 | Sep 30, 2026 | Jun 1, 2021 | Oct 1, 2021 / Oct 1, 2020 / Oct 1, 2023 | same as 10/17 / CPI / CPI |
| OPTION Notice 120 days prior to expiration. | 5 | Sep 30, 2031 | Jun 1, 2026 | Oct 1, 2026 / Oct 1, 2029 | same as 10/1/29 / CPI |
| OPTION Notice 120 days prior to expiration. | 4 | Sep 30, 2035 | Jun 1, 2031 | Oct 1, 2031 / Oct 1, 2032 | CPI / CPI |

Exhibit ____6____
Page ____112____

Stroud Acquisition Corp.  *  Lease Information

5/2/03

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **31 Stevens Creek** | Pay 90% to each | 15,000 | May 31, 1988 | | | | |
| 3111 Stevens Creek | Sue Lasher, Trustee of the Sue Lasher Family Trust | | | Rent Commencement Date Sep 1, 1988 | 7 | | |
| San Jose, CA 95117 | 3161 Cecil Ave | | | | | | Sep 1, 1989   $26,730.00 |
| | San Jose, CA 95117 | | | | | | Sep 1, 1990   $28,868.33 |
| 408-984-6090 | | | | | | | Sep 1, 1992   $31,177.83 |
| | 408-984-2443 (also a FAX #) | | | | | | Sep 1, 1994   $33,672.05 |
| Nov 25, 1988 | | | | OPTION ** EXERCISED Notice 180 days prior to expiration | 5 | | Sep 1, 1995   $33,672.05 |
| | Second Amend Apr 17, 2000 | | | | | | Sep 1, 1996   $36,172.05 |
| Santa Clara County | Sue Lasher, Trustee of the Davor Sorbin Family Trust | | | | | | Sep 1, 1997   $39,065.84 |
| | 3161 Cecil Ave | | | | | | Sep 1, 1999   $40,628.47 |
| | San Jose, CA 95117 | | | OPTION ** EXERCISED Notice 180 days prior to expiration | 5 Aug 31, 2005 | | Sep 1, 2000   $43,128.47 |
| | | | | | | | Sep 1, 2001   $46,578.74 |
| | | | | | | | Sep 1, 2003   $50,305.03 |
| | | | | OPTION Notice 180 days prior to expiration | 3 Aug 31, 2008 | Mar 1, 2005 | Sep 1, 2005   Mkt Rate |
| **35 Pasadena/Lake** | Te Fang Chen, Te Tsung Chen & Te Cheng Chen | 15,000 | Jan 22, 1989 | | | | |
| 440 So Lake Avenue | | | | Rent Commencement Date Mar 1, 1989 | 10 | | Mar 1, 1989   $22,000.00 |
| Pasadena, CA 91101 | Pay: | | | | | | Aug 1, 1995   $23,000.00 |
| | Te Tsung Chen | | | | | | |
| 626-578-0633 | 240 Whispering Pines Drive | | | 1st Amend - Lease Extension Apr 15, 1998 | 10 Jul 31, 2009 | | Aug 1, 1999   $28,000.00 |
| | Arcadia, CA 91006 | | | | | | Aug 1, 2004   $32,000.00 |
| Jun 5, 1989 | 818-446-1775 | | | | | | |
| Los Angeles County | Johnny Chen   626-556-5452 home | | | | | Mar 1, 2005 | |

bit _____ 6

Page _____ 113

| 36 Orange | | 18,800 | Undated, 19 ___ (Feb. 23, 1989) | 10 | | Aug 1, 1989 | $7,440.00 |
| 2830 N Tustin Ave | | | Commencement Date | | | Aug 1, 1990 | $14,880.00 |
| Orange, CA 92865 | | | Aug 1, 1989 | | | Aug 1, 1994 | $17,112.00 |
| 714-637-6465 | Deborah Hawthorne, Mail Mgr | | | | | | |
| | 714-998-1521  FAX: 714-998-8376 | | | | | | |
| Aug 11, 1989 | | | 2nd Amendment | 2 Jul 31, 2001 | Aug 1, 1999 | $18,678.76 |
| | Pay: H.M.A. Enterprises - Mall of Orange | | Feb 16, 1999 | | | |
| Orange County | (Fed ID 33-0736610) | | | | Aug 1, 2001 | $18,675.75 |
| | c/o Nomura Asset Capital Corp., Mortgagee | | | | Aug 1, 2003 | $20,675.75 |
| | Collection Account #015-509302 | | OPTION | 5 Jul 31, 2006 | | |
| | PO Box 51398 | | Notice 120 days prior | | | |
| | Los Angeles, CA  90051-5998 | | to expiration. | | Feb 1, 2006 | |

| 37 West Las Vegas | Decatur Crossing Center, LLC | 12,000 | Jan 6, 1989 | 10 | | Oct 25, 1989 | $15,166.67 |
| 204 S Decatur | | | Rent Commencement Date | | | Oct 25, 1994 | $18,000.00 |
| Las Vegas, NV 89107 | | | Oct 25, 1989 | | | Oct 25, 1999 | $19,800.00 |
| 702-870-7330 | | | | | | Feb 1, 2001 | $17,300.00 |
| | Pay: | | 2nd Amendment | 12.7/12 May 31, 2002 | | |
| Oct 25, 1989 | Decatur Crossing Shopping Center | | Feb 19, 1999 | | | |
| | c/o Realty Holdings Group | | | | | |
| Clark County | 300 South Fourth Street | | Amendment | Jan 23, 2001 | Sep 1, 2001 thru | $18,575.00 |
| | Las Vegas, NV 89101 | | Dec 18, 2001 | | Nov 30, 2001 | $20,225.00 |
| | Mary Marquis  702-384-4488 | | | 5 May 31, 2005 | Jun 1, 2002 | $21,600.00 |
| | FAX 702-383-9150 | | OPTION | Excercised for 3 yrs | Jun 1, 2003 | |
| | | | Notice 8 to 9 months | | Jun 1, 2004 | |
| | | | prior to expiration. | | | |
| | | | OPTION | 5 May 31, 2010 | Sep 1, 2004 thru | $21,600.00 |
| | | | Notice 6 to 9 months | | Sep 30, 2004 | |
| | | | prior to expiration. | | Jun 1, 2005 | |

| 38 Torrance/Del Amo | Regency Centers, LP | 13,980 | Jan 31, 1989 | 10 | | Jan 26, 1990 | $24,946.00 |
| 555 South Flower St Ste 3500 | | | Commencement Date | | | Apr 1, 1995 | $26,561.74 |
| 23000 Hawthorne Blvd | Los Angeles, CA 90071 | | May 1, 1990 | | | |
| Torrance, CA 90505 | | | Rent Commencement Date | | | 30 day month | |
| | | | Jul 1, 1990 | | | | |
| 310-373-2083 | 213-553-2200   Fax 213-624-2280 | | | | | | |
| Apr 18, 1990 | | | OPTION * Exercised | 5 Jun 30, 2005 | Jul 1, 2000 | $26,334.00 |
| | Purchased from Forest Lawn | | Oct 20, 1999 letter agreement | | Jan 1, 2002 | $27,720.00 |
| | Oct-02 | | | | | |
| Los Angeles County | | | OPTION | 5 Jun 30, 2010 | Jul 1, 2005 | Mkt Rate |
| | Property Mgr | | | | | |
| | John Shockey | | | | | |
| | 213-553-2245 | | | | | |

Exhibit _____ 6

Page _____ 114

5/20/03

**39 Rancho Mirage**

72014 Highway 111
Rancho Mirage, CA 92270

Riverside County

Santa Barbara Industrial Park
c/o Bryan Gegg's
222 E Carrillo Street #209
Santa Barbara, CA 93101-2141

805-962-8186 / 805-964-8710
FAX 805-962-4521
Bryan Gegg's
direct line @ 900  805-403-1241

619-775-2131
Duke Baker

780-341-6639
Mar 5, 1990

12,400  Nov 1, 1988  10
Commencement Date
Mar 5, 1990

** OR until expiration of Glanted loan

| Date | Amount |
|---|---|
| Mar 5, 1990 | $18,300.00 |
| Mar 1, 1993 | $18,060.31 |
| Sep 1, 1993 | $18,067.22 |
| Mar 1, 1994 | $18,464.40 |
| Sep 1, 1994 | $17,361.31 |
| Mar 1, 1995 | $17,523.54 |
| Sep 1, 1995 | $22,304.68 |
| Mar 1, 1996 | $22,569.03 |
| Sep 1, 1996 | $22,577.56 |
| Mar 1, 1997 | $22,578.01 |
| Sep 1, 1997 | $22,612.45 |
| Mar 1, 1998 | $22,738.06 |
| Sep 1, 1998 | $22,837.78 |
| Mar 1, 1999 | int -- |
| Sep 1, 1999 | int -- |

**40 Beverly Connection**

100 No. La Cienega Blvd.
Suite 218
Los Angeles, CA 90048

310-657-2422

The Beverly Connection
Beverly & LaCienega

May 16, 1990

Los Angeles County

The Beverly Connection, Ltd
PO Box 30369
Los Angeles, CA 90030-0369

Werner Clark, CFO, ext 301
310-470-4777

Vickie Fontenot, Prop Mgr
213-868-6085  FAX 213-852-0681

20,638  Jun ___ 1989  10
Commencement Date
Mar 15, 1990
Rent Commencement Date
Jun 6, 1990
Amendment Jun 12, 1987
CAM rebate thru Jan 31, 2001
Second Amendment
Jan 31, 2001

OPTION
Notice 6 months prior to expiration
5  Mar 4, 2010  Sep 1, 2004

OPTION - Exercised
Sep 17, 1999 letter
Amendment Jan 29, 2001
5  Mar 4, 2005

| Date | Amount |
|---|---|
| Mar 15, 1990 | $30,957.00 |
| Apr 1, 1992 | $34,382.91 |
| Apr 1, 1994 | $37,829.45 |
| Apr 1, 1995 | $41,276.00 |
| Apr 1, 1996 | $44,701.91 |
| Apr 1, 1997 | $48,148.45 |
| Apr 1, 1999 | $51,595.00 |
| Mar 5, 2000 | $21,700.00 |
| Sep 1, 2001 | $19,500.00 |
| Feb 1, 2002 | $20,800.00 |
| Feb 1, 2003 | $22,000.00 |
| Feb 1, 2004 (7?% orig lease $7?) | $21,700.00 |

PAY:
Beverly Connection, Ltd
Comerica Bank - California
Trident Group, Inc.
PO Box 512680
Los Angeles, CA 90051-2680

OPTION - Exercised
Oct 25, 1999 letter
2  Jan 31, 2004  Feb 1, 2001  $46,834.00
Feb 1, 2002  $48,686.00

OPTION
See Second Amend
1  Jan 31, 2004  Jan 31, 2003  $50,762.00

Feb 1, 2003

**41 Walnut Creek**

1300 California Street
Walnut Creek, CA 94596

925-833-1113
Jun 21, 1990

Alameda County

Woodcreek Center
c/o Cortese Investment Co.
211 Lafayette Circle, Suite 200
Lafayette, CA 94549

Michele Paiko
925-283-8777   FAX 925-283-8275

15,100  Oct 18, 1989  10
Commencement Date
Jan 21, 1990

5  Jun 20, 2005

| Date | Amount |
|---|---|
| Jun 21, 1990 | $21,261.00 |
| Jun 21, 1993 | $24,462.00 |
| Jun 21, 1995 | $26,678.00 |
| Jun 21, 1998 | $30,804.00 |

30 day/month
| Date | Amount |
|---|---|
| Jun 21, 2000 | $37,750.00 |
| Jun 21, 2001 | $38,580.00 |
| Jun 21, 2002 | $39,948.00 |
| Jun 21, 2003 | $41,250.00 |
| Jun 21, 2004 | $42,488.00 |

Exhibit ___6___

Page ___115___

5/2003

Stroube Acquisition Corp. • Lease Information

| No. / Location | Address / Contact | Sq Ft | Commencement / Option | Term | Expiration | Dates | Rent |
|---|---|---|---|---|---|---|---|
| 42 Dublin<br><br>7256 San Ramon Valley Rd<br>Dublin, CA 94568<br><br>925-829-2323<br><br>Aug 1, 1990<br><br>Alameda County | Dublin Town & Country Assoc.<br>318 Diablo Road, Suite 250<br>Danville, CA 94526<br><br>925-820-2110    FAX 925-820-2580 | 16,660 | Aug 18, 1989<br>Commencement Date<br>Aug 1, 1990<br><br>Expansion Commencement<br>Date Aug 1, 1994<br><br>OPTION - Exercised<br>Oct 25, 1999 letter<br><br>OPTION<br>Notice 6 to 12 months<br>prior to expiration. | 10 | 5 Jul 31, 2005 | Aug 1, 2004<br>thru<br>Jan 31, 2005 | $15,000.00<br>$16,333.33<br>$16,333.33<br>$16,333.33<br>$17,833.33<br>$19,662.33<br>$20,044.33<br>$21,261.67<br><br>$23,135.33<br>$24,539.33 |
| 43 Westside • Clearance Center<br><br>10830 Santa Monica Blvd.<br>Los Angeles, CA 90025<br><br>310-470-7806<br><br>Nov 23, 1990<br>Close original at Jul 20, 1997<br>Open Cir Cir Jul 30, 1997<br><br>Los Angeles County | 10830 Santa Monica Associates<br>c/o Yehuda Netthall<br>9312 Civic Center Dr., Suite 105<br>Beverly Hills, CA 90210<br><br>310-550-1210   FAX 310-550-1941<br><br>Payments & Inquires to mgt co.:<br>Sachse Real Estate Co. Inc.<br>Attn: Edmond A. Sachse<br>315 S. Beverly Drive, Suite 415<br>Beverly Hills, CA 90212<br><br>310-284-7100    FAX 310-284-7817<br>Al Dominguez, Property Mgr | 15,000 | May 15, 1989<br><br>Commencement Date<br>Nov 23, 1990<br><br>2nd Amendment<br>Apr 14, 1999<br><br>OPTION - EXERCISED<br>Notice 6 months prior<br>to expiration.<br><br>OPTION<br>Notice 6 months prior<br>to expiration. | 10<br><br>5 Jan 31, 2006<br><br>5 Jan 31, 2011 | | Nov 23, 1990<br>Nov 23, 1995<br><br>30 day month<br><br>Nov 23, 2000<br><br>Nov 23, 2005 | $30,000.00<br>$36,000.00<br><br>$37,500.00<br><br>Greater of<br>$51,840.00<br>or 90% Mkt |
| 45 Laguna Niguel<br><br>28001 Greenfield Drive<br>Laguna Niguel, CA 92656<br><br>949-831-2499<br><br>The Center at Rancho<br><br>Jan 11, 1991<br><br>Orange County | Rancho Niguel Plaza II L.P.<br>c/o Pacific West Asset Mgt Corp<br>PO Box 19058<br>Irvine, CA 92713-9058<br><br>Gina Rotta, Prop Mgr<br>714-433-7300 ext 227    FAX 714-433-7330<br>AE<br>Pacific West Asset Mgt Corp<br>150 Paularino, Suite 285<br>Costa Mesa, CA 92626-3302 | 14,960<br>Amendment<br>+  9,716<br>24,666 | May 7, 1990<br>Feb 1, 1991<br>Rent Commencement Date<br>Jan 11, 1991<br><br>1st Amendment, expansion<br>dated Dec 20, 1995<br>Expansion Rent Comm Date<br>Aug 25, 1996<br>2nd Amendment 5/1/01<br>OPTION<br>Notice 180 days prior to<br>expiration. | 10)<br>Amendment<br><br>15) Jan 31, 2006<br><br>5 Jan 31, 2011 | Aug 30, 2005 | Jan 11, 1991<br>Feb 1, 1996<br>Aug 25, 1996<br>Feb 1, 2001<br>March 1, 2001<br>March 1, 2002<br><br>March 1, 2003<br><br>Feb 1, 2006 | $17,940.00<br>$20,531.00<br>$36,531.00<br>$36,833.54<br>$34,198.00<br>$35,176.00<br><br>$39,084.10<br><br>last rent + 15% |

Exhibit ___

Page ___116___

Strouds Acquisition Corp. * Lease Information

| | | | | | | |
|---|---|---|---|---|---|---|
| **48 Brea** | State of California Public Employees' Retirement System / Brea Marketplace | 11,816 | Oct 31, 1990 | 10 | | Feb 14, 1991 | $13,807.00 |
| 835 Birch Street | 3909 Midway Drive, Suite C | | Commencement Date | | | Feb 14, 1996 | $16,004.40 |
| Brea, CA 92821 | San Diego, CA 92110 | | Feb 14, 1991 | | | | |
| | | | | | | |
| 714-529-8005 | Kay Vinduka | | 1st Amendment Aug 22, 2000 | | | Feb 14, 1991 | $13,807.00 |
| | 619-398-4723   FAX 619-398-4710 | | | | | Feb 14, 1996 | $16,004.40 |
| | Copy of Notices to: | | OPTION - EXERCISED | 5 Feb 13, 2006 | | Feb 14, 2001 | $18,004.80 |
| | Pillsbury Madison & Sutro LLP. | | | | | | |
| Feb 14, 1991 | 725 So. Figueroa Street, #1200 | | | | | | |
| | Los Angeles, CA 90017 | | | | | | |
| | Attn: Jackie K. Park, Esq. | | | | | | |
| Orange County | | | OPTION | 5 Feb 13, 2011 | | Feb 14, 2006 | $22,680.88 |
| | PAY: | | Notice 6 months prior | | | | |
| | CalPERS | | to expiration. | | | | |
| | Bank of America Brea Marketplace | | | | | | |
| | File #59752 | | | | | | |
| | Los Angeles, CA 90074-9752 | | | | | | |
| | | | | | | |
| **49 Montclair** | Montclair East Partnership | 15,000 | May 29, 1992 | 13 Apr 30, 2008 | Aug 13, 2005 | Apr 16, 1993 | $13,475.00 |
| 5427 Moreno Street, #D | c/o MM Fidder Properties | | Amend to Lease, Dec 21, 199 with 3rd Amend | | | Sep 1, 1993 | $21,875.00 |
| Montclair, CA 91763 | 1150 N. Mountain Ave. | | Lease Commencement Date | | | Aug 15, 1995 | $25,542.47 |
| | Suite 210 | | Jan 15, 1993 | | | | |
| | Upland, CA 91786-3666 | | | | | Nov 1, 1998 | $19,500.00 |
| 909-621-2970 | | | Rent Commencement Date | | | Nov 1, 1999 | $19,792.50 |
| | 909-946-0616 | | Apr 16, 1993 | | | Aug 15, 1995 | $20,088.39 |
| Feb 26, 1993 | FAX: 909-985-1418 | | 2nd Amend, Jan 17, 1995 | | | Nov 1, 2000 | $20,088.39 |
| | Salvatore Calunno, Jr | 2,334 | Adjacent Premises Rent | | | Feb 1, 2001 ** | $17,075.00 |
| | Prop Mgr | 17,334 | Commencement Date, Aug 15, 1995 | | | Feb 1, 2002 | $18,990.00 |
| San Bernardino County | | | Third Amend, Jun ___, 1998 | | | Feb 1, 2003 ** | $20,898.59 |
| | PAY (bank): | 2,334 | Effective Date, Nov 1, 1998 | | | Feb 1, 2004 | $21,322.14 |
| | Montclair East Shopping Center | 15,000 | Amendment, Jan ___, 2001 ** | | | Nov 1, 2004 | $21,007.04 |
| | PO Box 51458 | 9/30/98 | Effective Date, Feb. 1, 2001 | | | Nov 1, 2005 | $21,641.98 |
| | Los Angeles, CA 90051-5758 | | | | | Nov 1, 2006 | $21,966.61 |
| | | | | | | Nov 1, 2007 | $22,298.11 |

Lease_Limt Schedule 052003.xls

Exhibit

Page _____ 117

Strouds Acquisition Corp. * Lease Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **50 Ventura**<br>4300-B East Main<br>(Telephone & Main)<br>Ventura, CA 93005<br><br>805-650-7990<br><br>Oct 20, 1993<br><br>Ventura County | Telephone and Main Associates, LLC.<br>Fed. I.D. # 95-4811605<br>c/o Sandstone Property Management Co.<br>1543 Seventh Street, Suite 202<br>Santa Monica, CA 90401<br><br>310-576-0667  FAX 301-395-6513 | | Sep 29, 1992<br>Commencement Date<br>Dec. 1, 1993<br>Rent Commencement Date<br>Dec. 8, 1993<br>OPTION<br>OPTION | 15,000 | 10  Dec. 4, 2003<br>5  Dec. 4, 2008<br>5  Dec. 4, 2013 | Dec 8, 1993<br>Sep 7, 1996<br>30 day/month<br>Dec. 5, 2003<br>Dec. 5, 2008 | $21,000.00<br>$24,150.00<br>$27,750.00<br>$31,950.00 |
| **51 Lake Elsinore Outlet**<br>17800 Collier Avenue<br>Suite G-160<br>Lake Elsinore, CA 92530<br><br>909-245-2525<br><br>Nov 24, 1993<br><br>Riverside County | Notices & all other correspondence:<br>Second Horizon Group Limited Partnership<br>c/o Prime Retail, L.P.<br>Attn: Office of the General Counsel<br>100 East Pratt St., 19th Floor<br>Baltimore, MD 21202<br>410-234-0782<br>Legal Dept FAX 410-234-1781<br><br>PAY, sales reports:<br>Second Horizon Group Limited Partnership<br>Dept 206<br>PO Box 17805<br>Baltimore, MD 21297<br>410-234-1745<br>FAX 410-234-1704<br>Lease Admin - Michael Williams | | 10,000  May 4, 1993<br>Rent Commencement Date<br>Jan 18, 1994<br>Extension of lease<br>Sep 2, 2000<br>Amendment,<br>2001<br>OPTION ** EXERCISED<br>Notice 180 days prior to<br>expiration.<br>OPTION<br>Notice 180 days prior to<br>expiration. | | 7<br>1  Jan 31, 2002<br>5  Jan 31, 2007<br>5  Jan 31, 2012 | Jan 18, 1994<br>Feb 1, 1996<br>Feb 1, 2001<br>Jul 31, 2001<br>Jul 31, 2006<br>Feb 1, 2007 | $11,666.67<br>$12,833.33<br>$10,500.00<br>$11,500.00<br>$14,583.33<br>$17,083.33 |

Exhibit _____6_____

Page _____118_____

5/20/03

| Store | Notices & all other correspondence: | Sq Ft | Lease Date | Event | # Exp. | Expiration | Renewal | Rent Start | Monthly Rent |
|---|---|---|---|---|---|---|---|---|---|
| **53 Tracy Outlet** <br> 1005 Pescadero Ave., #127 <br> Tracy, CA 95376 <br> 209-833-6292 <br> Oct 14, 1994 <br> San Joaquin County | Second Horizon Group Limited Partnership <br> c/o Prime Retail, L.P. <br> Attn: Office of the General Counsel <br> 100 East Pratt St., 19th Floor <br> Baltimore, MD 21202 <br> 410-234-0782 <br> Legal Dept FAX 410-234-1781 <br><br> PAY, sales reports: <br> Second Horizon Group Limited Partnership <br> Dept 216 <br> PO Box 17605 <br> Baltimore, MD 21297 <br> Lease Admin - Michele Williams <br> 410-234-1745 <br> FAX 410-234-1704 | 7,500 | May 31, 1994 | Commencement Date <br> Dec 5, 1994 | 7 | | | Dec 5, 1994 <br> Dec 5, 1996 <br> Feb 1, 2001 | $8,750.00 <br> $10,156.25 <br> $6,125.00 |
| | | | | Amendment <br> Feb 20, 2001 | | | | | |
| | | | | OPTION ** EXERCISED <br> Notice 180 days prior to expiration. | 5 Dec 31, 2006 | | | Jan 1, 2002 <br> Feb 1, 2002 <br> Feb 1, 2003 | $8,125.00 <br> $8,830.00 <br> $12,031.25 |
| | | | | OPTION <br> Notice 180 days prior to expiration. | 5 Dec 31, 2011 | Jul 1, 2006 | | Jan 1, 2007 | $13,906.25 |
| **55 Edina, MN** <br> 3140 Galleria <br> Edina, MN 55435 <br> 952-922-8615 <br> Galleria Shopping Center <br> Hennepin County <br> 02-27-95 | Gabbert And Gabbert Company <br> 3510 West 70th Street <br> Edina, MN 55435 <br> 612-925-4321 <br> FAX 612-925-2995 <br> Debbie Courier | 24,546 | Jul 25, 1994 | Commencement Date <br> Feb 27, 1995 | 10 Jan 31, 2006 | | | Feb 27, 1995 <br> Jan 1, 2000 <br> 360 day year <br> Feb 1, 2006 | $14,543.51 <br> $16,589.01 |
| | | | | OPTION #1 <br> Notice 9 months prior to expiration. | 5 Jan 31, 2011 | May 1, 2005 | | Feb 1, 2006 | $18,982.24 |
| | | | | OPTION #2 <br> Notice 9 months prior to expiration. | 5 Jan 31, 2016 | May 1, 2010 | | Feb 1, 2011 | $21,027.74 |
| | | | | OPTION #3 <br> Notice 9 months prior to expiration. | 5 Jan 31, 2021 | May 1, 2015 | | Feb 1, 2016 | $27,164.24 |

Lease Limit Schedule 05/2003.xls

Exhibit _____ 6

Page _____ 119

| 57 Vacaville Outlet | | 7,030 | Nov 15, 1994 Summary Sheet, Nov 9, 1994 | 8 | | | |
|---|---|---|---|---|---|---|---|
| 311 - B Nut Tree Road Vacaville, CA 95687 | KRT Remic Loan LLC c/o Konover Property Trust, Inc. 3454 Kildaire Farm Road Suite 200 Raleigh, NC 27606 | | Commencement Date Jan 1, 1995 | | | | Dec 24, 1994 Jan 1, 1998 Jan 1, 2000 Feb 1, 2001 | $8,201.67 $9,060.42 $9,969.17 $8,500.00 |
| 707-451-4781 | | | Rent Commencement Date Dec 24, 1994 | | | | | |
| Dec 24, 1994 | Deborah Rogers, Lease Acct. Mgr. 919-372-3000   FAX 919-372-3250 | | Amendment Feb 20, 2001 | | | | | |
| | PAY: KRT Remic Loan LLC c/o Konover Property Trust, Inc. Attn: Vacaville, CA PO Box 601240 Charlotte, NC 28260-1240 | | OPTION Exercised Notice 180 days prior to expiration. | 3 | Jan 31, 2006 | Aug 1, 2005 | Feb 1, 2003 | $10,837.92 |
| Nut Tree Rd & Burton Drive Solano County | | | OPTION Notice 180 days prior to expiration. | 3 | Jan 31, 2009 | | Feb 1, 2006 | $11,716.87 |

Exhibit _____ 6

Page _____ 120

5/20/03

Shmuda Acquisition Corp.  ·  Lease Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 62 Point Loma Outlet, CA<br><br>3361-A Rosecrans St.<br>San Diego, CA 92110<br>619-523-9084<br><br>Loma Square<br>Rosecrans St. & Midway Dr.<br>San Diego County<br><br>Aug 13, 1995 | CT Retail Properties Finance V, LLC<br>(Fed ID 95-4734956)<br>3500 Sepulveda Blvd., Box 10010<br>Manhattan Beach, CA 90266-8510<br>310-546-4520    FAX 310-546-8455<br><br>Notice: Attn: Legal Dept 310-546-6249<br>Acct questions: Attn: Accounting Dept 310-546-4520<br>Leasing: Fred Brunning, Sr. VP<br>Prop Mgr: Frank Volgel 760-433-3700<br><br>PAY:<br>CT Retail Properties Finance V, LLC<br>Attn: 50074-24101/7, File 56634<br>Los Angeles, CA 90074-5634 | 7,800 | Jun 18, 1995 | Commencement Date<br>Sep 23, 1995<br><br>Lease Amendment No. 1 - Rent Reduction<br>Feb 2, 1999<br><br>Lease Amendment No. 2<br><br>OPTION - Exercised<br>Oct 25, 1999 letter | 5 | | Sep 23, 1995<br>Aug 1, 1996 | $11,083.33<br>$9,900.00 |
| | | | | | | Jan 1, 2000 | $11,083.33 |
| | | | | 5 Sep 30, 2005 | | Oct 1, 2000<br>Oct 1, 2001<br>Oct 1, 2002<br>Oct 1, 2003<br>Oct 1, 2004 | $11,419.00<br>$11,761.57<br>$12,114.42<br>$12,477.85<br>$12,852.19 |
| 65 Mission Valley, CA<br><br>990 Camino De La Reina<br>San Diego, CA 92116<br>619-281-0026<br><br>San Diego County<br><br>Feb 17, 1996 | Mission Center Road, LLC<br>c/o Marc Lantzman<br>3355 Lower Ridge Road<br>San Diego, CA 92130<br>619-259-5724<br><br>PAY and NOTIFY (see below if override):<br>Mission Center Road, LLC<br>c/o Kim Peterson<br>PO Box 676237<br>Rancho Santa Fe, CA 92067<br><br>NOTIFY - IF OVERNITE:<br>12520 High Bluff Drive #170<br>San Diego, CA 92130<br>858-461-3539    FAX 858-461-3943<br>e-mail: kim6060?@aol.com | | Apr 8, 1995<br><br>Rent Commencement Date<br>March 4, 1996 | OPTION<br>Written notice 12 - 6 months<br>prior to expiration<br><br>Commencement Date<br>December 18, 1995<br><br>OPTION<br>Written notice 9 months<br>prior to expiration<br><br>OPTION<br>Written notice 9 months<br>prior to expiration<br><br>OPTION<br>Written notice 9 months<br>prior to expiration | | 20,000<br>4,000<br>24,000 | | FMV |
| | | | | 5 Sep 30, 2010 | | Oct 1, 2004<br>thru<br>Mar 31, 2005 | Oct 1, 2005 |
| | | | | 10 Mar 31, 2006 | | | Mar 4, 1996<br>Mar 4, 2001<br>30 day/month | $34,000.00<br>$39,100.00 |
| | | | | 5 Mar 31, 2011 | | Jul 1, 2005 | Apr 1, 2006 | $44,995.00 |
| | | | | 5 Mar 31, 2016 | | Jul 1, 2010 | Apr 1, 2011 | $51,709.00 |
| | | | | 5 Mar 31, 2021 | | Jul 1, 2015 | Apr 1, 2016 | $59,466.00 |

Page 19

Leases Limit Schedule 052003.xls

Exhibit _____ 6

Page _____ 121

| 66 Long Beach, CA | | | | | | |
|---|---|---|---|---|---|---|
| 8346-A East Pacific Coast Hwy | Marina Pacifica, LLC | 22,457 | Feb 28, 1995 | 10 | | |
| Long Beach, CA 90803 | 6372d E. Pacific Coast Hwy. | | 1st Amendment, Jul 1, 1995 | | | |
| | Long Beach, CA 90803 | | 2nd Amendment, Sep 29, 1995 | | | |
| 562-430-9425 | Eldad Levy or Mary Mastrucci | | Commencement Date | Sep 30, 2006 | Mar 30, 2006 | |
| | 562-598-2728   FAX 562-431-8413 | | Sep. 29, 1996 | | | |
| Sep 29, 1996 | | | Amendment  Jan 29, 2001 | | | |
| | Copies of notices: | | OPTION Written notice 6 months prior to expiration. | Sep 30, 2011 | Mar 30, 2011 | Oct 1, 2006 |
| Marina Pacifica Shopping Ctr | Martin I Blank, Jr., Esq. | | | | | |
| | 310-477-5455   FAX 310-444-9203 | | | | | |
| | 11755 Wilshire Blvd., Suite 1400 | | OPTION Written notice 6 months prior to expiration. | Sep 30, 2016 | Mar 30, 2016 | Oct 1, 2011 |
| Los Angeles County | Los Angeles, CA 90025-1520 | | | | | |
| | | | OPTION Written notice 6 months prior to expiration. | Sep 30, 2021 | Mar 30, 2021 | Oct 1, 2016 |
| | PAY: | | | | | |
| | Marina Pacifica LLC | | OPTION Written notice 6 months prior to expiration. | Sep 30, 2026 | | Oct 1, 2021 |
| | Loan No. 6527-OL | | | | | |
| | Dept. No. 86435 | | | | | |
| | El Monte, CA 91735-6435 | | | | | |

Rent column (right):
- Sep 29, 1996 — $11,228.50
- Nov 1, 1996 — $22,457.00
- Oct 1, 1998 — $24,328.42
- Oct 1, 2000 — $26,071.25
- Feb 1, 2001 — $26,404.33
- Oct 1, 2001 — $26,276.33
- Feb 1, 2002 — $29,108.67
- Feb 1, 2003 — $29,942.87
- Oct 1, 2006 — $35,556.92
- Oct 1, 2011 — $41,171.17
- Oct 1, 2016 — Mkt Value   Mkt rent $1.83332
- Oct 1, 2021 — 115% Mkt Rate of 3rd option term

hibit _____ 6

Page _____ 122

75 Monterey, CA

960 Del Monte Center
Monterey, CA 93940

831-646-9220

Feb. 12, 1999

Monterey County

Del Monte Regional Mall, LLC
c/o Dinco West Properties, LLC
150 Almaden Blvd., Suite 700
San Jose, CA 95113-2017

Del Monte Regional Mall, LLC
1410 Del Monte Center
Monterey, CA 93940

831-393-2705    FAX 831-373-9675

Billing: Suresh Prahad

PAY:
Del Monte Regional Mall, LLC
PO Box 7282
San Francisco, CA 94120-7282

15,970 | Apr 6, 1998

Commencement Date
Mar 18, 1999

OPTION (Addendum #1, 4.)
Notice 365 days to 180 days
prior to expiration

OPTION (Addendum #1, 4.)
Notice 365 days to 180 days
prior to expiration

15 | Mar 31, 2014

5 | Mar 31, 2019

5 | Mar 31, 2024

Apr 1, 2013 to
Sep 30, 2013

Apr 1, 2018 to
Sep 30, 2018

Mar 18, 1999
Mar 18, 2004
Mar 18, 2009
30 day calendar month

Apr 1, 2014

Apr 1, 2019

$21,919.58
$24,040.83
$26,162.08

$28,990.42

$31,818.75

Exhibit 6

Page 123

Strouds Acquisition Corp. * Leases Information

| | | | | | Annual Rent |
|---|---|---|---|---|---|
| 76 Saratoga Outlet, CA<br><br>650 El Paseo de Saratoga<br>San Jose, CA 95130<br><br>408-379-9079<br><br>El Paseo De Saratoga Shopping Center<br><br>Nov. 24, 1998<br><br>Santa Clara County | Sunrise Penguin Saratoga Ltd Partnership<br>c/o Pritzer Realty Group<br>(Notices - Attn: General Counsel)<br>200 West Madison St., 37th Floor<br>Chicago, IL 60606<br><br>Mgt Co.:<br>Shelter Bay Retail Group<br>9757 Juanita Drive, N.E., Suite 103<br>Kirkland, WA 98034<br><br>Penny Gordon<br>425-814-8454    FAX 425-814-0275<br><br>Pay:<br>Sunrise Penguin Saratoga L. P.<br>c/o Shelter Bay Retail Group<br>PO Box 550<br>Mill Valley, CA 94942 | 8,652   Sep 30, 1998, Effective Date<br><br>Rent Commencement Date<br>Nov. 24, 1998<br><br>OPTION<br>Written notice 12 - 6 months<br>prior to expiration | 8 Nov 30, 2006<br><br>5 Nov 30, 2011 | Nov 24, 1998<br>Dec 1, 2001<br>Jun 1, 2004<br><br>Partial mo. = #dys/360 X<br><br>Dec 1, 2006 to<br>May 30, 2008<br><br>Dec 1, 2008<br>Jun 1, 2009 | $12,976.6?<br>$14,162.24<br>$15,141.8?<br><br>$16,265.76<br>$17,304.00 |
| 77 Thousand Oaks, CA<br><br>33 North Moorpark<br>Thousand Oaks, CA 91360<br><br>805-494-1719<br><br>The Village At Moorpark<br>Ventura County<br><br>Jul 19, 1999 | Moorpark Village Company, LLC<br>c/o Caruso Affiliated Holdings<br>100 Wilshire Blvd., 14th Floor<br>Santa Monica, CA 90401-1112<br><br>310-458-0202       FAX 310-458-0212<br><br>Bret Nielsen, Project Coordinator<br>Patrick Kinney, VP-Operations | 15,428   Mar 25, 1999<br><br>Rent Commencement Date<br>May 1, 1999<br><br>Rent Commencement Date<br>to use for term period<br>Jul 19, 1999<br><br>OPTION (2.5)<br>Notices 9 to 18 months<br>prior to expiration<br><br>OPTION (2.5)<br>Notice 8 to 18 months<br>prior to expiration | 10 Jul 31, 2009<br><br>5 Jul 31, 2014<br><br>5 Jul 31, 2019 | Jul 19, 1999<br># days in month<br><br>Feb 1, 2008 to<br>Nov 1, 2008<br><br>Feb 1, 2013 to<br>Nov 1, 2013<br><br>Aug 1, 2009<br><br>Aug 1, 2014 | $31,466.04<br><br>$36,251.11<br><br>$41,650.20 |

Page _____

6

/24

Shrouds Acquisition Corp.  *  Lease Information

| # / Property | Landlord / Notice | Sq Ft | Lease Date | Term / Expiration | Options | Rent Dates | Rent Amount |
|---|---|---|---|---|---|---|---|
| **79** 223 N. Glendale Ave. Glendale, CA 91206<br>818-247-0608<br>Glendale Fashion Center<br>May 20, 2000<br>Tl 48,546.80 flooring<br>Los Angeles County<br>Dec. 11, 1999<br>Tl Addendum, pg 8, #37 & 40<br>Dec. 11, 1999 | Vestar/Land Lease Glendale Fashion Center, L.L.C.<br>c/o Vestar Development Co.<br>2425 East Camelback Road, Suite 750<br>Phoenix, AZ 85016<br>PAY and notice to: TAX ID 95-4666250/<br>Glendale Fashion Associates, LLC/BALS<br>File 56787, Ground Level<br>Los Angeles, CA 90074-6787 (90012 CN)<br>Property Mgt.<br>Vestar Development Co.<br>7575 Carson Blvd.<br>Long Beach, CA 90808<br>562-938-1722   FAX 562-938-1744<br>Prop Mgr Vonda Rentz 562-420-5114<br>Asst. Prop Mgr Paula Long 562-420-5116 | 18,673 | Jul 22, 1999<br>Commencement Date<br>May 20, 2000 | 10 | May 31, 2010 | | May 20, 2000<br>Jun 1, 2000<br>Jul 1, 2000<br>Jun 1, 2005 | fractional month = 30ys360 * annual rent<br>2% of sales<br>$15,500.94<br>$31,121.67<br>$34,233.83 |
| | | | | 5 | May 31, 2015 | OPTION Notice 360 days to 180 days prior to expiration | May 31, 2009 to Dec 1, 2009 | Jun 1, 2010 | $37,657.22 |
| | | | | 5 | May 31, 2020 | OPTION Notice 360 days to 180 days prior to expiration | May 31, 2014 to Dec 1, 2014 | Jun 1, 2015 | $41,422.94 |
| | | | | 5 | May 31, 2025 | OPTION Notice 360 days to 180 days prior to expiration | May 31, 2024 to Dec 1, 2024 | Jun 1, 2020 | $45,592.12 |
| **80** Tustin Outlet, CA<br>13230 Jamboree Road<br>Irvine, CA 92602<br>714-566-9354<br>The Market Place Tustin / Irvine<br>Orange County<br>Dec. 11, 1999 | Irvine Retail Properties Company,<br>Division of The Irvine Company,<br>(Fed ID# 133177761)<br>CC: NOTICES - Attn: General Counsel<br>PO Box 6370<br>Newport Beach, CA 92658-6370<br>550 Newport Center Drive, 6th Floor<br>Newport Beach, CA 92658<br>714-720-2200  FAX 714-720-2216<br>PAY & Notice:<br>Irvine Retail Properties Company,<br>c/o Donahue Schriber<br>2777 El Camino Real<br>Tustin, CA 92680 | 7,849 | Oct 12, 1999<br>Commencement Date<br>Dec. 11, 1999 | 10 | Dec 31, 2009 | | Dec. 11, 1999 (Addendum, pg 1, #6)<br>Feb 1, 2000<br>Feb 1, 2003<br>Feb 1, 2007 | $0.00 Only min rent is waived thru 1/00<br>$12,427.58<br>$13,735.75<br>$15,095.00<br>30 day month |
| **81** Arrowhead Outlet, AZ<br>8154 West Bell Road<br>Glendale, AZ 85308<br>Arrowhead Market Place<br>Maricopa County<br>Feb. 15, 2000 | Faith McClintock, Property Manager<br>480-731-9291 fax 480-731-3026<br>Elmer: 602-289-1782  Maint: 602-289-5332<br>Kristen Wieder, Reg. Property Super<br>303-291-0111 x302 fax 303-291-1044<br>Rent to:<br>Arrowhead Center 01, LLC<br>ACF Property Management, Inc.<br>13440 Ventura Blvd., Suite 200<br>Sherman Oaks, CA 91423 | 8,208 | Nov 18, 1999 | 5 | Dec 31, 2004 | OPTION (2,5) Notice 9 to 18 months prior to expiration | Nov 18, 1999<br>Feb 1, 2001 | $5,643.00<br>$6,156.00 |
| | ACF Property Management, Inc.<br>725 S. Rural Rd., Suite C-201<br>Tempe, AZ 85281 | | | 5 | Dec 31, 2009 | OPTION (2,5) Notice 9 to 18 months prior to expiration | Jan 1, 2005 | $6,640.00 |
| | | | | 5 | Dec 31, 2014 | OPTION (2,5) Notice 9 to 18 months prior to expiration | Jan 1, 2010 | $8,206.00 |

5/20/03

Leases Limit Schedule 002003.xls

Exhibit ____6____
Page ____125____

Shiraz Acquisition Corp. • Lease Information

| | | | | | | |
|---|---|---|---|---|---|---|
| **82 Scottsdale Outlet, AZ**<br>8939 E. Indian Bend Road<br>Suite 2<br>Scottsdale, AZ 85250<br><br>480-367-7865<br><br>Jan 18, 2000 | P.G. Development II<br>c/o Estes Development Co<br>16900 N. Black Canyon<br>Phoenix, AZ 85023<br><br>Temp Management Co.:<br>RREEF Management Company<br>Attn: Brian Holmes<br>1201 Main Street, Suite 930<br>Dallas, TX 75202<br><br>Brian Holmes, District Manager<br>(214) 745-1701<br>(214) 745-1653 (fax)<br><br>Rent to:<br>Scottsdale Pavilions II<br>75 Remittance Drive, Suite 3299<br>Chicago, IL 60675-3299 | 11,807 | Jun 18, 1990 | OPTION | | Dec 23, 1999 | $10,722.00 |
| **Salt River Pima-Maricopa<br>Indian Community<br>Maricopa County** | thru bankruptcy, 9/99, Three D Departments, Inc., Lin | | | OPTION<br>Exercise is automatic.<br>Notice NOT TO EXERCISE<br>12 to 9 months prior to expiration | 5 Mar 31, 2006 | Apr 1, 2006 | Feb 1, 2004 | $11,897.00 |
| **84 Colonnade Outlet, AZ**<br>1919 E. Camelback Road<br>Suite 128<br>Phoenix, AZ 85016<br><br>Feb 5, 2000 | Camelback Colonnade Associates<br>Limited Partnership<br>c/o Westcor Partners<br>1919 E. Camelback Road<br>Phoenix, AZ 85016<br><br>602-953-6280    fax 602-494-6188<br><br>Jamie Mills<br><br>Notices to:<br>Camelback Colonnade Associates<br>Attn: John F. Rasor<br>11411 T. Tatum Blvd<br>Phoenix AZ 85028 | 7,832 | Nov 16, 1999 | First Amendment, Nov., 1999<br>Second Amendment, Aug 27, 2001<br><br>OPTION (2.6)<br>Exercise is automatic.<br>Notice NOT TO EXERCISE<br>9 months prior to expiration<br><br>OPTION (2.6)<br>Exercise is automatic.<br>Notice NOT TO EXERCISE<br>9 months prior to expiration | 5 Dec 31, 2004 | Nov 16, 1999<br>Aug 27, 2001 | $7,179.33<br>$9,626.83 |

Leases Limit Schedule.lr(52003.xls)

Exhibit 6

Page 176

| Property | Landlord / Notice | Sq Ft / Lease Info | Term / Expiration | | Option Dates | Rent |
|---|---|---|---|---|---|---|
| **85 Paradise Valley, AZ**<br>12805 N Tatum Blvd,<br>Phoenix, AZ 85032<br><br>Village Fair North<br>Maricopa County<br><br>Mar 9, 2000 | PCF Investments, L.L.C.<br>Attn: John Pretz<br>1451 Quail Street, Suite 109<br>Newport Beach, CA 92660<br>949-756-1022   fax 949-756-1023 | 21,060 | Nov 30, 1994<br>Lease Commencement<br>Dec 1, 1994<br>Bankruptcy Order, 9/23/99<br>Subleases, Nov 18, 1999<br>New Lease Commencement<br>& Commencement Date<br>when PCF is to pay rent<br>Rent Commencement<br>Mar 9, 2000 | Jan 31, 2016 | 30 day month | Mar 9, 2000<br>Feb 1, 2001<br>Feb 1, 2006<br>Feb 1, 2011 | $23,242.71<br>$25,566.98<br>$28,123.68<br>$30,936.05 |
| | | | OPTION<br>Notice 12 months prior<br>to expiration | 5 Jan 31, 2021 | Jan 31, 2015 | Feb 1, 2016 | $35,576.45 |
| | | | OPTION<br>Notice 12 months prior<br>to expiration | 5 Jan 31, 2026 | Jan 31, 2020 | Feb 1, 2021 | $40,912.92 |
| | | | OPTION<br>Notice 12 months prior<br>to expiration | 5 Jan 31, 2031 | Jan 31, 2025 | Feb 1, 2026 | $47,049.86 |
| | | | OPTION<br>Notice 12 months prior<br>to expiration | 10 Jan 31, 2041 | Jan 31, 2030 | Feb 1, 2031<br>Feb 1, 2036 | $54,107.34<br>$62,223.44 |
| **86 Woodland Hills, CA**<br>6263-A Topanga Canyon Blvd.<br>Woodland Hills, Ca 91367<br><br>818-702-9435<br><br>Jan 30, 2000<br><br>Los Angeles County | Calabsa Development Corporation<br>Attn: Asset Management<br>304 South Broadway, 4th Floor<br>Los Angeles, CA 90013-1209<br>213-625-5865    FAX 213-626-1623<br><br>Notice also:<br>Property Mgt.<br>Coreland Companies<br>960 E Green Street Ste L-102<br>Pasadena, CA 91106<br>626-793-6392 Fax 626-793-9897<br>Tracy Thomas | 17,666 | Oct 6, 1999<br>Lease Commencement<br>Nov 1, 1999<br>Rent Commencement<br>Jan 30, 2000 | 10 yrs<br>4 mos   Feb 28, 2009 | | Jan 30, 2000<br>Feb 1, 2005<br>30 day month | $30,919.00<br>$34,010.90 |
| | | | OPTION<br>Notice 180 to 365 days prior<br>to expiration | 5 Feb 28, 2014 | Mar 1, 2008 to<br>Aug 31, 2008 | Mar 1, 2009 | $38,099.26 |
| | | | OPTION<br>Notice 180 to 365 days prior<br>to expiration | 5 Feb 26, 2019 | Mar 1, 2013 to<br>Aug 31, 2013 | Mar 1, 2014 | Fair Mkt |

Exhibit _____ 6

Page _____ 127

## CERTIFICATE OF SERVICE

I, P.J. Marksbury, declare as follows:

I am employed in the County of Orange, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 660 Newport Center Drive, 4th Floor, Newport Beach, California 92660.  On May 20, 2003, I served the following document(s):  **DEBTOR'S EMERGENCY MOTION FOR:  AN ORDER (i) APPROVING AND AUTHORIZING THE ASSUMPTION OF THE AGENCY AGREEMENT, (ii) AUTHORIZING DEBTOR AND LIQUIDATING AGENT TO CONDUCT GOING-OUT-OF-BUSINESS SALES, (iii) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND OTHER INTERESTS, AND (iv) GRANTING SECURITY INTEREST TO LIQUIDATING AGENT IN ACCORDANCE WITH AGENCY AGREEMENT;MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF SUSAN STOREY AND ALAN MAZURSKY IN SUPPORT THEREOF**  on each of the interested parties stated on the attached service list:

## SEE ATTACHED SERVICE LIST

by the following means of service:

☒ **BY FEDERAL EXPRESS OR UNITED STATES POSTAL EXPRESS MAIL:  On the** above-mentioned date, I placed a true copy of the above mentioned document(s), in a sealed envelope or package designated by either Federal Express or the United States Postal Service with delivery fees paid or provided for, addressed to the person(s) as indicated above and deposited same in a box or other facility regularly maintained by Federal Express or the United States Postal Service or delivered same to an authorized courier or driver authorized by Federal Express or the United States Postal Service to receive documents.

☒ **(FEDERAL)**   I declare under penalty of perjury that the foregoing is true and correct.

Executed on **May 20, 2003**.

P.J. Marksbury

initials

-41-

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:46 AM

# SERVICE LIST

| | |
|---|---|
| **Strouds Acquisition Corporation**<br>Attn: Susan L. Storey, CEO<br>280 Machlin Court<br>City of Industry, CA 91789 | **U.S. Trustee's Office**<br>725 South Figueroa St., 26th Fl.<br>Los Angeles, CA 90017 |
| **Fleet Retail Finance**<br>Donald E. Rothman, Esq.<br>Three Center Plaza<br>Boston, MA 02108 | **Fog Cutter Capital Group, Inc.**<br>Attn: Corporate Officer<br>11410 SW Jefferson St.<br>Portland, OR 97201-2548 |
| **Fleet Retail Finance, Inc.**<br>Attn: Corporate Officer<br>40 Broad St.<br>Boston, MA 02109 | **Walter W. Cruttenden**<br>4600 Campus Dr.<br>Newport Beach, CA 92660 |
| **Yogananda Foundation**<br>Attn: Corporate Officer<br>4600 Campus Dr.<br>Newport Beach, CA 92660 | **The Bank of Hemet**<br>Attn: Corporate Officer<br>3715 Sunnyside Dr.<br>Riverside, CA 92506 |
| **Hollander Home Fashions**<br>Attn: Jeff Hollander<br>1370 Broadway<br>New York, NY 10018 | **Fieldcrest Cannon Inc.**<br>Attn: Scott Senatore<br>1 Lake Circle Drive<br>Kannapolis, NC 28081 |
| **Veratex**<br>Attn: Saul Sobal<br>14000 Arminta Street<br>Panorama City, CA 91402 | **Enmark Trading Inc.**<br>Attn: Allen Gordon<br>315 S Beverly Drive Ste 406<br>Beverly Hills, CA 90212 |
| **Sheridan Australia**<br>Attn: Barbara Jackson<br>250 Feaster Rd<br>Greenville, SC 29615 | **Park B. Smith Ltd.**<br>Attn: Apurva Muchhala<br>295 Fifth Avenue<br>New York, NY 10016 |
| **Wamsutta**<br>Attn: William Bartelmo<br>136 Grace Ave<br>Lancaser, SC 29720 | **Croscill**<br>Attn: Amy Jones<br>P O Box 30003<br>Durham, NC 27704 |
| **Regal**<br>Attn: William Bartelmo<br>136 Grace Ave<br>Lancaser, SC 29720 | **Creative Bath**<br>Attn: Mathias Meinzinger<br>250 Creative Drive<br>Central Islip, NY 11722 |
| **Pem-America**<br>Attn: Heath Hart<br>230 Fifth Ave Ste 200<br>New York, NY 10001 | **American Pacific**<br>Attn: Diane Taylor<br>3901 Gantz Road Ste A<br>Grove City, OH 43123 |
| **Louisville Bedding**<br>Attn: Mary Jo Kissel<br>10400 Bunsen Way<br>Louisville, KY 40299 | **Pillowtex**<br>Attn: Scott Senatore<br>1 Lake Circle Drive<br>Kannapolis, NC 28081 |

| Custom Comfort<br>Attn: Carol Norquist<br>1701 E Edinger Ave Ste E14<br>Santa Ana, CA 92705 | Sherry Kline<br>Attn: Sam Samani<br>2331 Tubeway Ave<br>City of Commerce CA 90040 |
| Sferra<br>Attn: Paul J Hooker<br>77 Cliffwood Avenue<br>Cliffwood, NJ 07721 | Uma Enterprises Inc.<br>Attn: Moti Kapur<br>1620 S Wilmington Ave<br>Compton, CA 90220 |
| Next Creations/Offis Textiles<br>Attn: Michael Vidra<br>161 West 61st Street<br>New York, NY 10023 | Smith & Johnson Dry Goods Inc.<br>Attn: Apurva Muchhala<br>295 Fifth Avenue<br>New York, NY 10016 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

#86486 v3 - Strouds Revised Mtn re GOB Sale
05/20/2003 8:46 AM